IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 CR 322-2 |
| ) | Judge Robert M. Dow, Jr. |
| EDWARD M. BURKE, *et al.*, ) | |
| (PETER J. ANDREWS) ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT ANDREWS' MOTION FOR DISCLOSURE
OF FAVORABLE EVIDENCE RELATED TO "MATERIALITY"**

Defendant, **PETER J. ANDREWS**, by and through his attorneys, **BLEGEN & GARVEY** and **LELAND SHALGOS**, pursuant to the Fifth and Sixth Amendments to the Constitution of the United States, and the principles enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972), *Agurs v. United States*, 427 U.S. 97, 96 S.Ct. 2392 (1976), and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1986), respectfully moves this Court to require the government to disclose any previously undisclosed evidence or information known to the government or in its possession, custody, or control, the existence of which is known or by the exercise of reasonable diligence may become known, that is favorable to the defendant and is material to the issues of Defendant's guilt, innocence, or sentencing, or which bears upon the credibility of a government witness.

**Background on Discovery Request**

1. Although the government's *Brady* obligations apply to the case in total, this motion specifically addresses a request for evidence and information related to the requirement that the government prove "materiality" for Count Ten of the Superseding Indictment, charging Mr. Andrews with false statements in violation of 18 U.S.C. §1001(a)(2).

2. Via a letter to the government sent more than two months ago, Mr. Andrews has requested discovery on a series of topics related to the "materiality" element of a § 1001 prosecution.[1] Counsel's letter to the government, dated May 26, 2020, is attached hereto as Exhibit A.

3. Without repeating the entirety of the letter, and without limiting the requests made in the letter, the essence of the request is for discovery, including internal communications between agents and prosecutors, shedding light on

---

[1] Count Ten of the Superseding Indictment charges that on November 29, 2018, Mr. Andrews "did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation," in violation of 18 U.S.C. § 1001(a)(2). The alleged false statements are identified as follows:

    i.    ANDREWS denied ever hearing the name of Individual B-1;

    ii.    ANDREWS denied ever hearing the name of Individual B-2;

    iii.    When asked whether he thought BURKE had ever met Individual B-1 and Individual B-2, ANDREWS said, "I don't know. I don't know.";  and

    iv.    When asked whether he remembered dealing with Individual B-1 and Individual B-2, ANDREWS replied, "They may have come in to our office or something. . . . . Maybe, I don't know. I don't recall."

(Docket 30, pp. 47-48).

whether the interview of Mr. Andrews was an effort to obtain information capable of influencing the FBI, or whether it was an effort at "fishing" for a statement that could be used in a § 1001 prosecution of Mr. Andrews. *See*, Exhibit A.

4. The impetus for this discovery request was the government motion to dismiss charges in *United States v. Michael T. Flynn*, Crim. No. 17-232, United States District Court for the District of Columbia. (Docket 198, p. 13). The government's motion to dismiss in the *Flynn* case made unambiguously clear that it is the position of the Department of Justice that, "the materiality threshold . . . prevents law enforcement from fishing for falsehoods merely to manufacture jurisdiction over any statement – true or false – uttered by a private citizen or public official." *Id*. at 13. Because the government's *Flynn* motion also relied in significant part on internal communications between agents and between agents and prosecutors that were produced to the defense in that case, it is apparent that internal communications touching on that subject are discoverable. *Id*. at 3-9 (describing a series of internal FBI communications). It is the defense position that such communications which, for example, reveal whether the agents in this case were not seeking relevant information, but simply fishing for a false statement from Mr. Andrews, would constitute *Brady* material.[2]

5. The government responded to Counsel's letter on August 17, 2020. That letter is attached as Exhibit C. The government's letter does indicate that it is

---

[2] The government's motion to dismiss in *Flynn* is attached hereto as Exhibit B.

3

in the process of conducting a review, and it is possible therefore that the Court's intervention will not be required on this issue.

6. Because the date for the filing of pretrial motions has arrived, however, and because email discussions following the government's letter did not make clear to defense counsel that the government intends to produce the type of material requested by the defense even if it exists, counsel believe the instant motion is necessary. The series of follow-up email discussions regarding counsel's initial letter and the government's response is attached hereto as Exhibit D.

7. In addition, as the Supreme Court stated in *Bagley*, "the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the non-disclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption." *Bagley*, 473 U.S. at 682-683.

**The FBI's Questioning of Andrews**

8. The FBI's questioning of Mr. Andrews, particularly when viewed in light of other investigative activity by the FBI, and in light of the manner in which interviews of other individuals were conducted, provides significant bases to conclude that the Andrews' interview was a fishing expedition, and that further discovery is warranted.

9. The FBI interview of Mr. Andrews was conducted on November 29, 2018, at Mr. Andrews' home, and at approximately 8:00 am. Two agents arrived at Mr. Andrews' home, unannounced, and proceeded to question him. Unbeknownst to

4

Mr. Andrews, the agents recorded the conversation, and the government has produced as discovery the audio recording and a draft transcript.[3]

10. The draft transcript reflects that after identifying themselves, and in response to Mr. Andrews' inquiry as to what the visit was regarding, the agents began their questioning of Mr. Andrews by stating, "We would like to show you a couple pictures and see if you know these individuals." Mr. Andrews allowed the agents in his home, and the agents then stated, "We need your help with these guys. [UI]. Thank you. We need your help with these guys. There are two of them." The agents then proceeded to show photos of Individuals B-1 and B-2 to Mr. Andrews. (Sealed Exhibit E, p. 1)

11. After Mr. Andrews indicated that he did not recognize the individuals in the photographs, the agents proceeded to ask whether he recognized the names of Individuals B-1 and B-2. Mr. Andrews indicated that he did not. *Id.* The agents then provided some information, that Individuals B-1 and B-2 own Burger King restaurants, and asked whether Mr. Andrews thinks Alderman Burke ever met with Individuals B-1 and B-2. Mr. Andrews replied that he does not know. *Id.* at 2-3.

12. The agents next told Mr. Andrews that, "what you don't want to say is no and you actually do know them." Mr. Andrews' response is, "I ah … mean they may have come up to our office or something. Maybe I don't know but I don't

---

[3] Consistent with the protective order in this case, the draft transcript is attached hereto as Sealed Exhibit E. The draft transcript was prepared by the government but has not yet been deemed final by the government or the defense. As such, references to the transcript herein should not be taken as concessions to its accuracy.

recall." Shortly after this statement, Mr. Andrews invokes his right to counsel. *Id.* at 3.

      13.    The conversation between agents and Mr. Andrews continued, with the agents stating, "But you said they had come to your office?" Mr. Andrews responds, "I don't know if it was these people but there were people that came in to our office regarding a development at 41st and Pulaski Burger King regarding that. But I don't know…" The agents then indicated that they wanted to respect Mr. Andrews' desire to have an attorney, and the conversation essentially came to an end. *Id.* at 5-6.

      14.    Discovery material tendered by the government provides a substantial basis to conclude that the FBI questioning of Mr. Andrews was not designed to obtain evidence that would be material to the government's investigation, but rather was a means of obtaining a statement from Mr. Andrews that the government could charge under § 1001. For example, there appears to be no utility to the government's investigation in asking Mr. Andrews to identify photographs of Individuals B-1 and B-2. The government already knew the identity of Individuals B-1 and B-2, had listened in on conversations between them and Alderman Burke, and there is no apparent investigatory benefit to some sort of photo line-up procedure. The agents also did not, "need [Mr. Andrews'] help with these guys." Other agents were interviewing Individuals B-1 and B-2 in Texas on the same day.[4]

---

[4] The time of the interview of Individuals B-1 & B-2 is not revealed by the report of the interview.

15. Moreover, although it happened nearly a year and a half prior, the government had surveilled, photographed, and partially listened-in on an in-person meeting at which Mr. Andrews (along with Alderman Burke) and Individuals B-1 and B-2 were present. Thus, the government knew that Mr. Andrews and Individuals B-1 and B-2 had met. Again, there appears to be little to no investigatory benefit in finding out whether Mr. Andrews remembered (eighteen months later) the meeting or the names of the individuals.[5]

16. The manner in which Mr. Andrews was questioned also suggests that the purpose of the interview was to try to elicit a chargeable false statement, as opposed to material information. Unlike the vast majority of the other individuals questioned as part of the government's investigation, the questioning of Mr. Andrews was audio recorded.[6] For example, the initial FBI interview of Individuals

---

[5] *See*, Exhibit B, pp. 17-18. ("Similarly, whether Mr. Flynn did or 'did not recall' (ECF No. 1) communications already known by the FBI was assuredly not material. Under these circumstances, the Government cannot explain, much less prove to a jury beyond a reasonable doubt, how false statements are 'material' to an investigation that—as explained above—seems to have been undertaken only to elicit those very false statements and thereby criminalize Mr. Flynn. Although it does not matter that the FBI knew the truth and therefore was not deceived by Mr. Flynn's statements, *see United States v. Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011), a false statement must still "be capable of influencing an agency function or decision," *United States v. Moore,* 612 F.3d 698, 702 (D.C. Cir. 2010) (citations and quotation mark omitted). Even if he told the truth, Mr. Flynn's statements could not have conceivably "influenced" an investigation that had neither a legitimate counterintelligence nor criminal purpose. *See United States v. Mancuso*, 485 F.2d 275, 281 (2d Cir. 1973) ("Neither the answer he in fact gave nor the truth he allegedly concealed could have impeded or furthered the investigation."); *cf. United States v. Hansen,* 772 F.2d 940, 949 (D.C. Cir. 1985) (noting that a lie can be material absent an existing investigation so long as it might "influenc[e] the possibility that an investigation might commence.")).

[6] As far as counsel can glean, only the interview of Codefendant Cui (who was also charged with a 1001 violation) was recorded.

7

B-1 and B-2, conducted the same day as Mr. Andrews interview, was not recorded. The 302 of that interview is attached as Sealed Exhibit F.

17.    The interview of Individuals B-1 and B-2 were also conducted differently and with decidedly different tactics.[7] Although he had personally met with Alderman Burke on at least three occasions (a meeting at the location of the restaurant on June 14, 2017, a lunch meeting at the Beverly Country Club that same day, and a Union League Club lunch meeting on December 12, 2017), Individual B-1 told the FBI that he did not recognize Alderman Burke when the Alderman's driver's license photo was first shown to him.  (Sealed Exhibit F, p. 1) Rather than document that statement and move on, the FBI instead told Individual B-1 that it was conducting an investigation, and that Alderman Burke was the subject of that investigation.[8] After he was provided this information, Individual B-1 viewed the photograph a second time and then indicated that he recognized Alderman Burke and recalled meeting with him in Chicago. *Id.*

18.    In addition, despite having met with Mr. Andrews on one occasion (the same June 14, 2017, meeting referenced above), Individual B-1 told the FBI that he did not recognize a photograph of Mr. Andrews when shown to him.  *Id.*  Individual B-1 told the FBI that he remembered Mr. Andrews' name.  But, his recollection of Mr. Andrews' name came only after he was played a recorded phone call between

---

[7] The meeting was also conducted jointly, meaning Individuals B-1 & B-2 were interviewed together.

[8] In contrast, when Mr. Andrews asked what the FBI's visit was regarding, the agents told him they wanted to see if he knew the people in photographs and that "we need your help with these guys."  (Sealed Exhibit E, p. 1).

Alderman Burke and Mr. Andrews, and only after he heard the identities of the call's participants. *Id*. at 2.[9]

19. The FBI concluded the interview of Individuals B-1 and B-2 by serving them with grand jury subpoenas. No false statement charges from that interview have been filed.

**Request for Favorable Evidence**

20. While the above facts gleaned from discovery strongly suggest that the interview of Mr. Andrews was not a search for "material" information, but was instead an effort at fishing for a false statement, there may well be more information on that topic which is favorable to the defense and is solely within the government's province to uncover and disclose. The defense, for example, does not have access to the agents 'communications with each other and with prosecutors where the motivation for or tactics to be used in the interview of Mr. Andrews may have been discussed. The Court should order that the government search for and disclose any and all evidence consistent with Mr. Andrews' request set forth in Exhibit A.

21. There has, of course, been significant public debate regarding the propriety of the government's motion to dismiss in *Flynn*. *See, e.g.*, Kimberley A. Strassel, *FBI's Flynn Outrage: New Documents Shock the Conscience and Demonstrate the Need for Accountability*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/the-fbis-flynn-outrage-11588288438; George T.

---

[9] In what appears to be an effort to help Individuals B-1 & B-2 recall people and events, the FBI also played several audio recordings for them.

Conway III and Lawrence S. Robbins, *No Serious Lawyer Would Argue What Trump's Justice Department is Arguing*, The Washington Post, (Aug. 18, 2020), https://www.washingtonpost.com/opinions/2020/08/18/justice-departments-extreme-legal-arguments-are-costing-it-court/. What should not be subject to debate, however, is that the law should apply to all Americans equally, regardless of who they are or the subject matter of their case. That principle is, in fact, embodied in the Department of Justice mission statement, "[t]o enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and *to ensure fair and impartial administration of justice for all Americans*." *See*, https://www.justice.gov/about (emphasis added).

22. There cannot be one set of rules for defendants like Michael Flynn and another set of rules for those like Mr. Andrews. The position of the Department of Justice is clear – "materiality" prevents "law enforcement from fishing for falsehoods merely to manufacture jurisdiction over any statement – true or false – uttered by a private citizen or public official." If there is evidence supporting that this is what the FBI did with regard to Mr. Andrews, the government should be required to provide it.

Respectfully submitted,

**s/Patrick W. Blegen**
**Patrick W. Blegen**


**s/Leland Shalgos**
**Leland Shalgos, Attorneys for**
**Defendant Peter J. Andrews.**

**Blegen & Garvey**
53 West Jackson Boulevard,
Suite 1424
Chicago, Illinois 60604
(312) 957-0100

**Leland Shalgos**
2650 West 51st Street
Chicago, Illinois 60632
(773) 925-1700