# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **MICHAEL T. FLYNN,** | **Crim. No. 17-232 (EGS)** |
| **Defendant** | |

## GOVERNMENT'S MOTION TO DISMISS THE CRIMINAL INFORMATION AGAINST THE DEFENDANT MICHAEL T. FLYNN

The United States of America hereby moves to dismiss with prejudice the criminal information filed against Michael T. Flynn pursuant to Federal Rule of Criminal Procedure 48(a). The Government has determined, pursuant to the *Principles of Federal Prosecution* and based on an extensive review and careful consideration of the circumstances, that continued prosecution of this case would not serve the interests of justice.

Mr. Flynn entered a guilty plea—which he has since sought to withdraw—to a single count of making false statements in a January 24, 2017 interview with investigators of the Federal Bureau of Investigation ("FBI"). *See* ECF Nos. 3-4. This crime, however, requires a statement to be not simply false, but "materially" false with respect to a matter under investigation. 18 U.S.C. § 1001(a)(2). Materiality is an essential element of the offense. Materiality, moreover, requires more than mere "relevance" or relatedness to the matter being investigated; it requires "probative weight," whereby the statement is "reasonably likely to influence the tribunal in making a determination *required to be made*." *United States v. Weinstock*, 231 F.2d 699, 701 (D.C. Cir. 1956) (emphasis added).

**Exhibit B**

After a considered review of all the facts and circumstances of this case, including newly discovered and disclosed information appended to the defendant's supplemental pleadings, ECF Nos. 181, 188-190,[1] the Government has concluded that the interview of Mr. Flynn was untethered to, and unjustified by, the FBI's counterintelligence investigation into Mr. Flynn—a no longer justifiably predicated investigation that the FBI had, in the Bureau's own words, prepared to close because it had yielded an "*absence* of *any* derogatory information." Ex. 1 at 4, FBI FD-1057 "Closing Communication" Jan. 4, 2017 (emphases added). The Government is not persuaded that the January 24, 2017 interview was conducted with a legitimate investigative basis and therefore does not believe Mr. Flynn's statements were material even if untrue. Moreover, we not believe that the Government can prove either the relevant false statements or their materiality beyond a reasonable doubt.

"A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal criminal law to a particular set of circumstances. . . ." Justice Manual § 9-27.001. In the Government's assessment—mindful of the high burden to prove every element of an offense beyond a reasonable doubt, and that "government prosecutors have a duty to do justice," *United States v. Darui*, 614 F. Supp. 2d 25, 37 (D.D.C. 2009)—continued prosecution of the charged crime does not serve a substantial federal interest. The Government respectfully moves to dismiss the criminal information with prejudice against Mr. Flynn.

---

[1] This review not only included newly discovered and disclosed information, but also recently declassified information as well.

Exhibit B

## **FACTUAL BACKGROUND**

The FBI opened a counterintelligence investigation into Mr. Flynn on August 16, 2016, "as part of the larger Crossfire Hurricane umbrella" investigation into the presidential campaign of Donald J. Trump and its possible coordination with Russian officials to interfere with the 2016 presidential election. Ex. 1 at 3; Ex. 2 at 1-2, FBI FD-1057, "Opening of the CROSSFIRE RAZOR Investigation," Aug. 16, 2016. Code-named "Crossfire Razor," the investigation's stated "goal" was to determine whether Mr. Flynn "was directed and controlled by and/or coordinated activities with the Russian Federation in a manner which is a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, 18 U.S.C. § 951 *et seq.*, or other related statutes." Ex. 1 at 2; Ex. 2 at 2.

In addition to the predication for opening Crossfire Hurricane, which did not specifically identify Mr. Flynn, the FBI predicated the counterintelligence investigation of him on "an articulable factual basis" that consisted of three facts: Mr. Flynn's service as a foreign policy advisor to the Trump campaign, his publicly documented connection to state-affiliated Russian entities, and the fact that he had traveled to Russia in December 2015. Ex. 1 at 3-4; Ex. 2 at 1-2. After approximately four months of investigation, however, the FBI "determined that [Mr. Flynn] was no longer a viable candidate as part of the larger Crossfire Hurricane umbrella case" and prepared to close the investigation. Ex. 1 at 3. At some point prior to January 4, 2017, the FBI drafted a "Closing Communication" to effect the termination of the case. *See* Ex. 1; Ex. 3 at 2, FBI FD-302, Interview of Mary McCord, July 17, 2017 (Date of Entry: Aug. 10, 2017). This document noted the specific "goal" and predication for the investigation. Ex. 1 at 2. It laid out the numerous searches of holdings and investigative steps that had at each step yielded "*no derogatory information*" on Mr. Flynn. Ex. 1 at 2-3 (emphasis added); *see also id.* at 5 (noting

Exhibit B

"the absence of any derogatory information or lead information"). It stated that the investigation had failed to produce "*any* information on which to predicate *further* investigative efforts." *Id.* at 3 (emphases added). And it noted that no interview of Mr. Flynn was required "as part of the case closing procedure," before concluding: "The FBI is closing this investigation." The document also stated: "If new information is identified or reported to the FBI regarding the activities of CROSSFIRE RAZOR, the FBI will consider reopening the investigation if warranted." *Id.* at 4. The document had not been approved, however, as of January 4, 2017. *See* Ex. 7 at 1-2, FBI Electronic Communications and Lync Messages (1/4/17; 1/23/17; 1/24/17; 2/10/17).

Before the intended case closing took effect, the FBI learned of communications between Mr. Flynn and Russian ambassador Sergey Kislyak that had taken place in late December 2016 and which touched on matters of foreign policy. *See* Ex. 3 at 2; Ex. 5 at 3-5, *FBI Counterintelligence Investigations*: Permanent Select Comm. on Intelligence, Statement of FBI Director James Comey, Mar. 2, 2017; Ex. 6 at 3-5, FBI FD-302, Interview of Michael Flynn, Jan. 24, 2017 (Date of Entry: Feb. 10, 2017). By this time, Mr. Flynn had already been named by President-Elect Trump as his incoming National Security Advisor. *See* Ex. 3 at 3; Bryan Bender, *Trump Names Mike Flynn National Security Adviser*, Politico (Nov. 17, 2016), *available at* https://www.politico.com/story/2016/11/michael-flynn-national-security-adviser-231591.

The FBI had in their possession transcripts of the relevant calls. *See* Ex. 5 at 3; Ex. 13 at 3, FBI FD-302, Interview of Peter Strzok, July 19, 2017 (Date of Entry: Aug. 22, 2017). Believing that the counterintelligence investigation of Mr. Flynn was to be closed, FBI leadership ("the 7th Floor") determined to continue its investigation of Mr. Flynn on the basis of these calls, and considered opening a new criminal investigation based solely on a potential

4

Case 1:17-cr-00232-EGS Document 198 Filed 05/07/20 Page 5 of 20

violation of the Logan Act, 18 U.S.C. § 953. *See* Ex. 3 at 2-3; Ex. 7 at 1-2; Ex. 8 at 1-5, FBI E-mails RE: Logan Act Jan. 4, 2017. Yet discussions with the Department of Justice resulted in the general view that the Logan Act would be difficult to prosecute. Ex. 3 at 2-3; Ex. 4 at 1-2, FBI FD-302, Interview of Sally Yates, Aug. 15, 2017 (Sept. 7, 2017); Ex. 5 at 9. The FBI never opened an independent FBI criminal investigation.

On January 4, 2017, FBI Deputy Assistant Director Peter Strzok learned that "RAZOR's closure" had not been timely executed, and the counterintelligence investigation into Mr. Flynn was, unexpectedly, still formally open. Ex. 7 at 1-2. Mr. Strzok immediately relayed the "serendipitously good" news to Lisa Page, the Special Counsel to FBI Deputy Director Andrew McCabe, remarking that "our utter incompetence actually helps us." *Id.* at 1. Ms. Page reacted with surprise and relief. *Id.* Mr. Strzok, moreover, instructed agents to "keep it open for now" at the behest of "the 7th Floor." *Id.* Mr. Strzok indicated that there was a "[n]eed to decide what to do with him." *Id.* Other internal FBI messages from that afternoon reflect apparently related conversations about a potential "interview." *See id.* at 2 ("i heard pete say, 'Andy and [redacted] will interview....."). As of January 4, 2017, then, the FBI kept open its counterintelligence investigation into Mr. Flynn based solely on his calls with Kislyak—the only new information to arise since the FBI's determination to close the case. *See* Ex. 3 at 2; Ex. 5 at 5.

On January 12, 2017, the *Washington Post* reported the December 29 communications between Mr. Flynn and the Russian ambassador. *See* David Ignatius, *Why Did Obama Dawdle on Russia's Hacking*, Wash. Post, Jan. 12, 2017. The next day, January 13, Sean Spicer, the spokesperson for the Trump transition, clarified that the communications had involved only logistics, which seemed to contradict the nature of the calls. Ex. 4 at 2. On January 15, Vice

Exhibit B

President-Elect Mike Pence stated in a news interview that Mr. Flynn had suggested that his conversation with Kislyak did not relate to sanctions. Ex. 3 at 4; Ex. 4 at 2-3; Ex. 5 at 4-5.

Around this time, FBI Director James Comey advised DOJ leadership of its investigation into Mr. Flynn, and senior officials at both the FBI and DOJ had concerns that the incumbent White House officials' descriptions of Mr. Flynn's calls with Kislyak were not accurate. Ex. 3 at 4; Ex. 4 at 2-3; Ex. 5 at 4-5. FBI Director Comey took the position that the FBI would not notify the incoming Trump administration of the Flynn-Kislyak communications. Ex. 3 at 4-5; Ex. 4 at 4. Deputy Attorney General Sally Yates and other senior DOJ officials took the contrary view and believed that the incoming administration should be notified. Ex. 3 at 4-5; Ex. 4 at 4. Deputy Attorney General Yates and another senior DOJ official became "frustrated" when Director Comey's justifications for withholding the information from the Trump administration repeatedly "morphed," vacillating from the potential compromise of a "counterintelligence" investigation to the protection of a purported "criminal" investigation. Ex. 3 at 5; *compare* Ex. 5 at 5 ("[W]e had an open counterintelligence investigation on Mr. Flynn"), *with* Ex. 4 at 4 ("Comey had said something to the effect of there being an 'ongoing criminal investigation'"). The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the incoming Trump administration of what had actually been said on the calls. Ex. 3 at 5. FBI Director Comey continued to refuse to brief the White House in a subsequent conversation with CIA Director John Brennan. *Id.*; Ex. 5 at 5-6. On January 23, 2017, then Acting Attorney General Yates met with senior DOJ officials, and they again discussed the need to press the FBI to notify the White House. Ex. 3 at 5; Ex. 4 at 4.

Exhibit B

Matters came to a head on January 24, 2017.  That morning, Yates contacted Director Comey to demand that the FBI notify the White House of the communications.  Ex. 3 at 5; Ex. 4 at 4.  Director Comey did not initially return her call.  Ex. 4 at 4.  When Director Comey called her back later that day, he advised her that the FBI agents were already on their way to the White House to interview Mr. Flynn.  Ex. 3 at 5; Ex. 4 at 4.  Acting Attorney General Yates was "flabbergasted" and "dumbfounded," and other senior DOJ officials "hit the roof" upon hearing of this development, given that "an interview of Flynn should have been coordinated with DOJ." Ex. 3 at 6; Ex. 4 at 5.

In fact, in the preceding days, senior officials at the FBI had been engaged in discussions about how to approach Mr. Flynn and whom to notify.  *See* Ex. 9, FBI E-mails, Jan. 21-24, 2017. On January 21, 2017, Mr. Strzok proposed to Bill Priestap, the FBI's counterintelligence chief, that Mr. Flynn should be given a "defensive briefing" about an investigation under the Crossfire Hurricane umbrella or alternatively an "interview under light 'defensive briefing' pretext."  *See* Ex. 9 at 1.  Mr. Strzok also noted that DOJ might "direct[] us" to inform "VPOTUS or anyone else," speculating that this could lead to the "WH specifically direct[ing] us not to" speak with Mr. Flynn.  *Id.*  On January 22, 2017, a FBI attorney emailed Mr. Strzok and Ms. Page that "if we usually tell the WH, then I think we should do what we normally do," though the official also noted that they could be "told not to [] debrief or interview Razor."  *Id.* at 2.

In advance of the interview, Director Comey determined that they would go interview Mr. Flynn the following day without notifying either DOJ or the White House.  Ex. 3 at 5-6; Ex. 4 at 4-5; Ex. 5 at 6.  In a December 2018 interview with MSNBC and NBC News analyst Nicolle Wallace, he stated this course of action was "something we, I probably wouldn't have done or gotten away with in a [] more organized administration."  *See* Interview by Nicolle Wallace with

Exhibit B

James Comey, Dec. 10, 2018, 14:31-14:55; https://www.youtube.com/watch?v=9xqGu66D6VU.
Messages between Mr. Strzok and Ms. Page on January 23, 2017, indicated that "Bill" had
conducted "several conversations with Andy [McCabe]" because "he wanted to know why we
had to go aggressively doing these things, openly." Ex. 7 at 2.

On the morning of January 24, 2017, follow-up messages between Mr. Strzok and Ms.
Page indicated that "Bill … brought [it] up – again, this time in front of D[irector Comey]" and
that Deputy Director McCabe was "frustrated" and "cut him off." Ex. 7 at 3.[2] In any event, that
morning, Deputy Director McCabe called Mr. Flynn to arrange the interview. *See* Ex. 11,
Deputy Director Andrew McCabe, Untitled Memorandum, January 24, 2017. He explained that
recent media statements about his contacts with Kislyak merited a "sit down" and expressed the
FBI's desire to accomplish the interview "quickly, quietly and discretely as possible." *Id.*
Deputy Director McCabe further advised that if Mr. Flynn wished to have anyone else at the
meeting, including the White House Counsel, the FBI would have to elevate the issue to DOJ.
*Id.* Mr. Flynn, himself a former Director of the Defense Intelligence Agency, stated that he
readily expected that the FBI already knew the contents of his conversations with the
ambassador, stating: "you listen to everything they say." *Id.* Mr. Flynn then agreed to meet with
the interviewing agents in his office less than two hours later. *Id.*

Mr. Flynn was "unguarded" in the interview and "clearly" viewed the agents as "allies."
Ex. 13 at 3. When interviewing Mr. Flynn, Mr. Strzok and the other agent "didn't show him the

---

[2] Priestap's notes dated January 24 state, "What's our goal? Truth/Admission or to get him to
lie, so we can prosecute him or get him fired?" On the same paper, Priestap wrote, "If we're
seen as playing games, WH will be furious. Protect our institution by not playing games." Ex.
10, FBI Handwritten Note, Jan. 23/24, 2017. Another note stated, "We regularly show subjects
evidence, with the goal of getting them to admit their wrongdoing. I don't see how getting
someone to admit their wrongdoing is going easy on him." *See id.*

Exhibit B

transcripts" of his calls. Ex. 5 at 7; *see also* Ex. 3 at 6; Ex. 4 at 5; Ex. 6. Nor did the agents give,

at any point, warnings that making false statements would be a crime. Ex. 3 at 6; Ex. 4 at 5; Ex.

9 at 5-6; *see also* Ex. 6. According to the FBI agents' recollections, when asked if Mr. Flynn

recalled any conversation in which he encouraged Kislyak not to "escalate the situation" in its

response to American sanctions, Mr. Flynn responded uncertainly, stating, "Not really. I don't

remember. It wasn't, 'Don't do anything.'" Ex. 6 at 5. Mr. Flynn also stated that although it

was possible, he did not recall any conversation in which the ambassador stated that Russia

would moderate its response due to Mr. Flynn's request. *Id.* He stated that he did not have a

long conversation with Mr. Kislyak to "don't do something." *Id.*

Meanwhile, when asked if he recalled asking countries to take certain actions on the

United Nations vote on Israeli settlements, Mr. Flynn explained that the conversations were

"along the lines of where do you stand and what's your position" and that "he did not believe his

calls to the various countries would change anything." *Id.* at 4. He also stated that his calls did

not involve any requests for how to vote, and answered "no" when asked if he discussed

delaying or defeating the vote. *See id.* at 4. The FD-302, moreover, indicates that Mr. Flynn

denied that Kislyak described any Russian request to his response. *Id.*; *see* Ex. 12, FBI

Handwritten Notes of Michael Flynn Interview (January 24, 2017).

After the interview, the FBI agents expressed uncertainty as to whether Mr. Flynn had

lied. *See* Ex. 4 at 5. FBI agents reported to their leadership that Mr. Flynn exhibited a "very sure

demeanor" and "did not give any indicators of deception." Ex. 13 at 3. Both of the agents "had

the impression at the time that Flynn was not lying or did not think he was lying." *Id.* When

Director Comey was asked, based on his evaluation of the case: "Do you believe that Mr. Flynn

Exhibit B

lied?" Director Comey responded: "I don't know.  I think there is an argument to be made he

lied.  It is a close one."  Ex. 5 at 9.

On November 30, 2017, the Special Counsel's Office filed a criminal information against

Mr. Flynn charging him with a single count of making false statements in violation of 18 U.S.C.

§ 1001(a)(2).  ECF No. 1.  Mr. Flynn pleaded guilty to that offense, *see* ECF Nos. 3-4, but

moved to withdraw that guilty plea on January 14, 2020, ECF Nos. 151, 154, 160.  On January

29, 2020, Mr. Flynn also filed a "Motion to Dismiss Case for Egregious Government Misconduct

and in the Interest of Justice," ECF No. 162, and supplemented that motion on April 24 and 30,

2020 based on additional disclosures, *see* ECF Nos. 181, 188-190.  Both Mr. Flynn's motion to

withdraw his guilty plea and motion to dismiss the case remain pending before the Court.[3]

## LEGAL BACKGROUND

Federal Rule of Criminal Procedure 48(a) permits the Government, "with leave of court,"

to "dismiss an indictment, information or complaint."  Fed. R. Crim. P. 48(a).  It is also "well

established that the Government may move to dismiss even after a complaint has turned into a

conviction because of a guilty plea." *United States v. Hector*, 577 F.3d 1099, 1101 (9th Cir.

2009) (collecting cases); *see also Rinaldi v. United States*, 434 U.S. 22, 31 (finding an abuse of

discretion to refuse to grant post-conviction Rule 48(a) motion).

When the Government so moves, the role for courts addressing Rule 48(a) motions is

"narrow" and circumscribed.  *United States v. Fokker Servs.*, *B.V.*, 818 F.3d 733, 742 (D.C. Cir.

2016).  The "leave of court" provision serves "primarily to guard against the prospect that

dismissal is part of a scheme of 'prosecutorial harassment' of the defendant" through repeated

---

[3] On May 7, 2020, defense counsel confirmed with the prosecution team that upon the
Government filing this motion to dismiss, the defense would move to withdraw all pending
defense motions without prejudice.

Exhibit B

prosecutions—a prospect not implicated by, as here, a motion to dismiss with prejudice. *Id.* at 742 (citing *Rinaldi*, 434 U.S. at 29 n.15); *see also In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (no such concerns where "[t]he government wants to dismiss the civil rights count with prejudice, and that is what [the defendant] wants as well").

The discretion accorded the DOJ under Rule 48(a) recognizes that "decisions to dismiss pending charges … lie squarely within the ken of prosecutorial discretion" and "'at the core of the Executive's duty to see to the faithful execution of the laws.'" *Fokker Servs.*, 818 F.3d at 741 (citation omitted); *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). As the Supreme Court has explained, the factors relevant to carrying forward with a prosecution, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," are "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985).

For those reasons, a court should not deny the Government's motion to dismiss "based on a disagreement with the prosecution's exercise of charging authority," such as "a view that the defendant should stand trial" or "that more serious charges should be brought." *Fokker Servs.*, 818 F.3d at 742-43. Nor should a court second-guess the Government's "conclusion that additional prosecution or punishment would not serve the public interest." *Id.* at 743; *see also In re United States*, 345 F.3d at 453 ("We are unaware … of any appellate decision that actually upholds a denial of a motion to dismiss a charge" on grounds that dismissal would not serve the "public interest.").

Exhibit B

## DISCUSSION

Based on an extensive review of this investigation, including newly discovered and disclosed information attached to the defendant's supplemental pleadings, *see* ECF Nos. 181, 188-190, the Government has concluded that continued prosecution of Mr. Flynn would not serve the interests of justice.

Under the *Principles of Federal Prosecution*, the Government should not prosecute a defendant "unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact."  Justice Manual 9-27.220.  "A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal criminal law to a particular set of circumstances. . . ."  Justice Manual 9-27.001.  The particular circumstances of this case militate in favor of terminating the proceedings:  Mr. Flynn pleaded guilty to making false statements that were not "material" to any investigation.  Because the Government does not have a substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred and that it does not believe it can prove beyond a reasonable doubt, the Government now moves to dismiss the criminal information under Rule 48(a).

Proof of a false statement to federal investigators under Section 1001(a)(2) requires more than a lie.  It also requires demonstrating that such a statement was "material" to the underlying investigation.  *See United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C. 2011).  Section 1001 prohibits "knowingly and willfully ... mak[ing] any *materially* false, fictitious, or fraudulent statement or representation" in a "matter within the jurisdiction of the executive … branch of the Government of the United States." 18 U.S.C. § 1001(a)(2) (emphasis added).  As is well-established, materiality does not equate to mere

Exhibit B

"relevance"; rather, "[t]o be 'material' means to have probative weight"—that is, to be "reasonably likely to influence the tribunal in making a determination *required to be made*." *Weinstock*, 231 F.2d at 701 (emphasis added).

The materiality threshold thus ensures that misstatements to investigators are criminalized only when linked to the particular "subject of [their] investigation." *Kim*, 808 F. Supp. 2d at 59; *cf. Kungys v. United States*, 485 U.S. 759, 774 (1988) (false date and birthplace statements in immigration application were not "material" as they were not "relevant to his qualifications [for citizenship]"). And it prevents law enforcement from fishing for falsehoods merely to manufacture jurisdiction over any statement—true or false—uttered by a private citizen or public official.

In the case of Mr. Flynn, the evidence shows his statements were not "material" to any viable counterintelligence investigation—or any investigation for that matter—initiated by the FBI. Indeed, the FBI itself had recognized that it lacked sufficient basis to sustain its initial counterintelligence investigation by seeking to close that very investigation without even an interview of Mr. Flynn. *See* Ex. 1 at 4. Having repeatedly found "no derogatory information" on Mr. Flynn, *id.* at 2, the FBI's draft "Closing Communication" made clear that the FBI had found no basis to "predicate further investigative efforts" into whether Mr. Flynn was being directed and controlled by a foreign power (Russia) in a manner that threatened U.S. national security or violated FARA or its related statutes, *id.* at 3.

With its counterintelligence investigation no longer justifiably predicated, the communications between Mr. Flynn and Mr. Kislyak—the FBI's *sole* basis for resurrecting the investigation on January 4, 2017—did not warrant either continuing that existing counterintelligence investigation or opening a new criminal investigation. The calls were

Exhibit B

entirely appropriate on their face.  Mr. Flynn has never disputed that the calls were made.

Indeed, Mr. Flynn, as the former Director of Defense Intelligence Agency, would have readily

expected that the FBI had known of the calls—and told FBI Deputy Director McCabe as much.

*See* Ex. 11.  Mr. Flynn, as the incumbent National Security Advisor and senior member of the

transition team, was reaching out to the Russian ambassador in that capacity.  In the words of

one senior DOJ official: "It seemed logical . . . that there may be some communications between

an incoming administration and their foreign partners."  Ex. 3 at 3.  Such calls are not uncommon

when incumbent public officials preparing for their oncoming duties seek to begin and build

relationships with soon-to-be counterparts.

   Nor was anything said on the calls themselves to indicate an inappropriate relationship

between Mr. Flynn and a foreign power.  Indeed, Mr. Flynn's request that Russia avoid

"escalating" tensions in response to U.S. sanctions in an effort to mollify geopolitical tensions

was consistent with him advocating for, not against, the interests of the United States.  At

bottom, the arms-length communications gave no indication that Mr. Flynn was being "directed

and controlled by … the Russian federation," much less in a manner that "threat[ened] …

national security."  Ex. 1 at 2, Ex. 2 at 2.  They provided no factual basis for positing that Mr.

Flynn had violated FARA.  Nor did the calls remotely transform Mr. Flynn into a "viable

candidate as part of the larger … umbrella case" into Russian interference in the 2016

presidential election.  Ex. 1 at 3.

   In any event, there was no question at the FBI as to the content of the calls; the FBI had

in its possession word-for-word transcripts of the actual communications between Mr. Flynn and

Mr. Kislyak.  *See* Ex. 5 at 3; Ex. 13. at 3.  With no dispute as to what was in fact said, there was

no factual basis for the predication of a new counterintelligence investigation.  Nor was there a

Exhibit B

justification or need to interview Mr. Flynn as to his own personal recollections of what had been said.  Whatever gaps in his memory Mr. Flynn might or might not reveal upon an interview regurgitating the content of those calls would not have implicated legitimate counterintelligence interests or somehow exposed Mr. Flynn as beholden to Russia.

Notably, at this time FBI did not open a *criminal* investigation based on Mr. Flynn's calls with Mr. Kislyak predicated on the Logan Act.  *See* Ex. 7 at 1-2.[4]  *See* Ex. 3 at 2-3; Ex. 4 at 1-2; Ex. 5 at 9.  The FBI never attempted to open a new investigation of Mr. Flynn on these grounds.  Mr. Flynn's communications with the Russian ambassador implicated no crime.  This is apparent from the FBI's rush to revive its old investigation rather than open and justify a new one, *see* Ex. 7 at 1-2, as well as its ongoing inability to espouse a consistent justification for its probe in conversations with DOJ leadership, *See* Ex. 3 at 5.  In fact, Deputy Attorney General Yates thought that the FBI leadership "morphed" between describing the investigation into Mr. Flynn as a "counterintelligence" or a "criminal" investigation.  *Id.*

In short, Mr. Flynn's calls with the Russian ambassador—the only new information to arise since the FBI's decision to close out his investigation—did not constitute an articulable factual basis to open any counterintelligence investigation or criminal investigation.  Mr. Strzok

---

[4] Congress first enacted the Logan Act in 1799 to "guard by law against the interference of individuals with the negotiation of our Executive with the Governments of foreign countries." Joseph Gales & William Seaton, *Annals of the Congress of the United States*, 2494 (1851) (quoting 5th Congress, 3d Session); *see also Waldron v. British Petro. Co.*, 231 F. Supp. 72, 89 n.30 (S.D.N.Y. 1964).  The Department of Justice does not appear ever to have brought a prosecution under the statute in the Department's 150-year history, and the Government is aware of only two indictments, in 1803 and 1852, neither of which resulted in a conviction.  In the absence of any history of enforcement or any public guidance concerning the scope of its prohibition, the Department does not believe there was a legitimate basis to investigate and prosecute the designated National Security Advisor of the President-Elect under the Logan Act for communicating with a foreign ambassador and seeking to mollify geopolitical tensions in advance of the inauguration of the next President.

Exhibit B

and Ms. Page apparently celebrated the "serendipitous[]" and "amazing" fact of the FBI's delay in formally closing out the original counterintelligence investigation. Ex. 7 at 1. Having the ability to bootstrap the calls with Mr. Kislyak onto the existing authorization obviated the need for the "7th Floor" of the FBI to predicate further investigative efforts. In doing so, the FBI sidestepped a modest but critical protection that constrains the investigative reach of law enforcement: the predication threshold for investigating American citizens.

Nor did anything about the statements by Vice President Pence or Sean Spicer in mid-January—weeks after the FBI had resolved to resurrect its dormant investigation into Mr. Flynn—provide a separate or distinct basis for an investigation. Had the FBI been deeply concerned about the disparities between what they knew had been said on the calls and the representations of Vice President Pence or Mr. Spicer, it would have sought to speak with them directly, but did not. Whether or not Mr. Flynn had been entirely candid with the future Vice President or Press Secretary did not create a predicate for believing he had committed a crime or was beholden to a foreign power.

The frail and shifting justifications for its ongoing probe of Mr. Flynn, as well as the irregular procedure that preceded his interview, suggests that the FBI was eager to interview Mr. Flynn irrespective of any underlying investigation. As is undisputed, the agents breached the common practice of arranging for the interview through the White House Counsel. *See* Ex. 3 at 5-6; Ex. 4 at 5; Ex. 5 at 6. Deputy Director McCabe effectively discouraged Mr. Flynn from procuring counsel or even notifying the White House Counsel. *See* Ex. 11. The interviewing agents failed to issue the common Section 1001 admonitions about lying to investigators. *See* Ex. 3 at 6; Ex. 4 at 5; Ex. 9 at 5-6; *see also* Ex. 6. Nor did the FBI even notify Acting Attorney General Yates that the interview was happening until the interviewing agents were already *en*

Exhibit B

*route* to Mr. Flynn. *See* Ex. 3 at 5-6; Ex. 4 at 4-5; Ex. 5 at 6. This gambit by the FBI left Yates "flabbergasted" and "dumbfounded." *See* Ex. 3 at 6.

Additionally, prior to the interview, there were internal FBI discussions about whether to show Mr. Flynn the transcripts of his calls with Mr. Kislyak.[5] In light of the fact that the FBI already had these transcripts in its possessions, Mr. Flynn's answers would have shed no light on whether and what he communicated with Mr. Kislyak.—and those issues were immaterial to the no longer justifiably predicated counterintelligence investigation. Similarly, whether Mr. Flynn did or "did not recall" (ECF No. 1) communications already known by the FBI was assuredly not material.

Under these circumstances, the Government cannot explain, much less prove to a jury beyond a reasonable doubt, how false statements are "material" to an investigation that—as explained above—seems to have been undertaken only to elicit those very false statements and thereby criminalize Mr. Flynn. Although it does not matter that the FBI knew the truth and therefore was not deceived by Mr. Flynn's statements, *see United States v. Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011), a false statement must still "be capable of influencing an agency function or decision," *United States v. Moore,* 612 F.3d 698, 702 (D.C. Cir. 2010) (citations and quotation mark omitted). Even if he told the truth, Mr. Flynn's statements could not have conceivably "influenced" an investigation that had neither a legitimate counterintelligence nor criminal purpose. *See United States v. Mancuso*, 485 F.2d 275, 281 (2d Cir. 1973) ("Neither the answer he in fact gave nor the truth he allegedly concealed could have impeded or furthered the investigation."); *cf. United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985) (noting that a

---

[5] Priestap's talking points, prepared in advance of a January 24 morning meeting with McCabe reflect this internal debate.

Exhibit B

lie can be material absent an existing investigation so long as it might "influenc[e] the possibility that an investigation might commence."). Accordingly, a review of the facts and circumstances of this case, including newly discovered and disclosed information, indicates that Mr. Flynn's statements were never "material" to any FBI investigation.[6]

And even if they could be material, the Government does not believe it could prove that Mr. Flynn knowingly and willfully made a false statement beyond a reasonable doubt.[7] Based on the facts of this case, the Government is not persuaded that it could show that Mr. Flynn committed a false statement under its burden of proof. The FBI agents "had the impression that Flynn was not lying or did not think he was lying." Ex. 13 at 4. And the statements in question were not by their nature easily falsifiable. In his interview, Mr. Flynn offered either equivocal ("I don't know") or indirect responses, or claimed to not remember the matter in question. *See United States v. Ring*, 811 F. Supp. 2d 359, 384 (D.D.C. 2011) (holding that "faulty memory" is not enough to establish "willful" lie absent proof the defendant indeed remembered the matter in

---

[6] The statements by Mr. Flynn also were not material to the umbrella investigation of Crossfire Hurricane, which focused on the Trump campaign and its possible coordination with Russian officials to interfere with the 2016 presidential election back prior to November 2016. *See* Ex. 1 at 3; Ex. 2 at 1-2. Mr. Flynn had never been identified by that investigation and had been deemed "no longer" a viable candidate for it. Most importantly, his interview had nothing to do with this subject matter and nothing in FBI materials suggest any relationship between the interview and the umbrella investigation. Rather, throughout the period before the interview, the FBI consistently justified the interview of Flynn based on its no longer justifiably predicated counterintelligence investigation of him alone.

[7] The Government appreciates that the Court previously deemed Mr. Flynn's statements sufficiently "material" to the investigation. *United States v. Flynn*, 411 F. Supp. 3d 15, 41-42 (D.D.C. 2019). It did so, however, based on the Government's prior understanding of the nature of the investigation, before new disclosures crystallized the lack of a legitimate investigative basis for the interview of Mr. Flynn, and in the context of a decision on multiple defense *Brady* motions independent of the Government's assessment of its burden of proof beyond a reasonable doubt.

Exhibit B

question).  Combining the vague substance of the answers, the FBI's own preliminary estimation of Mr. Flynn's truthfulness, the inconsistent FBI records as to the actual questions and statements made, and Director Comey's own sentiment that the case was a "close one," Ex. 5 at 9, the evidentiary problems that have emerged create reasonable doubt as to whether Mr. Flynn knowingly and willingly lied to investigators during the interview.

Mr. Flynn previously pleaded guilty to making false statements.  *See* Def's Plea Agreement, ECF Nos. 3-4.  In the Government's assessment, however, he did so without full awareness of the circumstances of the newly discovered, disclosed, or declassified information as to the FBI's investigation of him.  Mr. Flynn stipulated to the essential element of materiality without cause to dispute it insofar as it concerned not his course of conduct but rather that of the agency investigating him, and insofar as it has been further illuminated by new information in discovery.

"The advocacy function of a prosecutor includes seeking exoneration and confessing error to correct an erroneous conviction."  *Warney v. Monroe Cty..*, 587 F.3d 113, 125 (2d Cir. 2009).  So in the final analysis, irrespective of Mr. Flynn's plea, "prosecutors have a duty to do justice."  *Darui*, 614 F. Supp. 2d at 37; *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980) ("Prosecutors are also public officials; they too must serve the public interest.") (citation omitted).  Federal prosecutors possess "immense power to strike at citizens, not with mere individual strength, but with all the force of government itself."  Robert H. Jackson, The Federal Prosecutor, 24 Judicature 18, 18 (1940) (address delivered at the Second Annual Conference of United States Attorneys, April 1, 1940).  For that reason, "the citizen's safety lies in the prosecutor who … seeks truth and not victims, who serves the law and not factional purposes, and who approaches [the] task with humility."  *Id.*  Based on a careful assessment of the balance

Exhibit B

of proof, the equities, and the federal interest served by continued prosecution of false statements that were not "material" to any bona fide investigation, the Government has concluded that the evidence is insufficient to prove its case beyond a reasonable doubt.  The Government therefore moves to dismiss the criminal information under Rule 48(a).

## **CONCLUSION**

The Government respectfully moves under Rule 48(a) to dismiss the criminal information against Mr. Flynn.

Respectfully submitted,

TIMOTHY SHEA

BY: _____*Timothy Shea*_____
United States Attorney
D.C. Bar No. 472845

Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL T. FLYNN,**

**Defendant**

**Crim. No. 17-232 (EGS)**

**[PROPOSED] ORDER**

On May 7, 2020, the government filed a Motion to Dismiss the Criminal Information Against the Defendant Michael T. Flynn, in which the government moved to dismiss with prejudice the criminal information filed in this case pursuant to Federal Rule of Criminal Procedure 48 and as an exercise of its prosecutorial discretion.

Upon consideration of the request, and for the reasons stated in the government's motion, the government's motion is hereby GRANTED.

It is further ORDERED that criminal information filed in this case will be dismissed with prejudice.

IT IS SO ORDERED.

_____
The Honorable Emmet G. Sullivan
United States District Judge

Exhibit B

# EXHIBIT 1



FD-1057 (Rev. 5-8-10)

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ▮▮ Closing Communication          **Date:** 01/04/2017

**From:** WASHINGTON FIELD
▮▮
     **Contact:** BARNETT WILLIAM J JR, ▮▮

**Approved By:** Joe Pientka III

**Drafted By:** BARNETT WILLIAM J JR

**Case ID #:** ▮▮     ▮▮ CROSSFIRE RAZOR
FOREIGN AGENTS REGISTRATION ACT –
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ▮▮ To document the closing of captioned case.

**Details:**

▮▮ The FBI opened captioned case based on an articulable factual basis that CROSSFIRE RAZOR (CR) may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security. The FBI predicated the investigation on predetermined criteria set forth by the CROSSFIRE HURRICANE (CH) investigative team based on an assessment of reliable lead information received during the course of the investigation. Specifically, CR was cited as an adviser to then Republican presidential candidate DONALD J. TRUMP for foreign policy issues since February 2016; CR had ties to various state-affiliated entities of the Russian Federation, as reported by open source information; and CR traveled to Russia in December 2015, as reported by open source information. Additionally, CR has an active TS/SCI clearance.

Title: ██████████ Closing Communication
Re: ███████████, 01/04/2017


██████████ The goal of the investigation was to determine whether
the captioned subject, associated with the Trump campaign, was directed
and controlled by and/or coordinated activities with the Russian
Federation in a manner which is a threat to the national security
and/or possibly a violation of the Foreign Agents Registration Act, 18
U.S.C section 951 *et seq*, or other related statutes.

██████████ Following the initiation of captioned case, the CH Team
conducted a check of logical databases for any derogatory information
on CROSSFIRE RAZOR. No derogatory information was identified in FBI
holdings.

██████████ The FBI requested that ████████████████████ for
any derogatory information on CROSSFIRE RAZOR. ████████████████████

██████████████████████████████████████████████████████████████████

██████████ The ████ found no derogatory information in their holdings on
CROSSFIRE RAZOR.

██████████ In addition to ████████, the FBI requested that ████████
conduct a search of its holdings for any derogatory information on
CROSSFIRE RAZOR. No derogatory information was reported back to the
FBI.

██████████ The CH investigative team also addressed this
investigation through CHS reporting CROSSFIRE RAZOR for any derogatory
or lead information. As such CH contacted an established FBI CHS to
query about CR. During the debriefing the CHS relayed an incident s/he
witnessed when CROSSFIRE RAZOR (CR) spoke at the ████████ in the
████████. The CHS was unsure of the date, but noted that
CROSSFIRE RAZOR was still in his/her position within the USIC.
[Writer's note: per open source, CR spoke at ████████████ on
███████████] The CHS advised that after CR spoke and socialized with
members of ████████████ at dinner and over drinks, members of ████
████████ got CR a cab to take CR to the train station to bring

2

DOJSCO - 700023467
Exhibit B

Title: Closing Communication
Re: ████████ 01/04/2017

him/her to ██████. The CHS stated that a ████████████
surprised everyone and got into CR's cab and joined CR on the train
ride to ██████. The CHS stated that s/he was somewhat suspicious of
████████, as ███ has been affiliated with several prominent members of
████████ The CHS believes that ████████ father may be a Russian
Oligarch living in ██████. The CHS could not provide further
information on CR and ████████ trip.

████████ The CH investigative team checked ████████ name through
available FBI databases for any derogatory information with negative
results. A formal ████████████████ was submitted to ██████ for
any derogatory information. ████████ reported no derogatory information
in its holdings.

████████ Analysis was conducted on known CR travel. This analysis
utilized records ████████████████████ as well as ████████
and ███ records. In addition to historical travel analysis, the FBI
initiated surveillance on a certain Russian subject
████████████████████████████████████████ to determine
if there was contact between him and CROSSFIRE RAZOR. No contact
between the two individuals was observed by the surveillance teams
covering the event.

████████ In addition to CHS reporting,
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████ Following the compilation of the above information, the CH
team determined that CROSSFIRE RAZOR was no longer a viable candidate
as part of the larger CROSSFIRE HURRICANE umbrella case. A review of
logical ████████ databases did not yield any information on
which to predicate further investigative efforts. While a CHS provided
some information on CR's interaction with ████████ the absence of
derogatory information on ███ limited the investigative value of the
information. The writer notes that since CROSSFIRE RAZOR was not
specifically named as an agent of a foreign power by the original

3

DOJSCO - 700023468
Exhibit B



Title: ▮▮▮▮ Closing Communication
Re: ▮▮▮▮▮ 01/04/2017

CROSSFIRE HURRICANE predicated reporting, the absence of any derogatory
information or lead information from these logical sources reduced the
number of investigative avenues and techniques to pursue. Per the
direction of FBI management, CROSSFIRE RAZOR was not interviewed as
part of the case closing procedure.

▮▮▮▮ The FBI is closing this investigation. If new information is
identified or reported to the FBI regarding the activities of CROSSFIRE
RAZOR, the FBI will consider reopening the investigation if warranted.

◆◆

4

SUBJECT TO PROTECTIVE ORDER

DOJSCO - 700023469

Exhibit B

Case: 1:17-cr-00232-ECS Document 198-3 Filed 05/07/20 Page 1 of 3

# EXHIBIT 2

Exhibit B

FD-1057 (Rev. 5-8-10)

 **OFFICIAL RECORD**

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ▮▮▮▮▮ Opening of the CROSSFIRE RAZOR     **Date:** 08/16/2016
investigation.

**From:** NEW YORK
▮▮▮▮ **Contact:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Approved By:** ▮▮▮▮▮▮▮▮▮▮
STRZOK PETER P II

**Drafted By:** ▮▮▮▮▮▮▮▮▮▮

**Case ID #:** ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ CROSSFIRE RAZOR
FOREIGN AGENTS REGISTRATION ACT –
RUSSIA;
SENSITIVE INVESTIGATIVE MATTER

**Synopsis:** ▮▮▮▮ Opening EC for the CROSSFIRE RAZOR investigation.



**Full Investigation Initiated:** 08/16/2016

**Details:**

▮▮▮▮▮ The FBI is opening a full investigation based on an articulable factual basis that reasonably indicates that CROSSFIRE RAZOR (CR) may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security. The FBI is predicating the investigation on predetermined criteria set forth by the CROSSFIRE HURRICANE investigative team based on an assessment of reliable lead information received during the course of the investigation. Specifically, CR has been cited as an adviser to the Trump team on foreign policy issues February 2016; he has ties to various state-affiliated entities of the Russian

▮▮▮▮▮▮▮▮▮▮

Declassified by FBI - C58W88B61
on 5/4/2020
This redacted version only

Exhibit B

██████████████

Title: ████████ Opening of the CROSSFIRE RAZOR investigation.
Re: ██████████, 08/16/2016

Federation, as reported by open source information; and he
traveled to Russia in December 2015, as reported by open
source information. Additionally, CR has an active TS/SCI
clearance.

████████ The goal of the investigation is to determine
whether the captioned subject, associated with the Trump
Team, is being directed and controlled by and/or
coordinating activities with the Russian Federation in a
manner which may be a threat to the national security and/or
possibly a violation of the Foreign Agents Registration Act,
18 U.S.C section 951 *et seq*, or other related statutes.

████████ As the captioned subject is prominent in a
domestic political campaign, the FBI has categorized this
investigation as a sensitive investigative matter (SIM) and
considered the factors set forth in DIOG 10.1.3. Based on
the facts and circumstances provided to date, the FBI
believes that opening this investigation on captioned
subject is the least intrusive method to addressee the
serious national security risk posed by the activities
alleged.

◆◆

██████████████

Exhibit B

# **EXHIBIT 3**

Exhibit B

FD-302 (Rev. 5-8-10)

- 1 of 12 -



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     08/10/2017

■ MARY McCORD,

■ was interviewed at the Office of the Special Counsel, ■ ■ ,
Washington, DC. Participating in the interview were Special Agents (SAs) ■ and ■
■ , and Office of the Special Counsel attorneys Andrew Goldstein and Elizabeth Prelogar. SA
■ advised McCord that it is a violation of criminal law to lie to the FBI in the course of an
investigation, which McCord acknowledged. After being advised of the purpose of the interview,
McCord provided the following information:

### ■ McCord's Note-Taking Practice

■ McCord took notes on a variety of things, given the scope of her responsibilities. For
example, she took notes at White House meetings in order to be able to debrief others when she
returned from the meetings. On matters related to Russia, she took notes because the topic was
complex and she wanted to remember the details. During phone calls, she took notes on things she
needed to do based on the content of the calls. She didn't take notes in the same notebook every
time, often using whatever was handy. When she was close to leaving her position in the
Department of Justice (DOJ), McCord went back to her various folders and notebooks, pulled out
materials related to Russia, and gave them to her colleague George Toscas to hold on to, assuming
they may be needed at some point in the future.

### ■ Employment History

■ After law school, McCord clerked for U.S. District Court Judge Thomas Hogan for two
years, and then spent two years at the Department of Treasury Office of Legal Counsel. In 1994, she
joined the District of Columbia United States Attorney's Office (DC-USAO). She took a leave of
absence in 1997, when her husband got a job in Japan. When she returned, she went back to the
DC-USAO. In 2001, McCord and her husband left DC and moved to North Carolina, but returned to
the DC area about a year later. When they returned, McCord again went back to the DC-USAO. In



Declassified by FBI-C58W88B61
on 5/6/2020
This redacted version only

| Investigation on | 07/17/2017 | at | Washington, District Of Columbia, United States (In Person) |
|---|---|---|---|

| File # | | Date drafted | 07/20/2017 |
|---|---|---|---|

by

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ____Interview of Mary McCord_____, On 07/17/2017 , Page 2 of 12

2012, McCord became the Criminal Chief, where she remained until May 2014, when she left to go to Main Justice.

McCord started at DOJ as the acting Principal Deputy Assistant Attorney General for the National Security Division (NSD). In August 2014, she became the Principal Deputy Assistant Attorney General, where she remained until October 2016. In October 2016, after John Carlin's departure, McCord served as acting Assistant Attorney General (AAG) for NSD. McCord's last day at DOJ was May 12, 2017. She currently works at the Georgetown University Law Center.

During the time McCord served as the acting AAG, there was no Principal Deputy in place, so she performed the duties of both positions simultaneously. Her duties included assisting in running NSD's various components, which include the Office of Law and Policy, Counterintelligence and Export Control Section, the Appellate Section, and the CFIUS Unit. On occasion, McCord would attend Deputies Committees (DCs) and Principals Committees (PCs) at the White House when Yates was unavailable.

**The FBI Investigation on LTG Mike Flynn**

McCord first learned of the FBI's investigation into Mike Flynn on a phone call with FBI Deputy Director Andy McCabe on January 3, 2017. In that call, McCabe told McCord the FBI had been planning to close their investigation on Flynn before discovering his telephone calls with Russian Ambassador Sergey Kislyak, [                                        ] [McCord referenced page #1 in her notes.]

McCabe explained to McCord that an intelligence product was in the works to address the lack of Russian reaction to the U.S.'s December 2016 sanctions. There was a lot of speculation regarding the minimal response from the Russians which was not "what was expected." While the draft product was in the review stage, [        ] calls between Kislyak and Flynn were discovered, leading analysts to wonder if those calls were related to the lack of response. McCabe described to McCord, based on what he had been told, the content of the calls.

) Page 2 of McCord's notes indicate General Counsel at the Office of the Director of National Intelligence (ODNI) Bob Litt raised the issue of a possible Logan Act violation. McCord was not familiar with the Logan Act at the time and made a note to herself to look it up later.

Also on page 2 of her notes, McCord noted mention of a "referral," and noted that ultimately no referral was required, as the FBI maintained the information and would not refer a matter to themselves. Her notes also indicate that at the time, the individuals at FBI and ODNI that were aware of the issue were Director of National Intelligence James Clapper, Litt (ODNI), Jim Baker (FBI), and Tricia Anderson (FBI).

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of    Interview of Mary McCord    , On  07/17/2017 , Page  3 of 12

███ McCord later learned of the FBI's existing counterintelligence cases on George Papadopoulos, Carter Page, Paul Manafort, and Mike Flynn, which she initially understood were not criminal investigations. McCord later learned of the ongoing Manafort criminal investigation.

███ In the immediate aftermath of learning of the Flynn calls, McCord was not thinking about a criminal investigation. It seemed logical to her that there may be some communications between an incoming administration and their foreign partners, so the Logan Act seemed like a stretch to her. She described the matter as "concerning" but with no particular urgency. In early January, McCord did not think people were considering briefing the incoming administration. However, that changed when Vice President Michael Pence went on Face the Nation and said things McCord knew to be untrue. Also, as time went on, and then-White House spokesperson Sean Spicer made comments about Flynn's actions she knew to be false, the urgency grew.

███ On January 13, 2017, the FBI provided a briefing to DOJ on the background of the Flynn investigation, as well as the other pending related FBI counterintelligence cases. McCord recalled the participants on the FBI side to be Deputy Assistant Director Pete Strzok, Assistant Director Bill Priestap, and possibly attorney Sally Moyer. The DOJ participants were McCord, Toscas, Stu Evans, and maybe Tashina Gauhar. The briefing consisted of the "Crown" material, Flynn, and the cases she had already been briefed on. This was the first time McCord heard about these cases in detail, though she was aware of the ICA. Page 3 of her notes indicate President-Elect Trump was not briefed on the existence of the FBI investigations in his early January briefing on the ICA. [Agent note: ICA refers to the Intelligence Community Assessment entitled "Assessing Russian Activities and Intentions in Recent US Elections."]

███ McCord did not recall what her notation of "Flynn payment" on page 4 of her notes referred to, but surmised it might be related to Russia Today. Also on page 4, McCord made note of a David Ignatius column on Flynn's call and a potential Logan Act violation.

███ McCord recalled that she and others at DOJ queried the FBI as to their investigative plan if the case ended up moving into the criminal sphere, and Priestap relayed that a tasking to develop a plan had gone out.

███ Page 5 of McCord's notes say something to the effect of "re: Flynn. Most pressing as NS Advisor. Need to decide what to do w/it and how to discuss w/ incoming." McCord could not recall specifically what that meant, but thought it was when discussions started on what to do with the Flynn information and how to do it. McCord noted they were not thinking about criminal statutes at that point.

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Mary McCord | , On | 07/17/2017 | , Page | 4 of 12 |

██████          Page 10 of McCord's notes reference a defensive briefing. McCord believed those notes related to a conversation with Priestap in which he said a defensive briefing would be difficult, given it seems as though people within the White House are not being honest with one another. If Flynn was lying to people within the White House and is potentially compromised, the value of a defensive briefing was questionable. McCord thought Priestap was likely thinking from a purely counterintelligence perspective, not criminal.

██████          McCord did not recall exactly when she saw the transcripts of the Flynn calls, but believed she asked to see them after Pence's statements about Flynn on Face the Nation. [Agent note: Pence was on Face the Nation on January 15, 2017.] McCord believed she probably had the transcripts by January 19, 2017, possibly having come over SIPRnet from Strzok. After reading them, she felt they were "worse" than she initially thought; she noted that her recollection of them is that Flynn proactively raised the issue of sanctions, and she feels it is hard to believe he would forget talking about something he raised himself.

## Decision to Notify the White House

██████          Consulting pages 15 and 16 of her notes, McCord recalled an evening unclassified telephone call she had with Yates and Matt Axelrod. McCord was not certain of the timing of the call, but it might have been after Pence was on Face the Nation or after a January 17, 2017 call with McCabe. The three of them discussed what to do with the Flynn information and agreed someone should discuss their concerns with McCabe. They were concerned because at that point, Pence had said something untrue to the American people, and the Russians knew it was untrue. The implications of that were that the Russians believed one of two things – either that the Vice President was in on it with Flynn, or that Flynn was clearly willing to lie to the Vice President. They ultimately decided McCord would make the call to McCabe to discuss their concerns.

██████          When McCord called McCabe, he told her the FBI did not want to compromise their counterintelligence investigation, which is what would happen if the White House was notified. McCord believed her notes on page 15 document their phone call.

██████          Page 17 of McCord's notes relate to another call with McCabe. McCabe relayed to McCord in that call that the FBI was not convinced of a need to notify, the FBI has no "duty" to notify, and the FBI was concerned it would look like a political stunt.

██████          Around January 17 and 18, 2017, prior to the inauguration, McCord and others at DOJ began soliciting views of others in the Intelligence Community on whether or not the incoming administration needed to know about the existence and content of Flynn's calls with Kislyak. The initial DNI view was that they were "comfortable" with the information being shared, but that it was ultimately the FBI's information, so the FBI should make the final decision. There was some

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ██████  Interview of Mary McCord ██████ , On 07/17/2017 , Page 5 of 12

discussion of whether Congressional notification was required, and it was ultimately decided there was no obligation to notify at that point in time. McCord's notes on page 18 indicate that if Congress were to be notified, notification should be to Gang of 8 members only.

██████ Consulting pages 7 and 8 of her notes, McCord believed that on January 19, 2017, Comey was visiting the ODNI, and at that time DOJ was still trying to "drum up support" to notify the White House of the Flynn calls. On a phone call with ODNI attorneys Litt and Brad Brooker that day, it was relayed that the DNI agreed the information should be brought to the attention of the President-Elect and Vice President-Elect, but the primary equity was the FBI's, so they should make the final call. McCord relayed that Yates wanted to be able to say to Comey in a later conversation that the "DNI agrees" with the need to notify, and asked if Clapper and Brennan would call Comey. McCord was told Brennan may have been at the ODNI at the same time (as Comey), and someone would try to arrange for Comey and Clapper to talk. Later, McCord learned that Clapper and Comey talked, but Comey said he would not brief the White House.

██████ Yates and Axelrod were increasingly frustrated with the FBI at this point. One reason for the frustration was their perception that the FBI's perspective on the matter "morphed." Initially, the FBI's resistance to notify was attributed to the desire to protect the FBI's counterintelligence investigation, but later Comey told Yates he was concerned about compromising a criminal investigation. McCord was not sure when the discussion about the criminal investigation occurred, but said it definitely had happened by the week after the inauguration.

██████ McCord "pushed on Andy McCabe" about the FBI's unwillingness to notify the White House. She asked him about the FBI's plan and raised the fact that the DNI and the CIA concurred with the need to notify. She believes the FBI was concerned the FBI would be criticized for appearing to be politically motivated, especially after the reactions to the way the Clinton investigation was handled.

██████ **Flynn Interview by the FBI**

██████ On January 23, 2017, McCord, Yates, Axelrod, and Guahar had a discussion about the Flynn matter, and reinforced their collective position that the White House should be notified. Yates had a conversation with Comey after their discussion, but he did not change his position.

██████ On January 24, 2017, Yates held a meeting in her conference room, attended by McCord, Toscas, Gauhar, Scott Schools, and perhaps others, where Yates said she decided she was going to tell Comey he had to tell the White House Counsel's Office about the Flynn-Kislyak calls. In Yates' view, it was an FBI responsibility. Yates left the room to make the call to Comey and when she returned, reported that Comey told her he just sent FBI Agents to interview Flynn. The

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Mary McCord  , On  07/17/2017 , Page  6 of 12

DOJ group was "flabbergasted." McCord's impression was Yates was "dumbfounded" and didn't ask many questions of Comey in their call. Yates, Axelrod, and others were annoyed that they hadn't had an opportunity to weigh in on the decision or offer any input on the interview strategy.

Following the Flynn interview, Priestap, Strzok, ███ and FBI General Counsel Baker went to DOJ to brief them on the interview. The DOJ attendees included Axelrod, Gauhar, Jim Crowell, Toscas, Stu Evans, and possibly Schools. Strzok provided a readout of the Flynn interview, since he and another agent had conducted it. The FBI's provided rationale for doing the interview was that the existence of the investigation had already leaked, so Flynn was already aware that the information was being discussed publicly and there was no element of surprise. Priestap told the group the goal of the interview was to determine whether or not Flynn was in a clandestine relationship with the Russians. The FBI did not want to insinuate the existence of a criminal investigation to Flynn. To that end, they did not give a Title 18 USC 1001 warning. Toscas raised the issue of the lack of warning, since he and others, after hearing Strzok's description of the interview, thought Flynn lied to the FBI. Toscas also felt there were some loose ends to clean up based on Flynn's answers. However, the FBI position was that there was no need to re-interview at that time.

### ███ ) January 26, 2017 Meeting with White House Counsel's Office

The evening of January 25, 2017, Yates called McCord and said she had decided to brief the White House Counsel's Office on the Flynn matter, wanted to do it the following day, and wanted McCord to go with her. McCord believes Yates wanted McCord to go with her because first, she wanted a witness and second, she wanted that witness to be a career employee, rather than a political appointee.

The next day, McCord reviewed the Flynn transcripts and pulled out excerpts for Yates to reference in the discussion with the White House Counsel's Office, should they be necessary.

On January 26, 2017, McCord accompanied Yates to the White House, where they met with White House Counsel Don McGahn and another attorney from his office, James Burnham. The four of them were the only ones at the meeting. Neither Yates nor McCord took notes, but McGahn and Burnham both had notepads with them during the meeting. McCord is not sure if they actually took notes.

Yates did most of the talking in the meeting, and started the conversation by saying there was something she felt they needed to know about Flynn; in light of Pence's interview on Face the Nation, she wanted them to know that what he'd said about Flynn's calls with the Russians was not true. McGahn asked how Yates knew this, and she explained that ███████

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮▮    Interview of Mary McCord     , On   07/17/2017   , Page   7 of 12

                                                                   She told them
that the conversations made it clear that there were discussions on Russian sanctions in those calls,
contrary to what Vice President Pence had said on TV. Yates explained to them her concerns were
twofold - first, the Vice President needed to know he'd been misled, and second, the Russians
themselves knew that what the Vice President said was not true. This posed a potential compromise
situation for Flynn.

           McGahn asked if Flynn had been interviewed by the FBI and Yates told him that
he had been interviewed two days previously, on Tuesday. McCord got the impression that McGahn
did not know about the interview before Yates told him. He asked where the interview had taken
place, and Yates told him it was in Flynn's White House office. McGahn asked "how'd he do?" and
Yates declined to answer. McCord did not think it was a serious inquiry, but just something he said
because he was shocked and did not know what else to say. McGahn also asked what he could do
with the information, and Yates told him he could do what he needed to do with it. McCord specifically
recalled that McGahn at one point asked something to the effect of, "Would it be okay for me to ask if
you have a criminal investigation?" to which Yates replied, "It's okay for you to ask, but it's not okay
for me to answer."

           McCord remembered Burnham raising the Logan Act, mentioning it was in the
news, but they didn't talk about it at length. McGahn asked if he could talk to Flynn about the matter,
and Yates said he could.

           Toward the end of the conversation, McGahn asked about another case where an
individual had been prosecuted for taking highly classified pictures of a submarine. Flynn knew this
person and had previously openly asked the President to pardon him. McCord thinks someone may
have given them a heads up that this would be raised, as she recalled having looked up the details of
the case prior to their meeting. Yates explained to McGahn the role of the Office of the Pardon
Attorney to McGahn and Burnham in response to their question.

           After about fifteen minutes, the meeting ended.

           Upon returning to the Department of Justice, McCord and Yates debriefed
Axelrod, Schools, Gauhar, Evans, and Toscas. No one from FBI was present - McCord did not think
they told the FBI they were going to tell the White House.

**▮▮▮▮▮▮) January 27, 2017 Meeting with White House Counsel's Office**

Exhibit B



FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Mary McCord | , On | 07/17/2017 | , Page | 8 of 12 |

███████ On January 27, 2017, McCord learned McGahn had asked for a follow-up meeting, and that one had been scheduled for that afternoon. Based on a review of her calendar for that week, McCord believed it was a 2:30 pm meeting.

███████ McCord described the second meeting as "not really significant." She thinks McGahn and Burnham were so dumbstruck the first day, they hadn't had time to fully process the information. Now that they had more time to think about it, they wanted to rehash the material but also to focus on the restrictions on what they could and couldn't do with the information. They may have asked about discussing it with the Vice President in this meeting. Yates reiterated that there were no restrictions on what they could do with the information. The actual ███████ were never shown to them, so there was no need to specify that any particular thing could not be shared.

███████ McGahn asked about getting access to the underlying information, asking "is this something we could see?" Yates responded that they would have to take that question back for discussion. McCord is not sure if Yates characterized the underlying information as "FBI information" but Yates made it clear that the FBI had interviewed Flynn. ████████████████████████ ███████████████████. McGahn or Burnham may have asked if, in doing whatever they needed to do with the information, they should be worried about harming a criminal investigation. Yates responded that she would not discuss criminal violations with them.

███████ McCord said they did not discuss what McGahn and Burnham did with the information provided the previous day. Neither McGahn nor Burnham gave any indication they had talked to anyone else about the information. Based on their discussion and reactions, McCord believed McGahn and Burnham were caught off guard by the information.

███████ McCord did not think anyone at the White House Counsel's Office ever communicated that they didn't believe there was a legal issue, but she did recall them saying something along the lines of not wanting to jeopardize an investigation.

███████ At the conclusion of the meeting, Yates agreed to come back to them with what underlying information could be made available.

### Notification Follow-Up

███████ On January 28, 2017, McCord received an email from Flynn's email account, but signed by John Eisenberg, Deputy Counsel to the President for National Security Affairs. The email stated it was a follow-up to McCord's interactions with McGahn, and asked for a time to have a

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of __Interview of Mary McCord__ , On _07/17/2017_ , Page _9_ of _12_

secure call. Given that the email was from Flynn's email account, McCord opted to not reply to the email directly. She got Eisenberg's email from a contact at the National Security Council and emailed Eisenberg to set up a time to talk the following day.

McCord was initially shocked to receive an email from Flynn's email account. She surmised at the time that Flynn and Eisenberg had been discussing the DOJ notification regarding Flynn and had agreed that Eisenberg would reach out to McCord, and then had accidentally sent the message to her from Flynn's account.

When McCord and Eisenberg connected on the telephone on January 29, 2017, Eisenberg told McCord he had been in Flynn's office prior to his sending the email to McCord and an assistant had switched his and Flynn's telephones when giving them back. He explained they had the same password, so Eisenberg accidentally sent the email to McCord from Flynn's phone. Eisenberg told McCord he would be handling the Flynn matter from that point on.

On January 30, 2017, McCord and Eisenberg had another telephone call, to discuss some follow up issues, but McCord could not recall specifically what those issues were. Also on that day, Yates had a telephone call with McGahn . To McCord's knowledge, Yates did not meet personally with McGahn on January 30, 2017.

On January 30, 2017, McCord, Toscas, Gauhar, and Evans went to the FBI . The DOJ personnel wanted prior to giving access to the White House. FBI personnel in attendance were Strzok, Lisa Page, Priestap, and possibly McCabe.

On January 31, 2017, McCord emailed Eisenberg to tell him the material he had requested was available, and put him in touch with Strzok to coordinate the details.

On February 1, 2017, McCord emailed Eisenberg to ask if he'd been able to get access to the material.

On February 2, 2017, Eisenberg told McCord he was available that day to review the material.

Based on Eisenberg's communications, McCord assumed Eisenberg would be the one reviewing the material. The FBI had the lead on coordinating with Eisenberg, so McCord is not aware of exactly when he reviewed the material, but she had the impression it took a while to happen.

__Vice President Pence's Review of__ __Transcripts__

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Mary McCord | , On | 07/17/2017 | , Page | 10 of 12 |

███████████  McCord recalled McCabe calling her on February 10, 2017. He relayed he had been at the White House, possibly for a Deputies Committee meeting, and as he was leaving, he received a call from his office saying the White House was looking for him. He had not gone far from the White House, so turned around and went back. Once there, he learned that Pence wanted to see the Flynn transcripts. McCabe did not have the transcripts on him, so he returned to the FBI to retrieve them and returned to the White House Situation Room. There, he met with Pence; Pence's Chief of Staff; The President's Chief of Staff, Reince Preibus; and possibly others, and they reviewed the transcripts. Pence, while reviewing, directed his Chief of Staff to get the transcript of his (Pence's) Face the Nation interview, which he then compared to ███████ transcripts. At one point in the meeting, Priebus said he'd seen enough and left the room. McCord was not sure if anyone was with McCabe.

## ██ Flynn's Resignation and Aftermath

██  On February 13, 2017, Flynn resigned from his position as National Security Advisor.

██  On February 16, 2017, McCord participated in a briefing to Acting Attorney General Dana Boente on Flynn and the other Russia-related investigations, to include Papadopoulos, Manafort, and Carter Page. McCord's notes (page 42) reflect that at that time, analysis of Flynn's phone records was nearly done.

██  By that point in time, McCord's understanding is there was both a criminal and a counterintelligence investigation into Flynn. At that point, the Eastern District of Virginia (EDVA) was the central point for criminal process related to the investigations, a decision that had been made by Boente. Prior to that decision, legal process was being handled in other Districts as appropriate. McCord pointed out that if legal process was being used, it was clearly a criminal investigation.

## ██ Additional Contact with White House

███████  At some point in the spring of 2017, the same day the President's Twitter account stated Trump Tower had been tapped, McCord received a call from Eisenberg. He said to her, "What would we have to do to find out if this exists." McCord noted this was a highly unusual request and asked Eisenberg if he was asking her "if this coverage exists." Eisenberg replied, "I guess so." McCord asked Eisenberg to tell her exactly what he was asking for. Eisenberg told her he would send her an article, and he wanted to know if she could tell him if it was true. McCord told Eisenberg she would get back to him. McCord doesn't recall if he sent her an article or if she looked it up on her own, but she recalled reading an article from the Breitbart website on Trump's statements about Trump Tower being tapped. She never heard back from Eisenberg on that matter.

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ____ Interview of Mary McCord ____ ,On 07/17/2017 , Page 11 of 12

(U//FOUO) Later, ODNI attorney Brooker told McCord he'd gotten a similar request and hadn't called Eisenberg back. McCord considered it inappropriate for Eisenberg to ask for information of that nature.

### Congressional Interactions

[Agent note: Pages 53-81 of McCord's notes are various drafts of a document entitled "Talking Points re Crossfire Hurricane Cases." The talking points in the document were drafted in preparation for a Congressional briefing on the FBI's investigations into ties between Russia and members of the Trump campaign. The pages include handwritten comments as well as in "track changes."]

McCord believed that after briefing Boente on the investigation, the topic of a Congressional briefing to the "Gang of 8" was raised. It was decided they should work on a draft to "see what talking points would look like." Given what was already out in the public, it would be hard to not provide some level of information to Congress. The FBI sent over a set of talking points for DOJ review, and the documents went back and forth with various edits. The DOJ Office of Legislative Affairs was involved in the discussions on who should be briefed.

After reviewing the documents, McCord believed the initials "pps" may refer to Strzok, and "SNS" may be Scott Schools. The edits attributed to "NSD" were either made by McCord, Toscas, or Evans. After examining the documents, McCord thinks it is possible she made handwritten edits and then those edits were later entered as track changes.

Page 73 of the handwritten notes indicate McCord had a telephone call with McCabe in which they both agreed that the level of detail in some of the talking points would lead to a lot of follow up questions that they would not necessarily want to address. McCord believes the talking points were eventually pared down.

### Comey Firing and Appointment of Special Counsel

McCord had no advance notice of Comey's termination as FBI Director; she learned about an hour before she was due to give a speech. McCord did not talk to McCabe, Sessions, or Rosenstein about it in the immediate aftermath. She had no part in writing the letters written by AG Jeff Sessions and DAG Rod Rosenstein.

On May 10, 2017, the morning after Comey was fired, McCord attended an investigative update meeting with Rosenstein and others from DOJ. Also present were Brandon Van Grack, Evans, Gauhar, Jim Crowell, and David Laufman. Rosenstein asked them if anyone there thought he should appoint a Special Counsel for the investigation. Laufman responded that he did

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Mary McCord | , On | 07/17/2017 | , Page | 12 of 12 |

not think it necessary, as the prosecutors in DOJ's Counterintelligence and Export Control Section could handle it. Rosenstein followed with something like, "So nobody here thinks I should appoint a Special Counsel?" McCord was the only one who spoke up, and she told Rosenstein that a Special Counsel may not be legally required, but they needed to consider their tolerance for public perception of the impartiality of the investigation.

## Administrative

Copies of McCord's notes from her time as Acting Assistant Attorney General for DOJ NSD were provided by DOJ to SAs ▮ and ▮ on July 13, 2017 (documented in serial 50 of this case file). A subset of those notes was used in the interview of McCord. SA ▮ numbered the pages 1 - 90 for ease of reference; those numbers are used in the text above. The numbered notes will be maintained in the case file.

McCord provided nineteen pages of unclassified emails and a calendar printout, which she had pulled and reviewed in advance of the interview to refresh her memory. Those documents will be maintained in the case file.

Exhibit B

# EXHIBIT 4

Exhibit B

FD-302 (Rev. 5-8-10)

-1 of 12-

OFFICIAL RECORD
Document participants have digitally signed. All signatures have been verified by a certified FBI information system.

[redacted]

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry 09/07/2017

[redacted] SALLY YATES, [redacted] interviewed at the Special Counsel's Office spaces at [redacted], Washington, D.C. Yates was accompanied by her personal counsel, David O'Neil, [redacted] from the law offices of Debevoise & Plimpton. Participating in the interview were FBI Special Agents (SA) [redacted], and Special Counsel's Office attorneys Andrew Goldstein and Elizabeth Prelogar. After being advised of the identities of the interviewing team and the purpose of the interview, Yates provided the following information:

[redacted] **Yates' Awareness of the Flynn-Kislyak calls:**

[redacted] Yates first learned of the December 2016 calls between [LTG Michael] Flynn and [Russian Ambassador to the United States, Sergey] Kislyak on January 5, 2017, while in the Oval Office. Yates, along with then-FBI Director James Comey, then-CIA Director John Brennan, and then-Director of National Intelligence James Clapper, were at the White House to brief members of the Obama Administration on the classified Intelligence Community Assessment on Russian Activities in Recent U.S. Elections. President Obama was joined by his National Security Advisor, Susan Rice, and others from the National Security Council. After the briefing, Obama dismissed the group but asked Yates and Comey to stay behind. Obama started by saying he had "learned of the information about Flynn" and his conversation with Kislyak about sanctions. Obama specified he did not want any additional information on the matter, but was seeking information on whether the White House should be treating Flynn any differently, given the information. At that point, Yates had no idea what the President was talking about, but figured it out based on the conversation. Yates recalled Comey mentioning the Logan Act, but can't recall if he specified there was an "investigation." Comey did not talk

[redacted]

Declassified by FBI-C58W88B61
on 5/6/2020
This redacted version only

Investigation on 08/15/2017 at Washington, District Of Columbia, United States (In Person)

File # [redacted] Date drafted 08/16/2017

by [redacted]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Sally Q. Yates | , On | 08/15/2017 | , Page | 2 of 12 |

about prosecution in the meeting. It was not clear to Yates from where the President first received the information. Yates did not recall Comey's response to the President's question about how to treat Flynn. She was so surprised by the information she was hearing that she was having a hard time processing it and listening to the conversation at the same time.

Upon leaving the White House, Yates called Mary McCord, the Acting Assistant Attorney General for the National Security Division (NSD) at the time, to ask what was going on and why Yates hadn't been aware of it previously. Yates and McCord briefly spoke when Yates returned to DOJ, and McCord had already scheduled a meeting for that afternoon to discuss the Flynn information. Yates kept the previously scheduled afternoon meeting on the calendar. Yates learned McCord and George Toscas had been briefed on the Flynn information by the FBI the day before, and they then told Yates what they knew. Yates could not recall whether DOJ had in their possession

Yates, McCord, and others had a discussion in that meeting about whether this constituted a violation of the Logan Act, but there was no close analysis of the substance of the Flynn-Kislyak discussions. The feeling among NSD attorneys was Flynn's behavior was a technical violation of the Logan Act, but they were not sure this would have a lot of jury appeal, or if pursuing it would be a good use of the power of the Justice Department. Yates had the impression the FBI was more eager to pursue prosecution initially.

**Discussions Regarding Notification to White House**

In early January, DOJ began to "ramp up" their discussions regarding Flynn, in reaction to a David Ignatius column describing the phone calls in early January 2017, followed by a statement by Sean Spicer around January 13, in which Spicer denied there was sanctions talk on the calls and and stated that the Flynn calls were logistical. The false statement by Spicer, which Yates assessed to be the White House "trying to tamp down" the attention, caused DOJ to really start to wonder what they should do.

On January 15, 2017, things "really got hot." On that day, Vice President Pence was on Face the Nation and stated publicly he'd spoken to Flynn and had been told there had been no discussion of sanctions with Kislyak. Yates recalled she was in New York City that weekend, and received a call from McCord notifying her of the

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Sally Q. Yates | , On | 08/15/2017 | , Page | 3 of 12 |

statements. Prior to this, there had been some discussion about notifying the White House, but nothing had been decided. Until the Vice President made that statement on TV, there was a sense that they may not need to notify the White House, because others at the White House may already be aware of the calls.

Following January 15, 2017, discussions regarding Flynn and notification to the White House amplified. Yates described several different combinations of people having conversations about the Flynn case, to include internal DOJ discussion, DOJ/NSD and FBI discussions; DOJ /NSD and the intelligence community; Yates and the Deputy Director of the CIA, David Cohen; Yates and Mike Dempsey from the Office of the Director of National Intelligence; and McCord and the General Counsel at ODNI, Bob Litt. According to Yates, the feeling among the intelligence community was that the White House needed to be notified, because the Vice President was entitled to know he'd been saying something untrue to the public. Yates believed Flynn put the Vice President in a position to lie to the American people, creating a compromise situation for Flynn. As this was happening before the Inauguration, Yates' view was the White House should know what the National Security Advisor had been doing before he was officially "in the chair" and in the job.



Prior to inauguration, Yates recalled a conversation with either Comey or Deputy Director Andy McCabe regarding notification, and recalled that the FBI was resistant to the idea. Yates recalled Comey's view was that no one really knew if the Vice President was aware of the calls. The DOJ response was that they shouldn't assume the Vice President was aware and had knowingly lied. Yates said at the time that DOJ wanted to treat the incoming administration the same as the outgoing, and thinks Comey agreed that if this had happened to the Obama Administration, he would have just called Denis McDonough [Chief of Staff to President Obama]. Yates thought the FBI's position was driven by a sense that the FBI didn't want to mess up future relations with the incoming administration, since "we're going to have to work with these guys."

However, Yates didn't think that was the sole factor in not wanting to notify.

Exhibit B

FD-302a (Rev. 05-08-10)

| | | | | | |
|---|---|---|---|---|---|
| Continuation of FD-302 of | Interview of Sally Q. Yates | , On | 08/15/2017 | , Page | 4 of 12 |

The FBI said at some point that notification would mess up an ongoing investigation, but Yates said it was not always clear what exactly the FBI was doing to investigate Flynn.

In the days immediately leading up to inauguration, Yates was really pushing to notify, while Comey was still very resistant. Yates explained that she understood the criminal equities, but other things should be factored in, such as whether the Logan Act would be prosecuted. It was important to Yates that they all be on the same page and noted that Cohen in particular agreed with her position.

On or around the day before inauguration, there was an event at which Comey, Brennan, and Clapper were all present. Cohen relayed to Yates that Clapper and Brennan were going to pull Comey aside to talk to him about notification at that event. That night, Cohen called her and said Comey had said something to the effect of there being an "ongoing criminal investigation" and notification would interfere with it. Generally, when the Intelligence Community learns of a "criminal investigation," their reaction is to back off and defer to the FBI; . Yates did not herself believe the investigation would be negatively impacted, but Brennan and Clapper backed off after their talk with Comey.

Inauguration day passed without any notification to the White House regarding Flynn, but Yates still felt they had to to figure out what to do.

The Monday following inauguration, Spicer "doubled down" on the Flynn calls. He was "quite emphatic" that Flynn had one call with Kislyak, there were four topics, and sanctions weren't one of them. At that point, Yates decided "enough was enough" and decided it was time to notify the White House. She talked to the trial attorneys in NSD, and they collectively agreed it was more important to notify than to protect any investigation at that point.

The next day, Tuesday, Yates gathered her staff and they discussed notification to the White House. They agreed Yates should be accompanied by Mary McCord, an NSD career attorney and subject matter expert on the topic. Yates placed a call to Comey and the group waited for him to call back. When Comey called later - Yates is not certain now if he was returning her call or placing a new call - he informed her that two agents were on their way to interview Mike Flynn at the White House.

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ██████  Interview of Sally Q. Yates _____ ,On 08/15/2017 ,Page 5 of 12

██████     Yates was very frustrated in the call with Comey. She felt a decision to conduct an interview of Flynn should have been coordinated with DOJ. There were trial attorneys at NSD working with the FBI and it was not "solely" an FBI investigation. In Yates' view, the prosecutors should be involved in coordinating the type of approach and interview questions. ████████████████████████████████████
████████████ She also thought there should have been a discussion about recording the interview. In raising these things with Comey, he said something like "you can understand why I did this," to which Yates replied "no" and Comey responded he didn't want it to "look political." Yates was offended by the implication.

██████  Yates relayed to her team that the FBI was conducting an interview and they "hit the roof." She believed the agents had been tasked to do the interview, likely because of the recent Spicer statements. Yates added the interview was problematic for her because as a matter of protocol and as a courtesy, the White House Counsel's Office should have been notified of the interview. The FBI's approach was inconsistent with how things had been done.

██████  Yates received a brief readout of the interview the night it happened, and a longer readout the following day. The gist of what she was told was that Flynn was very accommodating, but the agents had not confronted him directly with the information ████████ , but he was "nudged" at one point and he said something like "oh, thank you for reminding me." Yates could not recall the specifics of that interaction. Flynn denied having a conversation about sanctions.

██████  Yates did not speak to the interviewing agents herself, but understood from others that their assessment was that Flynn showed no "tells" of lying and it was possible he really did not remember the substance of his calls with Kislyak. On the other hand, the DOJ prosecutors were very skeptical that Flynn would forget the discussion. After the interview NSD asked FBI if they wanted to do another interview, and the FBI said no. McCabe also said as much to McCord. Yates does not know why the FBI did not want to re-interview, but recalled them being pretty emphatic about it. Yates does not recall if they had a discussion on any exposure to 18 USC 1001, but she did remember McCord effectively "cross examining" the statements Flynn made to the interviewing agents as compared to the transcripts.

Exhibit B

FD-302a (Rev. 05-08-10)

<table>
<tr><td>Continuation of FD-302 of</td><td>█████</td><td>Interview of Sally Q. Yates</td><td>,On</td><td>08/15/2017</td><td>,Page</td><td>6 of 12</td></tr>
</table>

████ Yates reiterated that in hearing about the interview, the DOJ prosecutors thought Flynn was lying, but the FBI didn't say he wasn't lying, just that he didn't exhibit any "tells" that he was lying.

████ McCabe told Yates that ████████████████ █, he was convinced Flynn was lying. He noted that Flynn wasn't as engaged in the conversation until the part about the sanctions. NSD told Yates at some point that the interviewing agents hadn't ████████ read the full transcripts prior to the interview.

████ After the readouts of the Flynn interview, DOJ held internal discussions about what to do next, as they still wanted to notify the White House. After confirming the FBI did not want to do a second interview, Yates decided they should notify. She called Comey and told him she was going to notify the White House Counsel about Flynn. She wanted to gauge his reaction to her decision, and Comey said it was a great idea, and agreed a "lawyer to lawyer" talk made sense.

████ Yates acknowledged there was a chance that notifying would have some impact on the investigation, but it was outweighed by the national security concerns.

████ Yates notified Mike Dempsey at ODNI and a woman whose name she could not recall at CIA in advance of her notification to the White House.

### ██ January 26, 2017 White House Notification

████ The morning of January 26, 2017, Yates called Don McGahn, the White House Counsel and told him she had a "sensitive matter" to discuss with him and she couldn't do it over the phone. They agreed to meet that afternoon. Yates and McCord met in McGahn's office with him and one of his associates from the White House Counsel's Office.

████ Yates and McCord did not have ████ transcripts with them, but they took a document that summarized ████ because Yates wanted to be able to give them some examples while they talked. She did not take notes and does not recall if McCord took notes. Her impression is that McGahn's associate took notes, but she does not recall if McGahn took any.

████ Yates set up the conversation by laying out the fact that Flynn's conversation with the Russian Ambassador had been the subject of a lot of interest lately. She mentioned the Vice President's appearance on Face the Nation and Spicer's statements. Yates then explained that they

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Sally Q. Yates | , On 08/15/2017 | , Page 7 of 12 |

knew what the Vice President and Spicer said was not true, and then told them how they knew it.  She told them how they knew, because she didn't want them to think there was a wiretap on Flynn, but she did want them to know they had hard evidence.  She told them that not only did Flynn discuss sanctions, ███████████████████████ and provided specific examples.

████████████ Yates pointed out that Flynn actually made a specific request to Kislyak that the Russians not overreact and that they minimize their response, and Kislyak affirmed he had "taken it to the highest levels" and their response was because of the request.



████████████ The specific asks Flynn was making, and the back and forth between him and Kislyak, were contrary to what was being represented in the media at the time.  Yates added she was not saying the Vice President was being deliberately misleading, and McGahn noted that he could guarantee anything the Vice President said he'd heard directly from Flynn.

████████ Yates also told McGahn Flynn had been interviewed by the FBI that week. McGahn asked Yates "how he did" but Yates declined to answer. She "sort of shrugged" in response and wanted to give the impression that "all was not good." McGahn asked Yates if the FBI's investigation was criminal, and Yates declined to answer.  She added that she wouldn't normally answer that question.

████████ Yates stated it is a violation of the Logan Act for someone not a member of the administration to advocate a position contrary to the current administration position. When asked, Yates recalled the Logan Act

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Interview of Sally Q. Yates  , On 08/15/2017 , Page 8 of 12

definitely came up in her second meeting with McGahn but could not recall if it came up in the first one.

Yates told McGahn the reason they were telling him about the calls was that the underlying conduct itself was problematic, plus Flynn lied to the Vice President, Spicer, and the Chief of Staff, causing those people to in turn lie to the American people. The fact that the Russians were aware of the lie created a compromise situation for Flynn.

Yates explained she was providing the information to McGahn so he could take whatever action he deemed appropriate. She described McGahn and his associate's reactions as "reeling." She cannot recall if they asked her what they could do, but she did not offer a recommendation. She did personally think privately that Flynn would be fired.

At the conclusion of the meeting, which was about thirty minutes, McGahn and his associate thanked them, and Yates and McCord left. Yates and McCord remarked to one another that the meeting "went better than they thought it would." Yates thought McGahn and his associate fully appreciated the seriousness of what was discussed.

Yates was not sure if she expected a follow up to the meeting. She did expect McGahn to ask to read the transcripts , but he didn't in that initial meeting.

Yates does not recall if she called Comey personally to let him know, but she does believe someone at NSD notified someone at FBI.

**January 27,2017 White House Meeting**

On the morning of Friday, January 27, 2017 Yates received a call from McGahn in which he requested another meeting, ideally for that evening. They ultimately scheduled a meeting for late afternoon that day, and Yates again took McCord with her to the White House for the meeting where they met with McGahn and the same associate as the previous day. The second meeting was a distinct "tenor change" from the first. While the first meeting didn't feel adversarial, McGahn started the second meeting with something like, "What's it to DOJ if one White House official lies to another?" Yates was a little taken aback by that and explained again the same reasons for their concern that she had the day before. She told McGahn that there was more to this than one official lying to

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Sally Q. Yates | , On | 08/15/2017 | , Page | 9 of 12 |

another, and Flynn's actions themselves were problematic, especially when followed by lies and the public getting a false statement. Yates described McGahn's initial commentary was as almost as if he was saying "what's the crime?" McGahn said to her at one point something along the lines of "Oh, come on, what are the chances DOJ will prosecute the Logan Act?" Yates' impression was McGahn was trying to let her know he knew the Logan Act had never been prosecuted and was minimizing the seriousness of Flynn's actions. Yates got the sense that McGahn had done some research and clearly knew what the Logan Act was by that point.

Yates told McGahn that putting aside whether or not anyone had been successfully prosecuted for a Logan Act violation, they were missing the point that they had a potential compromise situation with their National Security Advisor.

McGahn asked Yates if Flynn should be fired, and she told him it was not for DOJ to make that call.

McGahn told Yates the White House did not want to take any action that would interfere with the investigation, and she replied that he should not worry about it, that DOJ had made the notification specifically so the White House could act on it. Yates does not recall if she told McGahn the investigation into Flynn was a "criminal" investigation, but she knows at the time there was no official decision on prosecution.

Yates had the impression McGahn was looking for a reason not to act, and DOJ did not want the White House to be able to use the ongoing investigation as an excuse not to act. Yates "really hammered" that the White House could and should act because she wanted to make sure they couldn't use the investigation as a shield.

McGahn asked Yates if the White House could review the transcripts, and she said they were inclined to agree, but would get back to them. At that point, DOJ had already agreed they would probably provide access to the transcripts if asked, but they would need to talk to the FBI.

Yates had no sense of what happened between the two meetings. Yates did not get the impression McGahn was fishing for more information on the investigation, but would have shut down that line of questioning if he had. She doesn't recall whether McGahn asked about 1001 violations or the FBI interview of Flynn in the second meeting. She did not say that DOJ was or wasn't going to prosecute the Logan Act, as she

Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | Interview of Sally Q. Yates | , On | 08/15/2017 | , Page | 10 of 12 |

doesn't think it was decided at that point in time. Yates added she wouldn't have told the White House if it had been decided.

Yates believed McGahn "got it" that they couldn't use the ongoing investigation as a reason not to act on Flynn.

The second meeting, which was shorter in duration than the one the day prior, ended shortly after the request for transcripts.

En route to DOJ, Yates and McCord discussed the transcripts and agreed McCord would talk to the FBI about accessing the transcripts, which McCord would do that weekend.

Upon returning to DOJ, Yates likely told Matt Axelrod about the meeting with McGahn. It's also likely Axelrod and McCord told others about the meeting. Yates is not sure if she told Comey about the second White House meeting herself, but she is sure someone at NSD told someone at the FBI.

Yates was scheduled to spend that weekend in Atlanta, and as she was getting ready to go to her plane, Axelrod called her to let her know about the travel ban that had been announced that afternoon. She spent the rest of her weekend working on issues surrounding that.

Yates was not aware at the time that Comey had dinner with President Trump the evening following her second meeting with McGahn. She first learned about it when Comey testified before Congress in June.

**White House Follow-Up**

On the morning of Monday, January 30, 2017, Yates called McCord, and not reaching him immediately, asked for a call back. McCord had told Yates that the FBI had made the arrangements for the transcript review, so Yates wanted to let McGahn know the transcripts were ready. By the time McGahn called her back that afternoon, Yates had issued a directive to the Department of Justice not to defend the travel ban that had come out the previous Friday, so she assumed McGahn wanted to talk about that. She realized once they started talking that he didn't know about her directive on the travel ban and instead was asking only about the transcripts. Yates told McGahn the transcripts were available but he would need to go to the FBI to review them, and then decided she should tell him about her directive regarding the travel ban. Yates was surprised he didn't know, having assumed the senior administration official at DOJ would have told the White House by then.

Exhibit B

FD-302a (Rev. 05-08-10)

██████████████████

Continuation of FD-302 of    ██████  Interview of Sally Q. Yates    ,On  08/15/2017  , Page  11 of 12

██████████    A few hours after Yates told McGahn about her actions regarding the travel ban, she was fired.

███████████████    Yates was gone by the time the White House reviewed the transcripts, but she heard it was some period of time before they did the review. Her understanding was the arrangement for the review would take place at the FBI.

██████████    Yates was aware of another Flynn related issue happening around the same time, specific to a FARA violation. She was aware NSD attorneys were interacting with Flynn's counsel, but the specifics had not risen to her level at the time. She did not share that information with McGahn.

██████████    Yates did not interact with the media regarding the Flynn-Kislyak calls or her interactions with the White House.

██████████    Yates was surprised Flynn wasn't fired earlier, given the reaction to the first meeting.

██████████    Yates noted her schedule at DOJ might provide some insight into her meetings, but not everything made it to her calendar. Her assistant at the time of her departure was Josh Mogil.

██████████    Yates said Spicer's characterization of her notification to the White House as a "heads up" was not accurate. She believes the notification, along with the way it was done, sent a more deliberate message than merely a "heads up."

██ **Administrative**



Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of      Interview of Sally Q. Yates      , On 08/15/2017 , Page 12 of 12

(U//FOUO) The original Non-Disclosure statements are being maintained in the 1A section of the case file.

Exhibit B

# EXHIBIT 5

Exhibit B

1

FBI COUNTERINTELLIGENCE INVESTIGATIONS


Thursday, March 2, 2017


U.S. House of Representatives,

Permanent Select Committee on Intelligence,

Washington, D.C.


    The committee met, pursuant to call, at 9:20 a.m., in Room

HVC-304, the Capitol, the Honorable Devin Nunes [chairman of the

committee] presiding.


    Present:  Representatives Nunes, Conaway, King, LoBiondo,
Rooney, Ros-Lehtinen, Turner, Wenstrup, Stewart, Crawford, Gowdy,
Stefanik, Hurd, Schiff, Himes, Sewell, Carson, Speier, Quigley,
Swalwell, Castro, and Heck.

    Also Present:  Representative Calvert.

    Staff Present:  Nick Ciarlante, Chief Clerk; William

Declassified by FBI - C58W88B61
on 5/6/2020
This redacted version only

Exhibit B

Flanigan, Professional Staff Member; Scott Glabe, Deputy General Counsel; Lisa Major, Professional Staff Member; Damon Nelson, Staff Director; George Pappas, Senior Advisor; Shannon Stuart, Budget Director; Mark Stewart, General Counsel; Michael Bahar, Minority Staff Director; Wells Bennett, Minority Counsel; Timothy Bergreen, Minority Deputy Staff Director; Carly Blake, Minority Budget Director; Linda Cohen, Professional Staff Member - Minority; Thomas Eager, Associate Professional Staff Member - Minority; Robert Minehart, Minority Senior Advisor; Amanda Rogers-Thorpe, Professional Staff Member - Minority; Rheanne Wirkkala, Professional Staff Member - Minority; Kristin Jepson, Security Director; Jeff Dressler, National Security Advisor for the Speaker; and Wyndee Parker, Senior Policy Advisor for the Minority Leader.

Exhibit B

████████████████

So when the President announced -- that is the completion of the ███ calls.  When the President announced that the United States Government was going to expel Russian diplomats and take the actions to close and to impose sanctions on some of the intelligence leadership in Russia, we obviously were covering very, very closely to see what reaction we would get from the Russians; what are they going to do?  So our analysts were watching ████████████████ all over the country on the Russians.  And so we -- they saw this much more quickly than we normally would, and ████████████████████ ████████████████

And then the Intelligence Community, including the FBI, was surprised when the Russians did nothing in response to the expulsion.  One of the reasons we were ████████████ was to see, how far will they go in retaliating to us, and then what will we do?

And so the last couple days of December and the first couple days of January, all the Intelligence Community was trying to figure out, so what is going on here?  Why is this -- why have the Russians reacted the way they did, which confused us?  And so we were all tasked to find out, do you have anything ████████████ that might reflect on this?  That turned up these calls at the end of December, beginning of January.  And then I briefed it to the Director of National Intelligence, and Director Clapper asked me for copies ████████████████, which I shared with him.

████████████████

Exhibit B

██████████████

In the first week of January, he briefed the President and the Vice President and then President Obama's senior team about what we had found and what we had seen to help them understand why the Russians were reacting the way they did.

We did not disseminate this ███ in any finished intelligence, although our people judged was appropriate, for reasons that I hope are obvious, to have Mr. Flynn's name unmasked. We kept this very close hold, and it was shared just as I described.

I had not briefed the Department of Justice about this, and found myself at the Oval Office on the 5th of January to brief the President on the separate effort that you all are aware of by the Intelligence Community to report on what the Russians had done during the election. And in the course of that conversation, the President mentioned this ███ And that was the first time the Acting Attorney General, Sally Yates, had heard about it. So, immediately after that, I briefed her about what it was. That was on the 6th of January. So that is the first week of January.

Nothing, to my mind, happens until the 13th of January, when David Ignatius publishes a column that contains a reference to communications Michael Flynn had with the Russians. That was on the 13th of January.

And then 2 days later -- I think it is Sunday the 15th of January -- the Vice President is on the Sunday morning shows and says that Flynn had communications with the Russians, but it was

██████████████

Exhibit B

about essentially nothing about sanctions, or nothing substantive.
It was about expressing condolences and -- and I forget what else
he said at that point.  So that is the 15th of January.

So that begins the last week of the Obama administration.
And during that week, the then Acting Attorney General was urging
me to tell the White House that the Vice President's statements
are inaccurate and to give them a heads-up that the statements
that he had made to the public were inconsistent with what we knew
█████████████████████████  And I resisted that, for two reasons.
The first and most important reason is I worried it would step on
our investigative equities.  Our investigative team wanted to
consider, so what else should we do with respect to Mr. Flynn?

And I should have said this at the beginning.  At that point,
we had an open counterintelligence investigation on Mr. Flynn, and
it had been open since the summertime, and we were very close to
closing it.  In fact, I had -- I think I had authorized it to be
closed at the end of January, beginning -- excuse me, end of
December, beginning of January.  And we kept it open once we
became aware of these communications.  And there were additional
steps the investigators wanted to consider, and if we were to give
a heads-up to anybody at the White House, it might step on our
ability to take those steps.

And, second, even if that hadn't been the case, I don't think
the FBI's job is to give prudential heads-ups.  And if the
leadership of the Department of Justice wanted to do that, that

Exhibit B

████████████████████

was certainly fine for them to do, but I didn't think it was
something that I should do.

And then the DNI and the Director of Central Intelligence
Agency, so Mr. Clapper and Mr. Brennan, both approached me on the
19th, the last evening of the Obama administration, and asked me
whether I was going to tell them about what I knew about Mr. Flynn
before they took office, and I said that I was not, given our
investigative equities, and the conversation ended there.

The administration takes office on the 20th, obviously. On
the 24th, I directed agents to go to the White House to interview
Mr. Flynn and had the Deputy Director call Mr. Flynn and say: We
want to send over a couple agents to interview you. Are you
willing to talk to them?

And he said: Sure. Send them over. I will talk to them
right now.

And we sent two of our most experienced counterintelligence
investigators over to the White House. I did not tell the
Department of Justice that I was taking that step until after I
had taken the step. And two experienced agents went over and met
Mr. Flynn alone.

The Deputy Director said: If you want to have somebody else
there, that is fine.

He said: I will meet with them alone.

And he met with the two agents and was interviewed in his
office in the West Wing and said essentially what the Vice

████████████████████

Exhibit B

President had said on television, which is:  I didn't talk to the
Russians about their expulsion of diplomats.  I didn't talk to the
Russians about their -- the sanctions.  I didn't talk about that
at all.

And then the agents, obviously being experienced agents,
start interviewing him, and not -- they didn't show him the
transcripts, but they started using in their questions words that
were taken directly from the transcripts:  Well, did you say this,
and did you say that, and did you say this?

And he obviously began to pick up that they had something
else that was underlying their questions, and he said:  Look, it
is possible.  I am guessing you guys ▮▮▮▮▮▮▮▮▮ the
Russians, but -- he said:  I don't remember talking about that.  I
was in the Dominican Republic.  I didn't get his text because I
had bad coverage there.  I called him back.  And I don't remember
talking to him about this.  And I am sorry, but I didn't -- he
said:  My recollection is I did not talk to him about that.

And the agents -- and the reason I mention their experience
is because I talked to them about this -- they discerned no
physical indications of deception.  They didn't see any change in
posture, in tone, in inflection, in eye contact.  They saw nothing
that indicated to them that he knew he was lying to them.

And they interviewed him completely, went through it all, did
not show him the transcript, ▮▮▮▮▮▮ or transcripts, and then
came back and drafted a 302 and reported to me and the Deputy

Exhibit B

Case: 1:19-cr-00322 Document #: 117-2 Filed: 08/20/20 Page 64 of 108 PageID #:1278
Case 1:17-cr-00232-EGS Document 198-6 Filed 05/07/20 Page 906 of 24

23

Director.

And I then briefed the White House on the contents of what Mr. Flynn had said. That is the 24th of January.

The 26th of January, the Acting Attorney General went over to the White House with a career senior official from the National Security Division and met with the White House Counsel and briefed him on what we had learned ███████████████ and what we had learned from the Flynn interview. And then they went back the next day and continued that conversation and offered to make available the transcripts ███████████████ to the White House.

The White House assigned a lawyer named John Eisenberg, who works for the White House Counsel, and he came over to the FBI shortly thereafter and reviewed the transcripts of the Flynn -█

And then, on the 10th of February, the FBI carried the transcripts -- two of our folks carried the transcripts over to the White House and reviewed them with White House Counsel and, I believe, the Vice President. And on the 13th of February, Mr. Flynn resigned.

So that is the chronology ███████████████, our review of it, and then our investigative steps.

Now, there is still, obviously, an open investigation of Mr. Flynn that is criminal in nature. So I am not going to go

**Exhibit B**

████████████

MR. ROONEY: Okay. Thank you.

I yield back.

THE CHAIRMAN: Okay. Mr. Carson is not here. Ms. Speier.

MS. SPEIER: Thank you, Mr. Chairman.

Thank you, Mr. Comey. Do you believe that Mr. Flynn lied?

MR. COMEY: I don't know. I think there is an argument to be made that he lied. It is a close one.

MS. SPEIER: So the fact that he actively was asking the Russians, through the Ambassador, to vote against the United States at the U.N. with regard to Israeli settlements, have you looked further into that issue? Because that clearly involves a private citizen conducting foreign policy.

MR. COMEY: We haven't besides obviously analyzing ████████ ████████ and interviewing him. That is one of the questions for the Department of Justice, is do you want further investigation. That would be the Logan Act angle, not the false statements to Federal agents angle.

MS. SPEIER: So you have not pursued that inquiry, though?

MR. COMEY: Not beyond what I have described here.

MS. SPEIER: Are you going to?

MR. COMEY: Not unless we get the Department of Justice directing us to, if they need some information to be able to evaluate Mr. Flynn. Like I said, I doubt it honestly because of the nature of the Logan Act as such. Again, I am not an expert, but I don't think it is something prosecutors have used. But it

████████████

is possible.  That is one of the reasons we sent it over to them,

saying look, here is this old statute.  Do you want us to do

further investigation?



Case: 1:18-cr-00323 Document #: 117-3 Filed: 08/20/20 Page 67 of 108 PageID #:1281
Case: 1:17-cr-00232-EGS Document 198-6 Filed 05/07/20 Page 12 of 14

75



MR. TURNER:  When your agents went to go speak to Mr. Flynn,

██████████████

and questioned him about the conversation, you already knew the contents of the conversation. You had the transcript and the agents had access to the transcript.

MR. COMEY: Correct.

MR. TURNER: So you couldn't have sent agents to Mr. Flynn for the purposes of questioning him about the content of the conversation because you already knew what the content was. Correct?

MR. COMEY: Right. Our purpose --

MR. TURNER: Right. You had a transcript, so there was no question. So right. Thank you.

So what was the purpose of the questioning? If it wasn't to ascertain what happened in the phone conversation, of which the contents you knew, what was the purpose to ask him these questions about what happened in the conversation?

MR. COMEY: To find out whether there was something we were missing about his relationship with the Russians and whether he would -- because we had this disconnect publicly between what the Vice President was saying and what we knew. And so before we closed an investigation of Flynn, I wanted them to sit before him and say what is the deal?

MR. TURNER: By publicly, you mean statements that were made in the press.

MR. COMEY: Right. That the Vice President made on TV.

MR. TURNER: Right. Okay. But you have also made statements

██████████████

Exhibit B

█████████████████████

business or government relationships, with Russia.  Is that correct?

MR. COMEY:  Well the context was there was an open counterintelligence investigation that had been open for months, trying to figure out is there some sort of covert relationship between Mr. Flynn and the Russian Government.  And then when Mr. Flynn has a communication ████████████ with the Russian Ambassador, and that it appears -- again, from what we can see from the outside -- that he for some reason hasn't been candid with the Vice President about this, my judgment was we could not close the investigation of Mr. Flynn without asking him what is the deal here.  That was the purpose.

MR. SWALWELL:  And do you agree with Ms. Yates's evaluation that that made him blackmailable?

MR. COMEY:  Possible.  That struck me as a bit of a reach, though, honestly.



# EXHIBIT 6

Exhibit B

FD-302 (Rev. 5-8-10)

-1 of 5-

### FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/14/2017

### DRAFT DOCUMENT/DELIBERATIVE MATERIAL

Do not disseminate outside the FBI without the permission of the originator or program manager.

On January 24, 2017, Deputy Assistant Director (DAD) Peter P. Strzok II and ████████████, interviewed United States (U.S.) National Security Advisor Michael T. FLYNN, date of birth (DOB) ██████████, at his office at the White House. After being advised of the identities of the interviewing agents and the nature of the interview, FLYNN provided the following information:

FLYNN's first invitation to Russia occurred when he was the Director of the Defense Intelligence Agency (DIA). FLYNN was the first DIA Director to be invited to GRU headquarters. During that four day trip in 2013, he participated in a leadership development program at GRU (Russian Military Intelligence) headquarters. FLYNN received proper authorization within the U.S. Government prior to conducting the trip. FLYNN could not recall if he met Russia's Ambassador to the United States, Sergey Ivanovich KISLYAK, during this trip. FLYNN described the Russians as very appreciative of his visit. During this trip to Russia as DIA Director, FLYNN first met the then-GRU Director Igor SERGUN. Following the trip, FLYNN and SERGUN continued their relationship on at least one occasion through video teleconference (VTC) and were planning a visit for SERGUN to travel to the United States on February 28, 2014. Russia invaded Crimea in the weeks prior to SERGUN's planned trip, SERGUN's trip was cancelled, and FLYNN had no further contact with the GRU Director. FLYNN described SERGUN as having common ground with FLYNN in that they had similar backgrounds, their sons were the same age, and they had a connection in fighting terrorism. SERGUN had scars from Chechnya and they shared stories about Afghanistan. FLYNN stated he called Ambassador KISLYAK following SERGUN's death in



Investigation on   01/24/2017   at   Washington, District Of Columbia, United States (In Person)

File #  ██████████                                          Date drafted   01/24/2017

by  ██████████,   STRZOK PETER P II

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJSCO-700022398



Exhibit B

FD-302a (Rev. 05-08-10)

| Continuation of FD-302 of | ▇▇ | Michael Flynn | , On | 01/24/2017 | , Page | 2 of 5 |

Lebanon early last year to express his condolences. FLYNN described SERGUN as someone the U.S. could work with. FLYNN said he was not really part of the TRUMP campaign at the time of this call to KISLYAK.

▇▇ FLYNN stated his second trip to Russia, after he left U.S. government service, had received so much press attention that "it [was] unbelievable." As background, FLYNN explained that he was never paid directly by media entities, however, he had been a contributor to a variety of media entities including Al Jazeera, Russia Today (RT), Sky, and MSNBC. FLYNN received a request from his speakers bureau, Leading Authorities (LAI), to speak about Middle East issues at the RT 10th Anniversary reception in Moscow. FLYNN was paid for the speech by LAI. FLYNN did not know from whom LAI received payment. FLYNN met with KISLYAK at the Russian Ambassador's residence next to the University Club prior to this trip to Russia. The visit was a courtesy call to the Ambassador prior to his trip, and FLYNN took his son with him to this meeting. The meeting occurred in the mid-afternoon. In addition, FLYNN received a DIA threat briefing prior to the travel.

▇▇ Prior to the Presidential inauguration, FLYNN spoke to multiple representatives in each of approximately thirty countries' governments. FLYNN stated the only exception to that practice was Russia, in that FLYNN had substantive conversations only with KISLYAK, and no other members of the Government of Russia. FLYNN's interest in Russia was as a common partner in the war on terror. FLYNN does not know if PUTIN and TRUMP will get along, but it is FLYNN's job to figure out paths to work with Russia to fight terrorism. FLYNN named the primary threats to the U.S. as the "four plus one:" China, Russia, Iran, North Korea and ISIS. FLYNN stated if the U.S. could neutralize one of the four, or even better, leverage their cooperation fighting a common enemy such as terrorism, that would be a success for U.S. national security.

▇▇ Sometime prior to Christmas, 2016, the Russian Ambassador to Turkey was assassinated. FLYNN called KISYLAK the next day to say he was sorry and to reinforce that terrorism was our common problem. FLYNN noted that it was a short call, and "that was it." On Christmas Day, a Russian military plane crashed and killed all on board to include what was the equivalent to the "Russian USO;" it was the same Russian choir that sang at the RT event. FLYNN called KISLYAK to pass his condolences, as his intent was to try to keep the relationship with KISLYAK going. FLYNN expanded that he has no particular affinity for Russia, but that KISLYAK was his

DOJSCO-700022399


Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▉▉▉▉▉ Michael Flynn ▉▉▉ ,On 01/24/2017 ,Page 3 of 5

counterpart, and maintaining trusted relationships within foreign
governments is important.

▉▉▉▉ Shortly after Christmas, 2016, FLYNN took a vacation to the
Dominican Republic with his wife. On December 28th, KISYLAK sent
FLYNN a text stating, "Can you call me?" FLYNN noted cellular
reception was poor and he was not checking his phone regularly, and
consequently did not see the text until approximately 24 hours
later. Upon seeing the text, FLYNN responded that he would call in
15-20 minutes, and he and KISYLAK subsequently spoke. The Dominican
Republic was one hour ahead of the time in Washington, D.C. During
the call, KISYLAK asked FLYNN to set-up a VTC between
President-elect TRUMP and Russian President PUTIN on January 21st.
In addition, FLYNN and KISYLAK discussed the U.S. sending an
observer to a terrorism conference in Astana, Kazakhstan, that would
be attended by Russia, Turkey, Iran and Syrian opposition groups.
FLYNN stated he did not respond back to KISYLAK about the conference
until probably this week. FLYNN did not make the decision on who
would represent the U.S. until the 20th or 21st of January, and
finally determined an observer from the U.S. Embassy in Astana would
attend. FLYNN noted Russia wanted to take the lead for peace in the
Middle East, but the U.S. needed to be the leader, particularly to
keep Turkey under the U.S.'s wing. FLYNN added there was a complete
lack of engagement from the prior administration.

▉▉▉▉ The interviewing agents asked FLYNN if he had any other
text, email, or personal meetings with KISYLAK or other Russians.
FLYNN volunteered that after the election, he had a closed door
meeting with KISYLAK and Jared KUSHNER at Trump Tower in New York
City. KISYLAK was in New York to meet with his diplomats, and the
three had a relatively sensitive meeting. FLYNN was a late addition
to the meeting and did not participate in setting it up. FLYNN
believed the meeting took place before Thanksgiving but was unsure
of the date. FLYNN explained that other meetings between the TRUMP
team and various foreign countries took place prior to the
inauguration, and were sensitive inasmuch as many countries did not
want the then-current administration to know about them. There were
no personal relationships between the leaders of many countries and
the prior administration. FLYNN stated that he and personnel from
the incoming administration met with many countries "to set
expectations for them, and the expectations were set very high."

▉▉▉▉ The interviewing agents asked FLYNN if he recalled any
discussions with KISYLAK about a United Nations (UN) vote
surrounding the issue of Israeli settlements. FLYNN quickly

DOJSCO-700022310


Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of     Michael Flynn     ,On  01/24/2017 ,Page  4 of 5

responded, "Yes, good reminder." On the 22nd of December, FLYNN
called a litany of countries to include Israel, the UK, Senegal,
Egypt, maybe France and maybe Russia/KISLYAK. Part of the reason
for FLYNN's calls was to conduct an exercise to see how fast the
incoming administration could get someone on the line. FLYNN
likened it to a battle drill to see who the administration could
reach in a crisis. The exercise was conducted at the campaign's GSA
transition building on 18th and I Streets N.W., which FLYNN
described as a somewhat chaotic environment. FLYNN stated he
conducted these calls to attempt to get a sense of where countries
stood on the UN vote, specifically, whether they intended to vote or
abstain.

The interviewing agents asked FLYNN if he made any request
of KISLYAK to vote in a particular way or take any action. FLYNN
stated he did not. FLYNN stated he did not believe his calls to the
various countries would change anything. FLYNN recalled there
needed to be a certain number of abstention votes to alter the
outcome, and that having looked at the math at the time, he knew it
could not be achieved. FLYNN said 14 countries were voting, and had
a recollection of the number of five votes being important. In the
end, only the U.S. abstained. FLYNN stated his calls were about
asking where countries would stand on a vote, not any requests of,
"hey if you do this."

The interviewing agents asked FLYNN if he made any comment
to KISLYAK about voting in a certain manner, or slowing down the
vote, or if KISLYAK described any Russian response to a request by
FLYNN. FLYNN answered, "No." FLYNN stated the conversations were
along the lines of where do you stand, and what's your position.
FLYNN heard through other channels that Egypt did not like the vote,
and believed the Egyptians of their own accord delayed the vote a
day. FLYNN again stated that he appreciated the interviewing agents
reminding him that he had another conversation with KISLYAK.

The interviewing agents asked FLYNN if he recalled any
conversation with KISLYAK surrounding the expulsion of Russian
diplomats or closing of Russian properties in response to Russian
hacking activities surrounding the election. FLYNN stated that he
did not. FLYNN reiterated his conversation was about the
PUTIN/TRUMP VTC and the "Astana thing" (the Kazakhstan conference
described earlier). FLYNN noted he was not aware of the
then-upcoming actions as he did not have access to television news
in the Dominican Republic and his government BlackBerry was not
working.

DOJSCO-700022311


Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of ▮▮▮  Michael Flynn  , On 01/24/2017 , Page 5 of 5

The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK in which the expulsions were discussed, where FLYNN might have encouraged KISLYAK not to escalate the situation, to keep the Russian response reciprocal, or not to engage in a "tit-for-tat." FLYNN responded, "Not really. I don't remember. It wasn't, 'Don't do anything.'" The U.S. Government's response was a total surprise to FLYNN. FLYNN did not know about the Persona Non-Grata (PNG) action until it was in the media. KISLYAK and FLYNN were starting off on a good footing and FLYNN was looking forward to the relationship. With regard to the scope of the Russians who were expelled, FLYNN said he did not understand it. FLYNN stated he could understand one PNG, but not thirty-five.

The interviewing agents asked FLYNN if he recalled any conversation with KISLYAK in which KISLYAK told him the Government of Russia had taken into account the incoming administration's position about the expulsions, or where KISLYAK said the Government of Russia had responded, or chosen to modulate their response, in any way to the U.S.'s actions as a result of a request by the incoming administration. FLYNN stated it was possible that he talked to KISLYAK on the issue, but if he did, he did not remember doing so. FLYNN stated he was attempting to start a good relationship with KISLYAK and move forward. FLYNN remembered making four to five calls that day about this issue, but that the Dominican Republic was a difficult place to make a call as he kept having connectivity issues. FLYNN reflected and stated he did not think he would have had a conversation with KISLYAK about the matter, as he did not know the expulsions were coming. FLYNN stated he did not have a long drawn out discussion with KISLYAK where he would have asked him to "don't do something."

Exhibit B

DOJSCO-700022242

# **EXHIBIT 7**

Exhibit B

| Corrected Date | Corrected Time | Sender | Recipient | Content/Notes |
|---|---|---|---|---|
| | | | | |
| | | | | |
| 4-Jan-17 | 2:11 PM | Strzok | | Hey if you havent closed ▮ don't do it yet |
| 4-Jan-17 | 2:12 PM | Strzok | ▮ | Sorry, RAZOR |
| 4-Jan-17 | 2:14 PM | Strzok | | Hey if you havent closed RAZOR, don't do so yet |
| 4-Jan-17 | 2:15 PM | ▮ | Strzok | Okay |
| 4-Jan-17 | 2:15 PM | Strzok | | Still open, right? |
| 4-Jan-17 | 2:15 PM | Strzok | ▮ | And youre case agent? Going to send you ▮ for the file |
| 4-Jan-17 | 2:15 PM | ▮ | Strzok | I have not closed it, I'll double check to see if ▮ had done it. |
| 4-Jan-17 | 2:17 PM | ▮ | Strzok | Still open and I'm still listed as the Case Manager (had to double check) |
| 4-Jan-17 | 2:18 PM | Strzok | ▮ | Rgr. I couldn't raise ▮ earlier. Pls keep it open for now |
| 4-Jan-17 | 2:17 PM | ▮ | Strzok | Will do |
| 4-Jan-17 | 2:19 PM | Strzok | Page | Razor still open.  :@ but serendipitously good, I guess. You want those chips and oreos? |
| 4-Jan-17 | 2:19 PM | Page | Strzok | phew. |
| 4-Jan-17 | 2:20 PM | Page | Strzok | But yeah, that's amazing that he is still open.  Good, I guess. |
| 4-Jan-17 | 2:20 PM | Strzok | Page | Yeah, our utter incompetence actually helps us.  20% of the time, I'm guessing :) |
| 4-Jan-17 | 2:21 PM | ▮ | Strzok | Anything I can help with? |
| 4-Jan-17 | 2:21 PM | Strzok | ▮ | Just need to relay to him not to close RAZOR yet.  I talked with ▮ |
| 4-Jan-17 | 2:22 PM | ▮ | Strzok | Oh, OK |
| 4-Jan-17 | 2:22 PM | ▮ | Strzok | What's up? |
| 4-Jan-17 | 2:22 PM | Strzok | ▮ | Need to decide what to do with him w/r/t the ▮ ▮ |
| 4-Jan-17 | 2:22 PM | Strzok | ▮ | 7th floor involved |
| 4-Jan-17 | 2:23 PM | ▮ | Strzok | I heard that might be the case yesterday.  Did DD send that material over? |
| 4-Jan-17 | 2:23 PM | ▮ | Strzok | ▮ has been handling RAZOR's closure -- do you want me to reach out to him? |

SUBJECT TO PROTECTIVE ORDER

| | | | | |
|---|---|---|---|---|
| 4-Jan-17 | 2:24 PM | Strzok | ████ | Yes |
| 4-Jan-17 | 2:24 PM | ████ | Strzok | Will do |
| 4-Jan-17 | 2:24 PM | Strzok | ████ | Hey don't close RAZOR |
| 4-Jan-17 | 2:24 PM | Strzok | ████ | actually, just got him on Lync |
| 4-Jan-17 | 2:24 PM | Strzok | ████ | Has he been doing the bulk of the work on him?> |
| 4-Jan-17 | 2:25 PM | ████ | Strzok | He's been doing some of the stuff more recently |
| 4-Jan-17 | 2:25 PM | Strzok | ████ | Actually, his green bubble just turned yellow, pls do try and reach him |
| 4-Jan-17 | 2:25 PM | ████ | Strzok | Will do |
| 4-Jan-17 | 2:27 PM | ████ | Strzok | ok |
| 4-Jan-17 | 2:28 PM | ████ | Strzok | should I be concerned? |
| 4-Jan-17 | 2:28 PM | Strzok | ████ | Possibly. Will know more in a bit |
| 4-Jan-17 | 2:29 PM | Strzok | ████ | I'll lync you in 10-15 |
| 4-Jan-17 | 2:29 PM | ████ | Strzok | ok |
| | | | | |
| 4-Jan-17 | 3:59 PM | ████ | ████ | have you seen the latest ████ ? |
| 4-Jan-17 | 3:59 PM | ████ | ████ | on the yellow side? yes ... ████ |
| 4-Jan-17 | 3:59 PM | ████ | ████ | to give you a thumb nail i heard pete say, "Andy and ██ will interview...." |
| 4-Jan-17 | 3:59 PM | ████ | ████ | yep |
| 4-Jan-17 | 3:59 PM | ████ | ████ | lemme get more clarity before i give you more |
| 4-Jan-17 | 4:00 PM | ████ | ████ | ██ meaning Preistep, correct? |
| 4-Jan-17 | 4:08 PM | ████ | ████ | nope - ████ |
| | | | | |
| | | | | |
| 23-Jan-17 | 6:37 AM | Strzok | Page | We'll see, about Bill. He was pretty adamant about what Andy it said with regard to that. And he mentioned on Saturday that he had several conversations |
| 23-Jan-17 | 6:37 AM | Strzok | Page | with Andy. Bill sense with it and he wanted to know why we had to go aggressively doing these things, openly. I worry Bill isn't getting the underlying d |
| 23-Jan-17 | 6:37 AM | Strzok | Page | istinction that I think is clear. But maybe I'm wrong. |

SUBJECT TO PROTECTIVE ORDER

Exhibit B

| | | | | |
|---|---|---|---|---|
| 24-Jan-17 | 6:46 AM | Strzok | ▮ | Hi - sorry I missed you yesterday. About to email you questions for Andy to think about in advance of his call with Flynn.  I'm sure he's thought of them already, but just in case |
| | | | | |
| 24-Jan-17 | 9:27 AM | Strzok | Page | ☹☹☹☹ Bill just told ▮ and me that he brought up - again, th |
| 24-Jan-17 | 9:27 AM | Strzok | Page | is time in front of D - ▮. Didn't know he was going to d |
| 24-Jan-17 | 9:27 AM | Strzok | Page | o that. |
| 24-Jan-17 | 9:29 AM | Page | Strzok | Yeah, dd is frustrated. Going into mtg. |
| 24-Jan-17 | 9:29 AM | Page | Strzok | Don't repeat |
| 24-Jan-17 | 9:30 AM | Strzok | Page | I won't. Bill said D started going one way and DD cut him off. I'd be frustrated too |
| | | | | |
| 10-Feb-17 | 5:37 PM | Page | Strzok | This document pisses me off.? You didn't even attempt to make this cogent and readable.? This is lazy work on your part. |
| 10-Feb-17 | 10:10 PM | Strzok | Page | Lisa, you didnt see it before my edits that went into what I sent you.  I was 1) trying to completely re-write the thing so as to save ▮ voice and 2) get it out to you for general review and comment in anticipation of needing it soon. I greatly appreciate your time in reviewing and your edits.  I incorporated them.  Thank you. |
| 10-Feb-17 | 10:11 PM | Strzok | Page | shoudl say 1) trying to not completely re-write.... |
| 10-Feb-17 | 10:11 PM | Strzok | Page | should |
| 10-Feb-17 | 10:11 PM | Strzok | Page | f*ck. |
| 10-Feb-17 | 10:11 PM | Strzok | Page | I did the edits better than I'm IMing |

SUBJECT TO PROTECTIVE ORDER

## code section at question

| | |
|---|---|
| **From:** | "\"page\" < >,\"lisa c. \"\" < >" |
| **To:** | Baker <-@->, James A. <james.baker@▇▇▇▇▇> |
| **Date:** | Wed, 04 Jan 2017 09:43:45 -0500 |

18 USC 953

**SUBJECT TO PROTECTIVE ORDER**

**DOJSCO - 700023476**

Exhibit B

# [No Subject]

| | |
|---|---|
| **From:** | "\"strzok\" < >,\"peter p. \"\" < peter.strzok@ ▇ >" |
| **To:** | Page <-@->, Lisa C. <lisa.page@ ▇ |
| **Date:** | Wed, 04 Jan 2017 09:52:37 -0500 |
| **Attachments:** | RL33265.pdf (254.22 kB) |

18 USC 953
Any citizen of the United States, wherever he may be, who, without authority of the United States, directly or indirectly commences or carries on any correspondence or intercourse with any foreign government or any officer or agent thereof, with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States, shall be fined under this title or imprisoned not more than three years, or both.

This section shall not abridge the right of a citizen to apply, himself or his agent, to any foreign government or the agents thereof for redress of any injury which he may have sustained from such government or any of its agents or subjects.

(June 25, 1948, ch. 645, 62 Stat. 744; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147.)

And because I am awesome, an excellent CRS piece on the Logan Act from 2015. All the legislative history they cite does not involve incoming administrations. Of note,
"The discussion of whether the act is currently viable may hinge on the fact that, despite its having been law for more than 200 years, no one has been prosecuted for violating it. Its viability may
also involve constitutional issues, such as freedom of speech and right to travel, mentioned above, since these constitutional issues appear not to have been litigated with respect to the Logan Act."

**SUBJECT TO PROTECTIVE ORDER**

**DOJSCO - 700023477**

Exhibit B

## RE:

| | |
|---|---|
| **From:** | "\"page\" < >,\"lisa c. \"\" < >" |
| **To:** | Strzok <-@->, Peter P. <peter.strzok@▇▇▇▇> |
| **Date:** | Wed, 04 Jan 2017 09:59:01 -0500 |

You are awesome.  Thank you.

-----Original Message-----
From: Strzok, Peter P. (CD) (FBI)
Sent: Wednesday, January 04, 2017 9:53 AM
To: Page, Lisa C. (OGC) (FBI) <Lisa.Page@▇▇▇▇>
Subject:

18 USC 953
Any citizen of the United States, wherever he may be, who, without authority of the United States, directly or indirectly
commences or carries on any correspondence or intercourse with any foreign government or any officer or agent thereof,
with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to
any disputes or controversies with the United States, or to defeat the measures of the United States, shall be fined under
this title or imprisoned not more than three years, or both.

This section shall not abridge the right of a citizen to apply, himself or his agent, to any foreign government or the agents
thereof for redress of any injury which he may have sustained from such government or any of its agents or subjects.

(June 25, 1948, ch. 645, 62 Stat. 744; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147.)

And because I am awesome, an excellent CRS piece on the Logan Act from 2015.  All the legislative history they cite
does not involve incoming administrations. Of note, "The discussion of whether the act is currently viable may hinge on
the fact that, despite its having been law for more than 200 years, no one has been prosecuted for violating it. Its viability
may also involve constitutional issues, such as freedom of speech and right to travel, mentioned above, since these
constitutional issues appear not to have been litigated with respect to the Logan Act."

**SUBJECT TO PROTECTIVE ORDER**

Exhibit B

# Logan Act

**From:** "\"page\" < >,\"lisa c. \"\" < >"
**To:** amg.dd@
**Date:** Wed, 04 Jan 2017 12:27:36 -0500

Here's the text of the Logan Act:

18 U.S. Code § 953 – Private correspondence with foreign governments
Any citizen of the United States, wherever he may be, who, without authority of the United States, directly or indirectly commences or carries on any correspondence or intercourse with any foreign government or any officer or agent thereof, with intent to influence the measures or conduct of any foreign government or of any officer or agent thereof, in relation to any disputes or controversies with the United States, or to defeat the measures of the United States, shall be fined under this title or imprisoned not more than three years, or both.
This section shall not abridge the right of a citizen to apply, himself or his agent, to any foreign government or the agents thereof for redress of any injury which he may have sustained from such government or any of its agents or subjects.
(June 25, 1948, ch. 645, 62 Stat. 744; Pub. L. 103–322, title XXXIII, § 330016(1)(K), Sept. 13, 1994, 108 Stat. 2147.)

**SUBJECT TO PROTECTIVE ORDER**

Exhibit B

# EXHIBIT 9

--- ████████████████████████████

**From:** "\"strzok\" < >,\"peter p. \"\" < ppstrzok████████████ >"
**To:** PRIESTAP <-@->, E. W. <jcboone@████████ >, MOFFA <-@->, JONATHAN C. <mfvaracalli@████████ >,
MOYER <-@->, SALLY ANNE <jtrhule@████████ >, AUTEN <-@->, BRIAN J. <jpientka@████████ >
**Cc:** CORSI <-@->, DINA M. <dmcorsi@████████ >
**Date:** Sat, 21 Jan 2017 19:13:31 -0500

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
------------------------------------===========

**CROSSFIRE TYPHOON:** ████████████████████████████████
████████████████████████████████████
████████████████████████████████

**CROSSFIRE RAZOR:** Provide a defensive briefing to him about CROSS WIND and ████████████████████
Beyond that, I am not certain. I think my preference would be to provide him a defensive briefing about ████████, put him
on notice, and see what he does with that. If that's not possible, then continue to monitor. We need to discuss what
happens if DOJ directs us, or directly tells, VPOTUS or anyone else about the ████████ specifically w/r/t what we do
directly with him. I think it will be very difficult not to do some sort of overt step with him, a defensive briefing or interview
under light "defensive briefing" pretext, unless WH specifically directs us not to.
**CROSS WIND:** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

**CROSSFIRE TYPHOON:** ████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████

--------------------------------========================
████████████████████████

**SUBJECT TO PROTECTIVE ORDER**

# RE: -- ███████████

**From:** "\"moyer\" < >,\"sally anne \"\" < samoyer(█████████)>"
**To:** STRZOK <-@->, PETER P. <jcmoffa████████>, PAGE <-@->, LISA C. <lcpage(█████████)>
**Date:** Sun, 22 Jan 2017 09:23:06 -0500

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

------------------------------------------------------------

TYPHOON: ████████████████████████████████████
████████████████████████████████████████

RAZOR: Based on his position, would we usually tell him about Wind and ██████████? I'd be interested in letting that play out a bit before he tells them and the whole thing goes underground. But if we usually tell the WH, then I think we should do what we would normally do. At the very least, I think we need to debrief or interview Razor (unless told not to). I think ████████ will get to him regardless so we should try to frame them in a way we want.

Good with the plan for CROSS WIND and ████████████ ████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

-----Original Message-----
From: STRZOK, PETER P. (CD) (FBI)
Sent: Saturday, January 21, 2017 7:30 PM
To: MOFFA, JONATHAN C. (CD) (FBI); MOYER, SALLY ANNE (OGC) (FBI); PAGE, LISA C. (OGC) (FBI)
Subject: FW: --██████████

████████████████████████████████████████
████████████████████████████████████████

------------------------------------------------------------

To the Magnificent Three, I of course hope you comment/support/disparage all of this as you see fit.

-----Original Message-----
From: STRZOK, PETER P. (CD) (FBI)
Sent: Saturday, January 21, 2017 7:14 PM
To: PRIESTAP, E. W. (CD) (FBI) <EWPRIESTAP████████>; BOONE, JENNIFER C (CD) (FBI) <JCBOONE(████████)>; MOFFA, JONATHAN C. (CD) (FBI) <JCMOFFA████████>; VARACALLI, MICHAEL F. (CD) (FBI) <MFVARACALLI(████████)>; MOYER, SALLY ANNE (OGC) (FBI) <SAMOYER(████████)>; RHULE, JEFFREY T. (WF) (FBI) <JTRHULE(████████)>; AUTEN, BRIAN J. (CD) (FBI) <BJAUTEN(████████)>; PIENTKA, JOE (WF) (FBI) <JPIENTKA████████>
Cc: CORSI, DINA M. (CD) (FBI) <DMCORSI████████>
Subject: ---███████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

======

CROSSFIRE TYPHOON: ████████████████████████████

SUBJECT TO PROTECTIVE ORDER

DOJSCO - 700023471

Exhibit B

██████████████████████████████████████████████████████████████████████████

CROSSFIRE RAZOR: Provide a defensive briefing to him about CROSS WIND and ████████████████
 Beyond that, I am not certain.  I think my preference would be to provide him a defensive briefing about ████████, put him
on notice, and see what he does with that.  If that's not possible, then continue to monitor.  We need to discuss what
happens if DOJ directs us, or directly tells, VPOTUS or anyone else about the ███████████ specifically w/r/t what we do
directly with him. I think it will be very difficult not to do some sort of overt step with him, a defensive briefing or interview
under light "defensive briefing" pretext, unless WH specifically directs us not to.
CROSS WIND: ████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████

CROSSFIRE TYPHOON: ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████

=======================================================
████████████████████████████████

=======================================================
████████████████████████████████

=======================================================
████████████████████████████████

Exhibit B

## Potential Qs for DD's call 

| | |
|---|---|
| **From:** | "\"strzok\" < >,\"peter p. \"\" < |
| **To:** | <-@-> |
| **Cc:** | BAKER <-@->, JAMES A. < |
| **Date:** | Tue, 24 Jan 2017 06:46:58 -0500 |



I'm sure he's thought through these, but for DD's consideration about how to answer in advance of his call with Flynn:

Am I in trouble?

Am I the subject of an investigation?

Is it a criminal investigation?

Is it an espionage investigation?

Do I need an attorney?

Do I need to tell Priebus? The President?

Will you tell Priebus? The President?

Will you tell the WH what I tell you?

What happens to the information/who will you tell what I tell you?

Will you need to interview other people?

Will our interview be released publically? Will the substance of our interview be released?

How long will this take (depends on his cooperation – I'd plan 45 minutes)?

Can we do this over the phone?

I can explain all this right now, I did this, this, this [do you shut him down? Hear him out? Conduct the interview if he starts talking? Do you want another agent/witness standing by in case he starts doing this?]

Thanks,

Pete

SUBJECT TO PROTECTIVE ORDER

# RE: Question regarding 1001

**From:** ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ "
**To:** Page <-@->, Lisa C. <peter.strzok ▉▉▉▉▉▉▉
**Date:** Mon, 23 Jan 2017 22:04:41 -0500

I haven't read the policy lately, but if I recall correctly, you can say it at any time. I'm 90 percent sure about that, but I can check in the am.

--

------- Original message -------
From: "Page, Lisa C. (OGC) (FBI)" <▉▉▉▉▉▉▉▉▉▉▉
Date: 01/23/2017 9:30 PM (GMT-05:00)
To: ▉▉▉▉▉(OGC) (FBI)" <▉▉▉▉▉▉▉▉▉, "Strzok, Peter P. (CD) (FBI)" <▉▉▉▉▉▉▉▉▉▉▉
Subject: Question regarding 1001

▉▉▉, I have a question for you. Could the admonition re 1001 be given at the beginning at the interview? Or does it have to come following a statement which agents believe to be false? Does the policy speak to that? (I feel bad that I don't know this but I don't remember ever having to do this! Plus I've only charged it once in the context of lying to a federal probation officer).

It seems to be if the former, then it would be an easy way to just casually slip that in. "Of course as you know sir, federal law makes it a crime to..."

**SUBJECT TO PROTECTIVE ORDER**

Exhibit B

# Question regarding 1001

| | |
|---|---|
| **From:** | "\"page\" < >,\"lisa c. \"\" ◼ ►" |
| **To:** | ◼ <peter.strzok ◼ ► |
| **Date:** | Mon, 23 Jan 2017 21:30:41 -0500 |

◼, I have a question for you. Could the admonition re 1001 be given at the beginning at the interview? Or does it have to come following a statement which agents believe to be false? Does the policy speak to that? (I feel bad that I don't know this but I don't remember ever having to do this! Plus I've only charged it once in the context of lying to a federal probation officer).

It seems to be if the former, then it would be an easy way to just casually slip that in. "Of course as you know sir, federal law makes it a crime to..."

SUBJECT TO PROTECTIVE ORDER

Case 1:17-cr-00232-EGS Document 198-11 Filed 05/07/20 Page 1 of 2

# EXHIBIT 10

Admins
could be your
1/24/2017

DD

• Afterwards

I. • Interview

• I agreed yesterday that we shouldn't show Flynn ▓▓▓ if he didn't admit

• I thought @ it last night, + I believe we should rethink this

• What is our goal? Truth/Admission or to ● get him to lie, so we can ☒ prosecute him or get him fired?

• We regularly show subjects evidence,

● with the goal of getting them to admit their wrongdoing

• I don't see how getting someone to admit their wrongdoing is going easy on him

• If we get him to admit to breaking the Logan Act, give that to DoJ + have them decide

• Or, if he initially lies, then we present him ▓▓▓ + he admits it, document for DoJ, + let them decide how to address it

• If we're seen as playing games, WH will be furious

• Protect our institution by not playing games

• We have a case on Flynn + Russians
• Our goal is to review case
• Our goal is to determine if Mike Flynn is going to tell the truth @ his relationship w/ Russians
• Can quote ▓▓▓
• Shouldn't ▓▓▓

Review is stand-alone

# EXHIBIT 11

Exhibit B

January 24, 2017

**What follows are notes I typed shortly after my conversation with LTG Michael Flynn. While I have quoted directly in a few places, this represents the substance of our conversation.**

On Tuesday, 01/24/2017, as 1235, LTG Michael Flynn called via secure phone from ███████ to my office number ████████. ████████████████████████████████████████, I told LTG Flynn that I had a sensitive matter to discuss. I explained that in light of the significant media coverage and public discussion about his recent contacts with Russian representatives, that Director Comey and I felt that we needed to have two of our agents sit down with the General and hear from him the details of those conversations. LTG Flynn asked if I was referring to his contacts with the Russian Ambassador to the United States, and I indicated that I was.

LTG Flynn then explained that he had been trying to "build relationships" with the Russians, and that he had calls in which he "exchanged condolences." He then stated that I probably knew what was said in these calls because, "you listen to everything they say." I reiterated that in light of everything that has been said about these contacts, the important thing now was for us to hear directly from him what he said and how he felt about the conversations.

LTG Flynn questioned how so much information had been made public and asked if we thought it had been leaked. ████████████████████████████████████████████████████████████████████████████████████████████████████████████ ████████ ██████████████ ████████████████████████

I explained to LTG Flynn that my desire was to have two of my agents interview him as quickly, quietly and discreetly as possible. He agreed and offered to meet with the agents today. We had some discussion about timing and ultimately agreed to conduct the interview at his office in the White House at 1430 this afternoon. I explained that I thought the quickest way to get this done was to have a conversation between him and the agents only. I further stated that if LTG Flynn wished to include anyone else in the meeting, like the White House Counsel for instance, that I would need to involve the Department of Justice. He stated that this would not be necessary and agreed to meet with the agents without any additional participants.



Declassified by FBI-C58W88B61
on 5/6/2020
This redacted version only

Exhibit B

Case 1:17-cr-00232-EGS Document 198-13 Filed 05/07/20 Page 1 of 8

# EXHIBIT 12

Exhibit B

1430

[REDACTED]

4 subjects

2 calls ① TRUMP - PUTIN CALL SET-UP

② Exchange HOLIDAY GREETINGS

③ Offer Russ condolences for lives lost   RUSSIAN plane was

④ SYRIA conference on ISIS

Dia 1st invited inside GRU [illegible] p 600. Al APPROVED. 4 DAY TRIP. Summer 2013
Kislyak. I don't know if left invitation. Very appreciate. Sergun - GRU UTC - IN UNIFORM, SET-UP
big visit. hints to come to US. 28th Feb 2014. Went to Crimea - ② more to def.
next time. TRIP TO RUSSIA so much pass unbelievable. Never paid by media.
Did RT, Al JAZEERA, SKY, MSNBC. Speakers Bureau LAI. Request To Speak
in MOSCOW @ RE. AT RT 10th ANNIVERSARY. I was AM'D for THAT. SPEAKERS BUREAU PAID
RE. They took 25%. I may have. Sergun want attack in Lebanon. He was like me.
Similar Background. Sons. Heard Daily - Send condolences. Really wasn't part of
conspiracy. Really thought Sergun was a guy we could work with. Connections FIGHT
Terrorism, Chechnya can't stand Sergun. Talked @ Afghanistan. Turkish Ambassador Kilic
20 days - up to probably spoken to 30 countries. Multiple people in countries

4 +1
China            Only Russia Kislyak. Direction
~ L
RUSSIA     Common partner in these things. ① know TRUMP / PUTIN for ALONE 1. figure out
IRAN        Paths work with Russia. Russia and Turk. Sorry, Common problem. That was it.
ISIS         Before Christmas. Mid December. Called next day. He said his family loves Christmas
——7        Day - plane CRASH. Russian USD. Crisis SASE @ my dinner. Took opportunity
            to press condolences. Trying to keep relationship. C+S - REPT Conversation.

No affinity Russia - Kislyak    Counterpart.    Vacay Dom Republic

28th Dec Tuesday - he sends me a text. Can you call me? I don't see it.
24 hours later. Call you 15 -20 mins. I took airplane Dom Republic.
Asked me. Set-up UTC Putin/Trump - 21st. Have him good into
Conference in Astana, Kazakh, Russia, Turkey, Iran, opposition groups
Sent Usemb person. Ø got back to him. Probably only this past week.
Make decision for representation - FRI/SAT. Observer.
Russia wants lead role for Mid East Peace. US. Turkey under wing.
Lack of engagement. Email - Meet in person. Met in NY post election.
Closed door meeting Jared Kushner.

Been to Rosens - before I went to speak at Spanska Board
DIA briefing person. Intel courtesy to see Ambo    30-45 mins. Saw w/TT
Late middle of day. Ambss Res. University Club.    NY meet in Nov
Maybe before Thanksgiving. He was in NY. Politically sensitive meeting JKE
Sensitive - countries Ø want White House take over. No personal relationship Trump Tower
Set expectations - set high for countries.    w/U.

UN Vote - Settlements - Yes good reminder. Yeah So 22nd December, Literally countries
Got JARE where stood on that vote. UK. Several. Egypt, Israel, maybe France. Maybe Kislyak
Get a stronger abstain, veto, abstain. This very
More where they stand. I Ø believe we would change anything. There
needed to be so many to abstain. 14 Countries permanent council S19.
only US abstain. US.    wasn't Hey if you do this I will be that
Surgical come up - how much    Kind of thing, Hey where do
Ø please consider voting this way?    you stand.
    No. Where do you stand? Whats position
    Egypt. Ø Like it. Other channels. Delayed on own accord.
Drill    Exercise - how fast can you get someone on the line - Battle Drill.
    NK - How do we act? How respond?
MBR info - Friday or Thursday, Right before Christmas. Loaded us in.

**Exhibit B**

TRANSITION OF GOVT. POLICY

KISLYAK - ROPP? 29th SPOKE. I DON'T. THE CONVERSATION WAS ON UTC, ASKING THINK, I HAVE NO TV, MY GOVT BLACKBERRY
Ø RECOLLECTION? NOT REALLY, I DON'T REMEMBER. THEY DON'T DO ANYTHING. TOTAL SURPRISE. I DIDN'T KNOW ABOUT IT UNTIL MEDIA.

CYBER BRIEFING - DECISION. WHAT

KISLYAK - START OFF ON GOOD FOOT.     LOOKING FORWARD TO RELATIONSHIP.
     I WOULDN'T UNDERSTAND IT. I CAN UNDERSTAND POS OF ONE.

     START GOOD RELATIONSHIP. MOVE FORWARD.
     I Ø REMEMBER MAKING 4-5 CALLS IF I DID LOUSY PLACE TO CALL.
     Ø LOOK ARROW OUT ABOUT DON'T DO SOMETHING.

EZRA

I PERSON HERE. APPROACHED HOPE HICKS - SOMEONE INTRODUCED.

CLOSE TO TRUMP.

HOPE HICKS, JOHN MCAFEE, DAN SCAVINO

     LEAK OF GOVT CLASSIFIED HANDLING, ELECTRONIC DEVICES,
     REAL WORLD EXAMPLES, HERE IS WHAT IS IN PLAY. THREAT
     MAYBE WE TAKE ADVANTAGE.

Exhibit B

Contact w/ RGOP Trump campaign thru many

W/k thru GOP contact

Who, purpose, form

In person?

Email?

Phone?

Calls: Approx how many? Logs

[redacted]

1° to be invited [illegible] HQ [illegible] Summer '13 "1 day ago"

Kislyak knew not sure if thru

Surgun Gchr head [illegible]

28 Feb 14 visit to US but them business cancelled

Next trip to Russia

Doing media stuff but not paid

RT on cable lines + Al Jazeera Skyy + many others

LAT Speakers bureau: Speak in Moscow no not [illegible]

RT 10th anniv

1-1 panel discussion [illegible] LAT set up + paid him → contracted + had his fee @ 75k

Heard Surgun had heart attack @ Lebanon

DOJSCO-700021192

Exhibit B

fed @ Lebanon + called Kislyak to send condolences
around death
Not part of Sergeans = felt we could work w/ him us
Common fighting terr scars Chechnya + AF
Need fine Turk Tumbo killed post-election
Up to 20 Jan space easily 30 different countries
+ multiple people w/ in countries
Kislyak only person in Russia
4 + 1     PRC DPRK Iran Russia ISIS
If anon partner
Short call: Sorry id happened, common enemy in
radical Islam, that was it = before Xmas
mid-Dec day after assassination
(Xmas day airplane crash USO equiv)
Called w/ condolences for crash + that was it
Goal: keep relationship going

Xmas day vacation to Dom Rep 5 days
28th      (Tues): Kislyak sends text: Can you call
didn't see text till 29th not checking
29th I'll call 15-20 min
K asked: Can we set up VTC btwn P + T dev 1st
Conference in Astana: Rus (sent someone us
Turk Iran, oppo groups         fm dumb)
My level?   No, someone lower
will get back, but didn't until this job
next
Didn't decide until this Fri-Sat to stand do
Rus was lead in ME peace w/ out Turkey

B

DOJSCO-700021193

Exhibit B

in Nov early on before Thanksgiving
Met in NY post-election, came to Trump tower w/ Greats of Obama admin
Jared Kushner
Been to Emb before speaking
DIA cable diligence, people, then saw Ambo @
Emb prior Amb rus
= 0-45 min courtesy call

Kislyak in NY mtg w/ UN Ambo & - VK @ Trump
Tower

Treasury sanctions still coming. Treasury action

He wasn't aware of mtg, invited late

That's a good reminder

22 Dec UN
Called a bunch of guys          UK          Egypt Isr
Don't know if called VK          maybe I did          Senegal
                                                        France

14 total 5 + x need to abstain

What is your position
No: hey if you do this ...

Any    vote this way, slow down
No
Egypt didn't like, was able to delay 1 day

to decide you reminding me that was another convo

Maybe Thurs - Fri prior to Xmas, had been @
PL w/ Porus
Did from GSA campaign R

Spoke on 29th
Explanations
Surprise

No reaction to that

Still

Ms calls that day? if so, dont remember. If so, busy
place to make phone calls

Nothing long drawn out but just do something

Ws: Hope
John McEntee
Dan Scavino other one name

=

Later classified story: Examples
Things in story
More substantial now than Cold War

Ezra: Someone known introduced themselves to Ezra

Mahon for

# EXHIBIT 13

Exhibit B

FD-302 (Rev. 5-8-10)

- 1 of 5 -

██████████████████



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    08/22/2017

**DOCUMENT RESTRICTED TO CASE PARTICIPANTS**
This document contains information that is restricted to case participants.

(U//FOUO)    FBI Deputy Assistant Director (DAD) Peter P. Strzok was
interviewed in his office in the Special Counsel's Office in Washington D.
C.  Participating in the interview were Senior Assistant Special Counsel
████████████████ and FBI Supervisory Special Agent ████████████    The
purpose of the interview was to collect certain information regarding
Strzok's involvement in various aspects of what has become the Special
Counsel's investigation.  Strzok provided the following information:

█████████    As FBI Counterintelligence DAD, Strzok had involvement in
several FBI investigations which were subsequently taken over by the
Special Counsel.  Specifically, FBI investigations regarding then-National
Security Adviser, General Michael Flynn; ████████████████████████████
██████    At various times, Strzok and then-FBI Director James Comey
briefed Deputy Attorney General/Acting Attorney General Sally Yates and
other DOJ representatives on the entire span of the FBI's Russian election
interference/collusion investigations.

(U//FOUO) ██████████████████████████████████████████████
███████████████████████████████ He worked closely with
multiple DOJ National Security Division (NSD) attorneys, up to Acting NSD
Assistant Attorney General Mary McCord.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

████████████████████████
████████████████████
████████████████

Investigation on  07/19/2017    at    Washington, District Of Columbia, United States (In
                                        Person)

File #   ████████████                                    Date drafted  07/20/2017

by   ████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

DOJSCO-700021201

Exhibit B

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of (U//FOUO) DAD Peter P. Strzok interview , On 07/19/2017 , Page 2 of 5



(U//FOUO)   On January 24, 2017, McCabe told Strzok to interview
Flynn.  McCabe called Flynn at 12:30 p.m. and Flynn agreed to be
interviewed that day at 2:30 p.m.  McCabe may have documented the
conversation.  Comey was going to tell Yates right before the interview,
but she called him first for another reason before he had a chance to

Exhibit B

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U//FOUO) DAD Peter P. Strzok interview , On 07/19/2017 , Page 3 of 5

call. When he told her the FBI was interviewing Flynn she was not happy.

(U//FOUO) Strzok and FBI SSA ▮▮▮▮▮ his interview partner, got access to the White House with the assistance of an FBI White House detailee. Flynn met them at about 2:15, which was earlier than agreed. Flynn was alone and "relaxed and jocular." He wanted to give them a little tour of the area around his office. During their walk through the West Wing, President Trump and some movers who were discussing where to place some art work walked between Strzok and ▮▮▮▮▮ but nobody paid attention to the agents. Flynn did not introduce them to anyone.

(U//FOUO) Before the interview, McCabe, FBI General Counsel James Baker and others decided the agents would not warn Flynn that it was a crime to lie during an FBI interview because they wanted Flynn to be relaxed, and they were concerned that giving the warnings might adversely affect the rapport.

(U//FOUO) Flynn was unguarded and clearly saw the FBI agents as allies. He talked about various subjects, including hotels where they stayed during the campaign and the President's knack for interior design. He talked about the long hours of the job and complained about the politics surrounding it, but Flynn always seemed to work his way to the subject of terrorism. Flynn was so talkative, and had so much time for them, that Strzok wondered if the National Security Adviser did not have more important things to do than have such a relaxed, non-pertinent discussion with them.

▮▮▮ It was decided before the interview the agents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but if Flynn said he did not remember something they knew he said, they would use the exact words Flynn used, such as ▮▮▮▮▮▮▮ to try to refresh his recollection. If Flynn still would not confirm what he said ▮▮▮▮. ▮▮▮▮▮▮▮, they would not confront him or talk him through it. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U//FOUO) Strzok conducted the interview and ▮▮▮▮▮ was primarily responsible for taking notes and writing the FD-302.

(U//FOUO) Throughout the interview, Flynn had a very "sure" demeanor and did not give any indicators of deception. He did not parse his words or hesitate in any of his answers. He only hedged once, which they

Exhibit B

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of (U//FOUO) DAD Peter P. Strzok interview .On 07/19/2017 .Page 4 of 5

documented in the 302. Strzok and ▆▆▆▆ both had the impression at the time that Flynn was not lying or did not think he was lying. Flynn struck Strzok as "bright, but not profoundly sophisticated."

(U//FOUO) The agents left Flynn in a collegial, positive way. There was no discussion of follow-up.

(U//FOUO) Strzok and ▆▆▆▆ returned to FBI Headquarters and briefed McCabe and Baker on the interview. McCabe briefed Comey. Strzok was aware that Baker and Principal Associate Deputy Attorney General Matt Axelrod later argued about the FBI's decision to interview Flynn.

(U//FOUO) Shortly after the interview, Yates and McCord briefed White House staff on the Flynn calls.

FD-302a (Rev. 05-08-10)



Continuation of FD-302 of _(U//FOUO) DAD Peter P. Strzok interview_ , On _07/19/2017_ , Page _5 of 5_

Exhibit B