IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| United States of America | |
| | Case No. 19-CR-322 |
| v. | |
| EDWARD M. BURKE, | Hon. Robert M. Dow, Jr. |
| PETER J. ANDREWS, and | |
| CHARLES CUI | United States District Court Judge |

**DEFENDANT CHARLES CUI'S REPLY IN SUPPORT OF
MOTION TO DISMISS COUNTS TWELVE, THIRTEEN, FOURTEEN, AND FIFTEEN
OF THE SUPERSEDING INDICTMENT**

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. 1

ARGUMENT IN REPLY ............................................................................................... 1

    **I.**    Count Twelve: 18 U.S.C. § 666(a)(2) ...................................................... 3

        **A.**    This Court should dismiss Count Twelve if the facts alleged in the Indictment do not constitute a violation of Section 666(a)(2). ................. 3

        **B.**    The government's interpretation would render Section 666(c) surplusage. .............................................................................................. 5

        **C.**    The government's interpretation of Section 666(c) is unsupported by any authority; its principal case rejects its argument and supports Mr. Cui. .................................................................................. 6

        **D.**    The government misreads Lupton, which also supports Mr. Cui. ............. 8

        **E.**    The government's interpretation of Section 666(c) is unsupported by any authority. .................................................................................. 9

            **1.**    Every case to consider Section 666(c) has considered whether the payment were made for work actually performed. .................................................................................... 9

            **2.**    United States v. Mills confirms Mr. Cui's interpretation. ........... 10

            **3.**    The government's argument that "hiring" must be in the usual course of business has no support in the statute. ................ 12

    **II.**    Counts Thirteen, Fourteen, and Fifteen: 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2 .......................................................................................... 13

        **A.**    The Indictment Fails to Allege Unlawful Conduct Under 720 ILCS 5/33-1 or 720 ILCS 5/33-3(a)(4) Because Burke Was Authorized By Law to Receive Legal Fees. .............................................................. 13

            **1.**    The government discusses the wrong portion of the Ethics Ordinance. .................................................................................. 14

            **2.**    The government does not address the only portion of the Ethics Ordinance governing what city officials may accept. ........ 15

            **3.**    The government misreads the authorization in the Ethics Ordinance. .................................................................................. 16

        **B.**    The Indictment Fails to Allege Unlawful Conduct Under the Commercial Bribery Statutes. .................................................................. 17

            **1.**    The government admits that its attempt to apply the Illinois commercial bribery statutes to misconduct involving a public official is unprecedented. .................................................. 17

**TABLE OF CONTENTS**
**(Continued)**

Page

       **2.**    The City of Chicago expressly consented to Mr. Burke receiving compensation for services so long as those services were unrelated to his city duties or responsibilities. ...... 19

    **C.**    Amendments to the Ethics Ordinance confirm that the City authorized (and consented to) Mr. Burke receiving fees from the retention of Klafter & Burke. ................................................................. 21

CONCLUSION ............................................................................................................ 22

CERTIFICATE OF SERVICE ............................................................................... - 24 -

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Commonwealth v. Benoit*,
196 N.E.2d 228 (1964) ................................................................................................18

*Mellouli v. Lynch*,
575 U.S. 798 (2015) ......................................................................................................12

*People v. Graf*,
261 A.D. 188 (N.Y. App. Div. 1941) ..........................................................................18

*People v. Levy*,
283 A.D. 383 (N.Y. App. Div. 1954) ..........................................................................18

*People v. Seligman*,
35 A.D.2d 591 (1970), *aff'd as modified*, 270 N.E.2d 721 (1971) ..........................18

*United States v. Bash*,
258 F. Supp. 807 (N.D. Ind. 1966), *aff'd sub nom. United States v. Miller*, 379
F.2d 483 (7th Cir. 1967) ...............................................................................................19

*United States v. Bryant*,
556 F. Supp. 2d 378 (D.N.J. 2008) .....................................................................*passim*

*United States v. Cicco*,
938 F.2d 441 (3d Cir. 1991) .........................................................................................12

*United States v. Dwyer*,
238 F. App'x 631 (1st Cir. 2007) ...........................................................................10, 11

*United States v. Gimbel*,
830 F.2d 621 (7th Cir. 1987) .........................................................................................1

*United States v. Grubb*,
11 F.3d 426 (4th Cir. 1993) ..........................................................................................10

*United States v. Lupton*,
620 F.3d 790 (7th Cir. 2010) ......................................................................................8, 9

*United States v. Risk*,
843 F.2d 1059 (7th Cir. 1988) ........................................................................................4

*United States v. Schmitz*,
634 F.3d 1247 (11th Cir. 2011) ....................................................................................10

*United States v. Shaw*,
957 F.3d 734 (7th Cir. 2020) ........................................................................................12

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

**Cases**

*United States v. Tomkins*,
No. 07 CR 227, 2009 WL 590237 (N.D. Ill. Mar. 6, 2009) ....................................................1

*United States v. Williams*,
507 F.3d 905 (5th Cir. 2007) ...............................................................................................10

**Statutes**

5 ILCS 420/3-102 ................................................................................................................21

720 ILCS 5/29A-1 ..........................................................................................................13, 17

720 ILCS 5/29A-2 ..........................................................................................................13, 17

720 ILCS 5/33-1 ..................................................................................................13, 14, 16, 21

720 ILCS 5/33-3(a)(4) ..........................................................................................13, 14, 16, 21

720 ILCS 5/33-4 ..................................................................................................................14

18 U.S.C. § 2 .......................................................................................................................13

18 U.S.C. § 666(a)(2) .....................................................................................................1, 3, 4, 5

18 U.S.C. § 666(c) ..........................................................................................................*passim*

18 U.S.C. § 1952 ............................................................................................................2, 3, 19

18 U.S.C. § 1952(a)(3) ....................................................................................................13, 16

Chicago Municipal Code § 2-156-090(b) ...............................................................................22

Chicago Municipal Code § 2-156-090(c) ...............................................................................22

Chicago Municipal Code § 2-156-142 ...................................................................................15

Chicago Municipal Code § 2-156-142(f) ........................................................................2, 16, 19

**Other Authorities**

Black's Law Dictionary 210 (10th ed. 2014).............................................................................10

Fran Spielman, *New ethics rules put Burke on hot seat: to avoid heft fines, choose
law firm or City Council seat*, Chicago Sun-Times, July 24, 2019, *available at*
https://chicago.suntimes.com/city-hall/2019/7/24/20708489/lightfoot-ethics-
ordinance-burke-indictment-racketeering-law-firm-city-council-fines ...................................22

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**Cases**

Restatement (Third) of Agency § 8.06(1)(a)(ii) ............................................................20

**ARGUMENT IN REPLY**

The government's response confirms that this Court should dismiss Counts Twelve, Thirteen, Fourteen, and Fifteen of the Superseding Indictment (the "Indictment") because the facts alleged, even if proven at trial, would not constitute any crime charged. *United States v. Tomkins*, No. 07 CR 227, 2009 WL 590237, at *2 (N.D. Ill. Mar. 6, 2009) (citing *United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987)).

The key premise of Mr. Cui's motion is undisputed: The Indictment does not allege that Mr. Cui retained Klafter & Burke for his property tax appeal on terms different from those on which he would have retained any other law firm or on terms different from Klafter & Burke's other clients. Nor does the Indictment allege that Mr. Cui offered to pay to Klafter & Burke more than standard fees for a property tax appeal. In other words, if Mr. Burke had received the "thing of value" identified in the Indictment—"fees arising from the retention of Klafter & Burke"—it would only have been as market-rate compensation for services actually rendered. None of this is denied by the government in its response.

These allegations, even if proven, do not constitute a violation of Section 666(a)(2) because Section 666 does not apply to "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). The government's response—that compensation cannot be "bona fide" under Section 666(c) if it is corruptly offered in violation of Section 666(a)(2)—is unsupported by any authority and would render Section 666(c) meaningless.

The government's chief case, *United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008), supports Mr. Cui. Section 666(c) did not apply because there, unlike here, "the payments at issue were allegedly compensation for Bryant's undisclosed, 'primary role' as a legislator on the take" and not "for work pursuant to Bryant's publicly disclosed job description." *Id.* at 427.

-1-

Indeed, *Bryant* expressly rejected the argument (made now by the government) that "the alleged illegal nature of the procurement process" could render a salary "not 'bona fide' and 'in the usual course of business.'" *Id.* at 428. The case distinguished circumstances, like those of the present case, in which a party was given a "totally legitimate job" and "paid only for legitimate work," even if the job was given for allegedly wrongful reasons. *Id.* Far from supporting the government, *Bryant* confirms that offering market-rate compensation for services actually rendered falls squarely within Section 666(c)'s safe harbor. A wealth of authority agrees.

With respect to Section 1952, the Indictment fails to allege a violation (or attempted violation) of any underlying state law. Bribery and official misconduct require that Mr. Cui have offered something Mr. Burke was "not authorized by law to accept." And commercial bribery—even if the statute could be applied to a public official—requires that the City not have consented to Mr. Burke receiving the "benefit."

But the City of Chicago, in its Ethics Ordinance, expressly authorized and consented to Mr. Burke receiving "compensation for services wholly unrelated to the official's or employee's city duties and responsibilities." Chicago Municipal Code § 2-156-142(f). The government misreads this provision, suggesting that Mr. Burke's compensation was impermissibly related to his city duties and responsibilities. Resp. at 80. But under the nearest-reasonable-referent canon, the phrase "wholly unrelated" modifies "services," not "compensation." Here, the Indictment alleges that Mr. Burke was to receive compensation for services ("fees arising from the retention of Klafter & Burke") and that the services (a property tax appeal, Indictment ¶61) were unrelated to Mr. Burke's city duties and responsibilities. Under the City's rules, Mr. Burke's receipt of these fees was perfectly permissible.

Unable to identify any prohibition on Mr. Burke receiving these fees, the government instead relies on a different provision of the Chicago Ethics Ordinance, which allegedly "prohibit[ed] Burke from using his official position to assist Cui, with whom he had a financial relationship through Klafter & Burke." Resp. at 77. But this argument is a non-sequitur. The quoted portion of the Ethics Ordinance did not prohibit the financial relationship, it merely prohibited use of the official position if a financial relationship existed. Nothing in the Ethics Ordinance prohibited Mr. Burke from accepting fees for the retention of Klafter & Burke. To the contrary, it expressly allowed it.

For these reasons, the facts alleged in the Indictment—indirectly offering fees to Mr. Burke through market-rate compensation of Klafter & Burke at standard rates for services actually performed—do not constitute a violation of either Section 666(c) or Section 1952. The government's prosecution of Mr. Cui is unprecedented, and his alleged conduct falls outside the bounds of the statutes under which he is charged. Counts Twelve, Thirteen, Fourteen, and Fifteen should be dismissed.

## I.     Count Twelve: 18 U.S.C. § 666(a)(2)

This Court should dismiss Count Twelve because the section under which Mr. Cui was charged—18 U.S.C. § 666(a)(2)—"does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c).

### A.     This Court should dismiss Count Twelve if the facts alleged in the Indictment do not constitute a violation of Section 666(a)(2).

The government argues that the Indictment should not be dismissed because "whether payments were made or offered in the usual course of business is a question of fact for the jury." Resp. at 63.

To the extent that there are any material disputed facts regarding whether payments were made or offered in the usual course of business, the government is correct that the determination would be made by a jury rather than a court. But at this stage of this case, there are no factual disputes. For the purposes of this motion, Mr. Cui assumes the truth of the allegations in the Indictment. The sole question is whether those facts, if proven, would constitute a crime.[1]

As the motion and response make clear, the sole dispute between the government and Mr. Cui concerns the interpretation of Section 666(c). Mr. Cui contends that whether a payment constitutes "bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business" depends on whether the job itself was legitimate or a sham, *i.e.*, whether the payment was market-rate compensation for work actually performed or (as in the *Bryant* decision) a payment that was truly for influencing a state actor that was merely disguised as a payment for legitimate work. The government does not contend that under this standard, Mr. Cui's retention of Klafter & Burke would have been outside the safe harbor of Section 666(c) (and thus potentially subject to Section 666(a)(2)).

Instead, the government argues that whether payments are "bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business" depends on the motivation or intent of the person acquiring or offering the job. In the language of courts that have considered (and

---

[1] Mr. Cui does not believe this principle to be in dispute. It is unclear why the government (at 68-69) discusses the facts of *United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988), a case that Mr. Cui relied on solely for the principle that an indictment should be dismissed if the facts alleged do not constitute a crime. Mr. Cui does not understand the government to be arguing that the case should proceed to trial even if the facts alleged in the Indictment do not constitute a crime. *United States v. Bryant*, which the government champions, accepted that "there may be situations where it is appropriate to dismiss an Indictment pursuant to § 666(c)." 556 F. Supp. 2d 378, 427 (D.N.J. 2008).

rejected) this theory, the government contends that the "alleged illegal nature of the procurement process" for a job renders compensation "not bona fide" and not "in the usual course of business."

This legal dispute over the meaning of Section 666(c) is fully ripe and suitable for resolution by this Court. If Mr. Cui's interpretation is correct, then the Indictment does not allege a crime, and Count Twelve should be dismissed.

## B. The government's interpretation would render Section 666(c) surplusage.

Although the government never plainly sets forth any proposed interpretation of "bona fide" or "usual course of business," the substance of its arguments is that a payment for a job cannot be "bona fide" or in the "usual course of business" if the job was offered "with corrupt intent . . . to influence [a decisionmaker] in his official capacity." Resp. at 66.

Not only, as discussed below, has such an interpretation never been embraced by any court, but it would render Section 666(c) surplusage. In order to prove a violation of Section 666(a)(2), the government must prove that a defendant "corruptly g[a]v[e], offer[ed], or agree[d] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof." 18 U.S.C. § 666(a)(2). If the government were correct, then any violation of Section 666(a)(2) would, by definition, not involve "bona fide" payments "in the usual course of business." Section 666(c) would be meaningless.

In contrast, Mr. Cui's interpretation properly gives meaning both to Section 666(a)(2) and Section 666(c). The allegations of the Indictment demonstrate the effect of both provisions. Mr. Cui allegedly corruptly offered a thing of value to Mr. Burke with the intent to influence or reward him, which would ordinarily state a violation of Section 666(a)(2). But because the alleged thing of value—"fees from the retention of Klafter & Burke"—was an offer to pay market rate on ordinary terms for work actually performed, it was an offer of "bona fide . . . fees . . . in the usual course of business" and thus Section 666 does not apply because of Section 666(c).

-5-

The government may disagree with this result as a policy matter, but it follows from the plain text of Section 666(c).

C.     **The government's interpretation of Section 666(c) is unsupported by any authority; its principal case rejects its argument and supports Mr. Cui.**

Unsurprisingly, no case—ever—has embraced the government's "illegal procurement" theory of Section 666(c). The government's response discusses only a single case that it contends involves "similar facts": *United States v. Bryant*, 556 F.Supp.2d 378 (D.N.J. 2008). Far from supporting the government, the case strongly supports Mr. Cui.

Although the facts of *Bryant* were similar, they were not identical, and the differences between *Bryant* and this case mandate a different outcome. Critically, *Bryant*—unlike this case— involved a sham job. *Id.* at 386. The state legislator's "primary role . . . was to use his official position to advocate . . . and to provide official assistance in obtaining state funds," but the publicly-disclosed job description falsely "state[d] that his job was to 'improve University communications, image, receptivity, and relationships with local governments, community and civic organizations and local residents.'" *Id.* Bryant was not offered a salary as compensation for work; he was offered a salary in exchange for his legislative actions: "The Indictment alleges that Bryant and Gallagher had a quid pro quo bribery arrangement, whereby Bryant exercised discretion in his official capacity as a state legislator favorably towards SOM in exchange for a salary from SOM." *Id.* at 387; *accord id.* at 389 ("[I]t is alleged that Bryant's 'primary role' at SOM was to use his official position as a state legislator to advocate on behalf of SOM and assist SOM in obtaining state funds[.]").

These facts are why the *Bryant* court concluded that Section 666(c) did not apply: "Since the payments at issue were allegedly compensation for Bryant's undisclosed, 'primary role' as a legislator on the take, rather than simply for work pursuant to Bryant's publicly disclosed job

description, it cannot be argued with a straight face that the payments were 'bona fide' salary paid in the 'usual course of business[.]'" *Id.* at 427. Here, in contrast, the Indictment alleges only that Mr. Cui offered to pay Klafter & Burke for work pursuant to its job as his attorneys.

Indeed, *Bryant* expressly rejects the theory urged by the government: that the "procurement process" for a legitimate job renders the salary not "bona fide": "The reason why Bryant's salary is not 'bona fide' and 'in the usual course of business' is not because of the alleged illegal nature of the procurement process." *Id.* at 428. *Bryant* distinguished an earlier decision because in that case, the allegations "were consistent with the possibility that, once the bribers were hired, the salary at issue was paid only for legitimate work, leaving the procurement process as the only reason to claim their salary was not 'bona fide.'" *Id. Bryant* expressly acknowledges that if Bryant had "an otherwise totally legitimate job . . . , a different result might follow." *Id.*

That "different result" should follow here. The Indictment does not allege that Mr. Cui offered to pay Klafter & Burke for anything other than legitimate work. The reason for hiring a law firm is very different than the reason for paying fees to that firm. Under the reasoning of *Bryant*, which both Mr. Cui and the government agree that this court should follow, the fees offered to Klafter & Burke fit squarely within the safe harbor of Section 666(c).

One could, of course, hypothesize circumstances in which a party retained a law firm on terms that were not bona fide or in the ordinary course of business. Imagine, for example, that Mr. Cui had agreed to pay Klafter & Burke a contingent fee that was double the rate charged by other firms (or by Klafter & Burke to its other clients). Or Mr. Cui might have agreed to pay a substantial fixed fee (perhaps for the entire value of the property) in addition to the standard contingency rate. In such circumstances, a factfinder might have a basis to conclude (as in *Bryant*) that the compensation was paid in part for legitimate work and in part to influence Mr. Burke and thus not

"bona fide" and "in the ordinary course of business." But none of that has occurred here. The Indictment does not allege that Mr. Cui's retention of Klafter & Burke was in any way a sham or outside the ordinary terms for property tax appeals. Section 666(c) thus applies.

### D. The government misreads *Lupton*, which also supports Mr. Cui.

Nor does *United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010), support the government's "procurement" theory. To the contrary, *Lupton*—like every other case—supports Mr. Cui's position that whether payment is bona fide and in the usual course of business turns on the terms of the payment. There, the defendant contended that he was not requesting an illegal kickback but instead "wanted to engage in . . . legitimate 'commission splitting' permitted by Wisconsin law." *Id.* at 802; *see also id.* (noting that the argument that "the discussions . . . were in his view proposals for a bona fide business transaction").

The Seventh Circuit held that the "unusual maneuvering" was evidence from which the factfinder could infer that the requested payment was not a true commission split (i.e., not bona fide or in the usual course of business). *See id.* ("[T]he record here is replete with evidence supporting the finding that this particular 'split' was neither bona fide nor sought in the ordinary course of business. Foremost, when discussing the payment with Silverstein, Lupton never referred to the 'hypothetical' payment as a 'split,' and always emphasized that it was for him alone."); *id.* ("As the government points out in its brief, '[c]ash payments, payments to sham companies, and mischaracterization of payments are hallmarks of concealment and fraud.'"); *id.* ("[T]he receipt of cash (or payment to a defunct corporation) would not generally be part of a legitimate commission split."). *Lupton* involved a genuine dispute over whether the payment was a commission split of the type that is paid within the ordinary course of business.

The "maneuvering" the government refers to in its brief (at 64-65) was evidence relevant to this dispute, but the case does not hold that wrongful procurement of a legitimate commission

split would be outside the scope of Section 666(c). If the government were correct, then *Lupton*'s discussion of how commission splits are typically paid and solicited was unnecessary because improper motive, alone, would have rendered any payment outside the ordinary course of business.

*Lupton*'s analysis is straightforward and correct. For example, imagine that an individual offered to retain Klafter & Burke for a property tax appeal at a 60% contingency fee plus a success bonus. If the individual argued that these terms were just typical fees that would be paid in the usual course of business in a property tax appeal, the government would respond that the offer was excessive (i.e., not the typical terms on which property tax appeals are handled and thus not in the usual course of business). In these circumstances, the individual's alleged motivation for hiring Klafter & Burke (e.g., to influence Mr. Burke) and the circumstances surrounding the retention would be relevant evidence that a factfinder might consider in evaluating whether the terms were truly ordinary commercial arrangements.

But here, the Indictment is fully consistent with the fact that the terms on which Mr. Cui retained Klafter & Burke are ordinary, typical, and consistent with the terms on which clients regularly retain law firms in property tax appeals. The government does not argue otherwise, and the Indictment does not allege what was proved in *Lupton*.

### E. The government's interpretation of Section 666(c) is unsupported by any authority.

In truth, no court has ever adopted the government's excessively narrow interpretation of the safe harbor in Section 666(c). Nor does any other authority support the interpretation.

### 1. Every case to consider Section 666(c) has considered whether the payment were made for work actually performed.

Like *Bryant*, every other case discussing Section 666(c) has concluded that payments were not bona fide salary because the payments were for work not actually performed:

- "[The defendant] performed little or no work, generated virtually no services or work product, and rarely showed up at Program offices. . . . Schmitz's job performance was almost non-existent." *United States v. Schmitz*, 634 F.3d 1247, 1251, 1264 (11th Cir. 2011).

- "A reasonable jury could conclude that Williams's 'advance' paychecks were actually extra payments for work she had not performed and therefore were not part of her bona fide salary." *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007).

- "The evidence taken in the light most favorable to the government showed he was paid repeatedly for weeks he did not work.  Illingsworth was paid on days when he was out due to injury, and he continued to be paid after he stopped working.  A reasonable jury could find that the payments to Illingsworth were not made in the usual course of business and thus were not bona fide. . . . [T]o the extent the payments were, as was argued, not intended as wages for work actually performed but reflected some kind of informal and unauthorized compensatory time reimbursement, they were also not bona fide wages." *United States v. Dwyer*, 238 F. App'x 631, 647–48 (1st Cir. 2007).

- "Tomblin received a salary, along with social security, retirement, and other benefits, but he performed little work for the Sheriff's office, he did not 'perform functions for the sheriff's office on a regular basis.'" *United States v. Grubb*, 11 F.3d 426, 430–31 (4th Cir. 1993).

In every case, the salary was not in the unusual course of business because it was paid for work not actually performed.  And the salary was not bona fide because it was falsely represented to be for legitimate work.  *See* Black's Law Dictionary 210 (10th ed. 2014) (defining "bona fide" as "in good faith; without fraud or deceit").

### 2. *United States v. Mills* confirms Mr. Cui's interpretation.

Compensation for legitimate work actually performed is within Section 666(c)'s safe harbor.  In *United States v. Mills*, the defendants obtained deputy sheriff positions through allegedly illicit means.  140 F.3d 630, 633 (6th Cir. 1998).  The government made the same argument there that it makes here, contending that "the salaries . . . could not have been bona fide because of the illegal nature of the employment procurement process."  *Id.*  The Sixth Circuit

correctly rejected this argument, holding that the relevant inquiry was not the motive for hiring but whether the "salaries" were "properly earned":

> [T]he indictment does not allege that the jobs in question were unnecessary or that the individuals who obtained those employment positions did not responsibly fulfill the duties associated with their employment. In the absence of such allegations, the government has no support for its claims that the salaries paid to the deputy sheriffs were not properly earned "in the usual course of business.
>
> Congress also saw fit to exclude from the reach of the federal statute those individuals and those transactions that involved only the payment of bona fide salaries, wages, fees, and other compensation. In this case, the government failed to allege that the salaries received by individuals who paid bribes to obtain employment positions within the Shelby County government were unnecessary or unjustified.

*Id.* at 634.

The Sixth Circuit's reasoning should be followed by this Court. The Indictment does not allege that the work performed by Klafter & Burke was unnecessary or that Mr. Cui would have paid Klafter & Burke's fees had the firm not responsibly fulfilled its duties. The government fails to allege that Mr. Cui offered to pay unnecessary or unjustified fees. Indeed, the Indictment alleges that Mr. Cui "signed a contingent fee agreement with Klafter & Burke" and would "pay Klafter & Burke a fee for its work, based on a specified percentage of any tax reduction obtained." Indictment 25. Under a contingency arrangement. Klafter & Burke would be paid only for its work and only if that work was successful. Following *Mills*, this Court should recognize that the contingent fees that Mr. Cui offered to pay Klafter & Burke are covered by Section 666(c).

In contrast to the wealth of authority supporting Mr. Cui, the government offers nothing— not a single case, law dictionary, article, or treatise—that supports its interpretation of Section 666(c).

### 3. The government's argument that "hiring" must be in the usual course of business has no support in the statute.

Portions of the government's argument conflict with the plain text of the statute. The government frames the inquiry as whether "[Cui's] hiring of Klafter & Burke was . . . bona fide or sought in the ordinary course of business," Resp. at 65; *see also* Resp. at 66 (whether "Cui's offer to hire Klafter & Burke was . . . made in the usual course of business").

But this argument misreads the statute, which says nothing about whether an "offer" or "hiring" must be in the usual course of business.[2] Subsection (c) provides that Section 666 does not apply to any "bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business." 18 U.S.C. § 666(c). Under the nearest-reasonable-referent canon, "a modifier refers to the nearest reasonable referent." *United States v. Shaw*, 957 F.3d 734, 739 (7th Cir. 2020); *see also, e.g.*, *Mellouli v. Lynch*, 575 U.S. 798 (2015) (applying the canon); Reading Law: The Interpretation of Legal Texts, Antonin Scalia & Bryan Garner (2012), § 20 (Nearest-Reasonable-Referent Canon) (explaining that the canon applies when "the syntax involves something other than a parallel series of nouns or verbs" and states that "a prepositive or postpostive modifier normally applies only to the nearest reasonable referent."). In this statute, the nearest reasonable referent for "in the usual course of business" is "paid."[3]

The sole question is thus whether any payment to Klafter & Burke would have been in the usual course of business. (As established above, it would have been.) Whether Mr. Cui's hiring of Klafter & Burke was within the usual course of business is irrelevant to Section 666(c).

---

[2] The government's "wrongful hiring" theory is precisely what *Bryant* and *Mills* rejected.

[3] Technically, the preceding commas would indicate that the phrase applies both to the "bona fide salary . .. paid" and "expenses paid or reimbursed" clauses. *See* Reading Law § 23 (Punctuation Canon) ("Punctuation in a legal text will rarely change the meaning of a word, but it will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part."). In applying the modifier to each of these clauses, the modifier would apply to the nearest reasonable referent.

There is no reason to adopt the government's interpretation, which would nullify Section 666(c), but even if the statute were ambiguous, "[c]riminal statutes, like § 666, must be construed narrowly." *United States v. Cicco*, 938 F.2d 441, 446 (3d Cir. 1991). This prosecution is unprecedented. We have located no case in which the "thing of value" under Section 666(c) was market-rate compensation for legitimate and necessary work actually performed, and the government identifies none. Under Mr. Cui's interpretation of Section 666(c), which is consistent with that of every court to consider the statute, the facts alleged in the Indictment do not constitute a violation of Section 666. Count Twelve should be dismissed.

## II.     Counts Thirteen, Fourteen, and Fifteen: 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2.

Counts Thirteen, Fourteen, and Fifteen of the Indictment fail to allege facts that would constitute a violation of 18 U.S.C. § 1952(a)(3) because they fail to allege a violation (or attempted violation) of any underlying state law. The government acknowledges that these counts require proof that Mr. Cui "perform[ed] or attempt[ed] to perform unlawful activity" and that the "'unlawful activity' alleged in the superseding indictment is the violation of the following four Illinois bribery statutes: 720 ILCS 5/33-1 (Bribery); 720 ILCS 5/33-3(a)(4) (Official Misconduct); 720 ILCS 5/29A-1 (Commercial Bribery); and 720 ILCS 5/29A-2 (Commercial Bribe Receiving)." Resp. at 72-73.

Because the facts alleged in the Indictment do not constitute unlawful activity under Illinois law, these counts should be dismissed.

### A.     The Indictment Fails to Allege Unlawful Conduct Under 720 ILCS 5/33-1 or 720 ILCS 5/33-3(a)(4) Because Burke Was Authorized By Law to Receive Legal Fees.

As Mr. Cui explained in his Motion to Dismiss, the Indictment fails to allege unlawful conduct under Section 5/33-1 and Section 5/33-3(a)(4) because Mr. Cui did not promise or tender

anything that Mr. Burke was not authorized by law to accept. The Chicago Ethics Ordinance did not prohibit receipt of these fees (and, to the contrary, expressly permitted it).

As the government correctly acknowledges, "the question of whether a payment is 'authorized by law' is in most cases a legal one to be determined by the court, not the jury." Resp. at 76.

The government first begs the question, arguing that Mr. Burke could not have been authorized by law to accept the fees because they were a "bribe." Resp. at 76. But the whole dispute between the government and Mr. Cui in this motion is whether the fees were an illegal bribe or a perfectly lawful offer to pay Klafter & Burke market-rate compensation for handling a tax appeal. The government cannot evade this inquiry with circular reasoning, relying on the assumption that the fees were a bribe to prove that the fees were an illegal bribe under 720 ILCS 5/33-1 or 720 ILCS 5/33-3(a)(4).

### 1. The government discusses the wrong portion of the Ethics Ordinance.

When it attempts to show (as it must) that the fees were not authorized under the Chicago Ethics Ordinance, the government relies on the wrong portion of the Ethics Ordinance. Under both statutes, the government must show that Mr. Burke was "not authorized by law to accept" the fees. 720 ILCS 5/33-1; 720 ILCS 5/33-4. The sole question is whether acceptance of the fees was unauthorized.

But rather than address whether Mr. Burke was authorized to accept fees, the government addresses an entirely different question: After Klafter & Burke was retained, what actions was Mr. Burke permitted to take on behalf of Mr. Cui? According to the government, "the City of Chicago Governmental Ethics Ordinance . . . did, in fact, prohibit Burke from using his official position to assist Cui, with whom he had a financial relationship through Klafter & Burke." Resp. at 77; *see also* Resp. at 77–79 (discussing what actions Mr. Burke was permitted to take). Mr. Cui takes no

position on whether "[t]he Ethics Ordinance plainly prohibited Burke from contacting these city officials," a question that is irrelevant to whether Mr. Burke was authorized to receive fees from Mr. Cui paying Klafter & Burke for a property tax appeal.

Consider, for example, a rule that a judge or law clerk must recuse if she is married to one of the attorneys in a case. If this rule were violated, then working on the case would be wrongful, but such a rule would not make the marriage itself unlawful or render the marriage "not authorized by law." The same is true here. Whether Mr. Burke violated rules regarding what he was permitted to do after Mr. Cui retained Klafter & Burke has no bearing on whether Mr. Cui hiring the firm was "authorized by law."

### 2. The government does not address the only portion of the Ethics Ordinance governing what city officials may accept.

As Mr. Cui explained in his Motion to Dismiss (at 15-16), the provision of the Ethics Ordinance that governs what may be accepted by city officials, such as Mr. Burke, is Section 2-156-142, which prohibits accepting "any anonymous gift" or "any gift of cash, gift card or cash equivalent." Chicago Municipal Code § 2-156-142. This section defines precisely what a city official is (and is not) authorized by law to accept.

But as Mr. Cui explained, the legal fees that he offered to pay Klafter & Burke in exchange for the firm's work on his property appeal do not fall within the Ethics Ordinance's definition of "gift." Mot. at 16.

To its credit, the government does not argue otherwise. Its response does not contend that the fees offered to Klafter & Burke constituted a "gift." Indeed, the prohibition on receiving gifts found in Section 2-156-142 goes entirely unmentioned by the government. It is thus undisputed that the legal fees offered to Klafter & Burke were not "gifts" and did not violate the prohibition on "acceptance" in Chicago Municipal Code § 2-156-142.

The government does not show that Mr. Burke was "not authorized by law to accept" the fees. The facts alleged in the Indictment do not constitute a violation (or attempted violation) of 720 ILCS 5/33-1 or 720 ILCS 5/33-3(a)(4) and thus do not constitute a violation of 18 U.S.C. § 1952(a)(3).

### 3.     The government misreads the authorization in the Ethics Ordinance.

The government also misreads the express authorization for city officials to receive compensation from outside employment: "[N]othing in this section shall prevent an official or employee . . . from accepting compensation for services wholly unrelated to the official's or employee's city duties and responsibilities and rendered as part of his or her non-city employment, occupation or profession." Chicago Municipal Code § 2-156- 142(f).

The government misreads the phrase "wholly unrelated to the official's or employee's city duties" as modifying the word "compensation." *See* Resp. at 80 ("Burke was permitted under the Ethics Ordinance to receive compensation for his work as an attorney, so long as it was wholly unrelated to his official duties; but, here, the compensation that Cui offered to Burke through his law firm and that Burke accepted was not unrelated to his official duties."). This mistake is the basis for all the government's arguments. Resp. at 79–80.

But under the nearest-reasonable-referent canon, discussed above, the "wholly unrelated" modifier applies to "services," not "compensation." Correctly read, the Chicago Ethics Ordinance allows city officials to receive: (1) compensation for services (2) if those services are (a) wholly unrelated to the official's city duties and responsibilities and (b) rendered as part of the official's non-city profession. Chicago Municipal Code § 2-156- 142(f). The City's authorization does not depend on whether the compensation is related to a city official's duties.

Here, the plain text of the Ethics Ordinance authorized Mr. Burke to receive fees. The only thing allegedly offered by Mr. Cui to Mr. Burke was fees that Mr. Burke would receive through

Klafter & Burke as compensation for services performed by Klafter & Burke in Mr. Cui's property tax appeal. And it is undisputed that these services performed by Klafter & Burke—representing Mr. Cui in a property tax appeal—were wholly unrelated to Mr. Burke's city duties and responsibilities and rendered as part of his non-city profession. The City of Chicago thus expressly authorized Mr. Burke to receive these fees.

The government does not argue that under the correct reading of the statute, Mr. Burke was not authorized by law to accept anything that Mr. Cui offered.

**B.    The Indictment Fails to Allege Unlawful Conduct Under the Commercial Bribery Statutes.**

The Indictment fails to allege conduct constituting an offense under the commercial bribery statutes, 720 ILCS 5/29A-1 and 720 ILCS 5/29A-2 because (1) both statutes concern "commercial bribery," not bribery of public officials; and (2) the City of Chicago, through its Ethics Ordinance, consented to Mr. Burke's receipt of compensation for outside employment.

**1.    The government admits that its attempt to apply the Illinois commercial bribery statutes to misconduct involving a public official is unprecedented.**

The government concedes that its effort to apply these Illinois statutes to conduct involving a public official is unprecedented. Resp. at 82 n.17. As Mr. Cui explained, the ordinary meaning of "commercial bribery" is that it involves private persons, Mot. at 19, and no reported Illinois case has ever applied the commercial bribery statutes to public officials.

Indeed, the commercial bribery statutes appear in an entirely separate part of the Illinois Code from bribery of a public official. Article 29a—"Commercial Bribery"—appears in Part III, "Offenses Affecting Public Health, Safety, and Decency." But Article 33—"Official Misconduct"—appears in Part IV, "Offenses Affecting Government Functions." This is a strong

indication that the commercial bribery statutes do not include offenses affecting government functions, like those Mr. Cui is accused of committing.

The law in other states is mixed. New York courts have held that the state's commercial bribery statute cannot apply to conduct governed by a more specific bribery statute. *E.g.*, *People v. Levy*, 283 A.D. 383, 384 (N.Y. App. Div. 1954) (commercial bribery statute "not applicable to bribery of a referee in games or sports," which is governed by a more specific statute); *People v. Graf*, 261 A.D. 188, 189 (N.Y. App. Div. 1941) (commercial bribery statute not applicable to bribery of a representative of a labor union, which is governed by a more specific statute).

The government misreads *People v. Seligman*, 35 A.D.2d 591, 593, (1970), *aff'd as modified*, 270 N.E.2d 721 (1971), inadvertently proving Mr. Cui's point. The government asserts that the case is distinguishable because the New York statute "relate[d] only to 'commercial fraud' committed by employees of a Private business," Resp. at 85, but the government quotes the court's conclusion, not the statute itself. *Seligman* reached that conclusion because the New York statute was—like the Illinois statutes here—a commercial bribery statute. Under *Seligman*'s reasoning, the Illinois commercial bribery statute does not apply to misconduct involving a public official— it "relates only to 'commercial fraud' committed by employees of a private business." The case is indistinguishable.

As the government acknowledges, Massachusetts similarly "held that a governmental bribery statute, rather than the commercial bribery statute" applied to alleged bribery of public officials. Resp. at 84-85 (describing *Commonwealth v. Benoit*, 196 N.E.2d 228, 230 (1964)). The government calls this case "distinguishable" but fails to explain why or how it can be distinguished.

It is true, as the government argues, that some states have reached other conclusions. Resp. at 83–84 (discussing the law of Pennsylvania, Michigan, and North Carolina). But criminal statutes must be construed narrowly, and any ambiguity must be resolved in favor of Mr. Cui.

Moreover, "the language of Title 18 U.S.C. § 1952 requires a specific intent to promote or facilitate the violation of state law." *United States v. Bash*, 258 F. Supp. 807, 809 (N.D. Ind. 1966), *aff'd sub nom. United States v. Miller*, 379 F.2d 483 (7th Cir. 1967). Given the serious, open questions regarding whether Illinois' commercial bribery statutes could even apply to Mr. Cui's interactions with Mr. Burke, the government necessarily cannot demonstrate that Mr. Cui had the "specific intent" to violate these laws.

### 2. The City of Chicago expressly consented to Mr. Burke receiving compensation for services so long as those services were unrelated to his city duties or responsibilities.

Moreover, even if the commercial bribery statutes could apply, the facts alleged in the Indictment would not violate them (or constitute an attempt to violate them) because the Indictment does not allege that Mr. Cui offered (or Mr. Burke agreed to accept) anything without the consent of the City of Chicago. The City of Chicago expressly permitted its aldermen to maintain outside employment, and it expressly allowed them to receive compensation for that outside employment, so long as the services were "wholly unrelated to the official's or employee's city duties and responsibilities and rendered as part of his or her non-city employment, occupation, or profession." Chicago Municipal Code § 2-156-142(f).

The government essentially argues that this provision is meaningless for purposes of "consent," apparently suggesting that the City could not generally consent to its aldermen receiving compensation from outside employment because it was required to consent on a transaction-by-transaction basis. Resp. at 87. But there is no reason that a city could not—as the City of Chicago did—generally consent to its officials receiving a certain type of benefit.

Even assuming that the civil rules of the Restatement (Third) of Agency had any relevance in this context, Resp. at 87, these rules demonstrate that the City's consent was effective. The government's sole argument is that "[n]either Cui nor Burke disclosed that Cui hired Burke's law firm in order to get a financial benefit in his dealings with the City." Resp. at 87. But the Restatement (Third) makes clear that disclosure is unnecessary when the principal "has manifested that such facts are already known by the principal or that the principal does not wish to know them." Restatement (Third) of Agency § 8.06(1)(a)(ii). The same rule is found in the Restatement (Second) of Agency. *See id.* § 390 (requiring disclosure "unless the principal has manifested that he knows such facts or that he does not care to know them"). This "does not wish/care to know" standard is precisely what allows a principal to provide broad, categorical consent in advance, without needing to know the details of any particular transaction. Here, the City's unqualified permission for its officials to receive outside compensation for services wholly unrelated to city duties confirms that it consented without wishing or caring to know the details of the specific transactions giving rise to its officials' outside compensation.

The citations to the Restatement (Third) of Agency and cases about an employer consent are also misplaced because this is not a civil suit concerning the relationship between an employer and employee—it is a criminal prosecution of an elected official. The government cites no authority for the proposition that civil principles of agency in the employer/employee context apply in criminal matters involving a municipality and an elected official. This is yet more evidence that using the general commercial bribery statute as an end-run around the specific bribery statutes applying to municipal officials is improper

The government's consent argument would also be unworkable practically. If the government were correct, then to be safe, city officials seeking to practice law would have to seek

permission from the City on a representation-by-representation basis. But this is not the approach taken by the City, which allowed an aldermen to practice law and be retained without seeking permission each representation but required aldermen to recuse from matters in which they had a financial interest. The government may disagree with this system, but it was well within the City's discretion. Under the facts alleged in the Indictment, the government cannot show that Mr. Cui offered anything to Mr. Burke without the City of Chicago's consent.

### C.    Amendments to the Ethics Ordinance confirm that the City authorized (and consented to) Mr. Burke receiving fees from the retention of Klafter & Burke.

One may, of course, quarrel with this result as a policy matter. The City of Chicago could easily have enacted a blanket prohibition on city official receiving anything intended to influence them. The Illinois Legislature has done so: a state legislator may not "accept any economic opportunity, under circumstances where he knows or should know that there is a substantial possibility that the opportunity is being afforded him with intent to influence his conduct in the performance of his official duties." 5 ILCS 420/3-102.

But the City of Chicago had not—at the time of the acts at issue in this case—enacted any similar provision. The Illinois Legislature's prohibition is clear and straightforward. It expressly governs what a legislator may "accept," and it applies broadly, to "any economic opportunity." Such a rule plainly governs what is "authorized" under 720 ILCS 5/33-1 or 720 ILCS 5/33-3(a)(4), and provides fair notice to everyone—legislators and constituents alike—of what may and not be offered. The City of Chicago had not adopted a similar prohibition, and the government errs by asking this Court to read one into the Chicago Ethics Ordinance.

If there were any remaining doubt that the City authorized and consented to Mr. Burke's receipt of fees, it is resolved by the subsequent amendments to the Chicago Ethics Ordinance. After news of this Indictment became public, the City of Chicago amended its Ethics Ordinance.

The current version expressly forbids elected officials from deriving any income or compensation from representing any person in property tax appeals:

> No elected official or employee may represent or derive any income, compensation or other tangible benefit from the representation of, any person in any judicial, quasi-judicial or other proceeding before any administrative agency or court: (i) in which the City is an adverse party; or (ii) that may result in an adverse effect on city revenue, city finances, or the health, safety, welfare or relative tax burden of any city residents.

Chicago Municipal Code § 2-156-090(b). And it expressly forbids elected officials to "derive any income or compensation from lobbying" any "unit of local government in the State." Chicago Municipal Code § 2-156-090(c); *see also id.* § 2-156-010(p) (defining "lobbying" to include "undertak[ing] to influence any legislative or administrative action"). These changes were "tailored to prevent Burke from doing what he's done for decades." Fran Spielman, *New ethics rules put Burke on hot seat: to avoid heft fines, choose law firm or City Council seat*, Chicago Sun-Times, July 24, 2019, *available at* https://chicago.suntimes.com/city-hall/2019/7/24/20708489/lightfoot-ethics-ordinance-burke-indictment-racketeering-law-firm-city-council-fines (last visited August 15, 2021).

The fact that the City of Chicago was required to amend its Ethics Ordinance to prohibit Alderman Burke's alleged acts provides strong confirmation that at the time of the acts at issue, the Ethics Ordinance permitted Mr. Burke to receive legal fees for Mr. Cui's retention of Klafter & Burke.

## CONCLUSION

For these reasons, Mr. Cui respectfully renews his request that this Court dismiss Counts Twelve, Thirteen, Fourteen, and Fifteen of the Superseding Indictment as they relate to Defendant Charles Cui.

Dated:  August 20, 2021

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *Tinos Diamantatos*

Tinos Diamantatos
Megan R. Braden
Alex D. Berger
77 West Wacker Drive
Chicago, IL  60601-5094
Telephone: +1.312.324.1000
Facsimile: +1.312.324.1001
tinos.diamantatos@morganlewis.com
megan.braden@morganlewis.com
alex.berger@morganlewis.com

William R. Peterson
Catherine L. Eschbach
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: +1.713.890.5000
Facsimile: +1.713.890.5001
william.peterson@morganlewis.com
catherine.eschbach@morganlewis.com

Counsel for Defendant Charles Cui

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed on August 20, 2021 using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Tinos Diamantatos*